# EXHIBIT B



**LOAN AGREEMENT**

dated as of
October 29, 2021

between

**KPM INVESTMENT A 2 LLC**,
as Borrower

and

**COREVEST AMERICAN FINANCE LENDER LLC**,
as Lender

CAF Large Balance Loan Agreement
Rev. 4/14/16
#49332641_v1

**TABLE OF CONTENTS**

**Page**

ARTICLE I     DEFINITIONS ...........................................................................................1
    Section 1.1   Defined Terms ...................................................................................1
    Section 1.2   Additional Definitions ...................................................................13

ARTICLE II     GENERAL TERMS...............................................................................13
    Section 2.1   The Loan .........................................................................................14
    Section 2.2   Interest and Principal .....................................................................14
    Section 2.3   Method and Place of Payment ......................................................15
    Section 2.4   Increased Costs ..............................................................................15
    Section 2.5   Taxes................................................................................................15
    Section 2.6   Closing Fee......................................................................................15
    Section 2.7   ACH Payment..................................................................................15

ARTICLE III     PREPAYMENT; PROPERTY RELEASES ...........................................16
    Section 3.1   Voluntary Prepayment ...................................................................16
    Section 3.2   Condemnation .................................................................................16
    Section 3.3   Casualty ..........................................................................................16
    Section 3.4   [Reserved.] ......................................................................................16
    Section 3.5   Property Releases............................................................................16
    Section 3.6   REMIC Savings Clause ..................................................................18
    Section 3.7   Prepayment Requirements..............................................................18

ARTICLE IV     LOAN RESERVES.................................................................................18
    Section 4.1   Tax Reserve .....................................................................................18
    Section 4.2   Insurance Reserve...........................................................................19
    Section 4.3   Capital Expenditure Reserve..........................................................19
    Section 4.4   Reserve Funds Generally ...............................................................19
    Section 4.5   Security Interest..............................................................................20
    Section 4.6   Holdback Reserve ...........................................................................20

ARTICLE V     REPRESENTATIONS .............................................................................20
    Section 5.1   Organization....................................................................................20
    Section 5.2   Authorization; Capacity.................................................................20
    Section 5.3   No Conflicts ....................................................................................20
    Section 5.4   Consents ..........................................................................................20
    Section 5.5   Enforceable Obligations.................................................................21
    Section 5.6   Payment of Taxes ...........................................................................21
    Section 5.7   Compliance with Law ....................................................................21
    Section 5.8   ERISA ..............................................................................................21
    Section 5.9   Investment Company Act................................................................21
    Section 5.10   Other Debt ......................................................................................21
    Section 5.11   Litigation.........................................................................................21
    Section 5.12   Leases; Material Agreements.........................................................21

i

Section 5.13    **Full and Accurate Disclosure**........................................................22
Section 5.14    **Financial Condition** .....................................................................23
Section 5.15    **Use of Loan Proceeds** ..................................................................23
Section 5.16    **Labor Matters** ..............................................................................23
Section 5.17    **Title**................................................................................................23
Section 5.18    **No Encroachments** .......................................................................23
Section 5.19    **Physical Condition** .......................................................................23
Section 5.20    **Fraudulent Conveyance**................................................................23
Section 5.21    **Management** ..................................................................................24
Section 5.22    **Condemnation** ..............................................................................24
Section 5.23    **Utilities and Public Access**...........................................................24
Section 5.24    **Assessments** .................................................................................24
Section 5.25    **No Joint Assessment** ....................................................................24
Section 5.26    **Separate Lots**................................................................................24
Section 5.27    **Permits; Certificate of Occupancy** .............................................24
Section 5.28    **Flood Zone** ...................................................................................24
Section 5.29    **Insurance** ......................................................................................25
Section 5.30    **Federal Trade Embargos** .............................................................25
Section 5.31    **Survival** ........................................................................................25

**ARTICLE VI    AFFIRMATIVE COVENANTS**........................................................25
Section 6.1    **Existence; Licenses; Tax Status**...................................................25
Section 6.2    **Maintenance of Properties** ..........................................................25
Section 6.3    **Compliance with Legal Requirements** ........................................26
Section 6.4    **Taxes, Other Charges and Other Claims** ...................................26
Section 6.5    **Access to Properties.** ...................................................................26
Section 6.6    **Cooperate in Legal Proceedings** .................................................27
Section 6.7    **Security Deposits** .........................................................................27
Section 6.8    **Plan Assets, etc** ............................................................................27
Section 6.9    **Management of Collateral.**............................................................27
Section 6.10    **Notice of Material Event** .............................................................28
Section 6.11    **Financial Reporting** .....................................................................28
Section 6.12    **Other Reports**...............................................................................29
Section 6.13    **Insurance** ......................................................................................30
Section 6.14    **Casualty** ........................................................................................31
Section 6.15    **Condemnation** ..............................................................................31
Section 6.16    **Restoration**...................................................................................32
Section 6.17    **Compliance with Material Agreements** .......................................34
Section 6.18    **Prohibited Persons** .......................................................................34
Section 6.19    **Notice to Tenant** ...........................................................................34
Section 6.20    **Special Purpose Entity**..................................................................34

**ARTICLE VII    NEGATIVE COVENANTS** ...............................................................34
Section 7.1    **Liens on the Collateral**.................................................................34
Section 7.2    **Ownership**.....................................................................................34
Section 7.3    **Leases** ...........................................................................................35
Section 7.4    **Transfers**.......................................................................................35

ii

**Section 7.5**    **Debt** ................................................................................35
**Section 7.6**    **Dissolution; Merger or Consolidation**....................................35
**Section 7.7**    **Change in Business** ............................................................35
**Section 7.8**    **Affiliate Transactions** .........................................................35
**Section 7.9**    **Jurisdiction of Formation; Name** ........................................35
**Section 7.10**    **Modifications and Waivers** ...............................................35
**Section 7.11**    **ERISA** ...............................................................................35
**Section 7.12**    **Advances and Investments**................................................36
**Section 7.13**    **Zoning and Uses** ...............................................................36
**Section 7.14**    **Waste**.................................................................................36

**ARTICLE VIII    DEFAULTS** ..................................................................36
**Section 8.1**    **Event of Default**.................................................................36
**Section 8.2**    **Remedies** ...........................................................................38
**Section 8.3**    **Duration and Cure of Events of Default** ..............................39

**ARTICLE IX    MISCELLANEOUS** .........................................................39
**Section 9.1**    **Notices** ..............................................................................40
**Section 9.2**    **Preferences; Waiver of Marshalling of Assets** .....................40
**Section 9.3**    **Remedies of Borrower** ........................................................40
**Section 9.4**    **Brokers and Financial Advisors** ..........................................41
**Section 9.5**    **General Indemnity; Payment of Expenses** ...........................41
**Section 9.6**    **Schedules and Exhibits Incorporated** ..................................42
**Section 9.7**    **Successors** .........................................................................42
**Section 9.8**    **Modification, Waiver in Writing**.........................................42
**Section 9.9**    **Severability** ........................................................................42
**Section 9.10**    **Offsets, Counterclaims and Defenses** ................................42
**Section 9.11**    **No Joint Venture**................................................................43
**Section 9.12**    **Conflict; Construction of Documents**..................................43
**Section 9.13**    **Counterparts** .....................................................................43
**Section 9.14**    **No Third-Party Beneficiaries**..............................................43
**Section 9.15**    **Right of Set-Off** .................................................................43
**Section 9.16**    **Servicer** .............................................................................43
**Section 9.17**    **Exculpation of Lender** ........................................................43
**Section 9.18**    **PATRIOT Act Records** ........................................................44
**Section 9.19**    **Prior Agreements** ..............................................................44
**Section 9.20**    **Governing Law**...................................................................44
**Section 9.21**    **Trial by Jury**......................................................................44
**Section 9.22**    **Delay Not a Waiver**............................................................44
**Section 9.23**    **Rules of Construction** ........................................................45
**Section 9.24**    **Lender's Discretion; Rating Agency Review**.........................45

## EXHIBITS AND SCHEDULES

<u>Exhibits</u>

Exhibit A        Form of Rent Statement
Exhibit B        Form of Request for Release
Exhibit C        Required Insurance
Exhibit D        Form of Officer's Certificate for Reporting

<u>Schedules</u>

Schedule A        Properties and Allocated Loan Amounts
Schedule B        Exception Report
Schedule C        Capital Expenditure and Reserve Amounts
Schedule D        Definition of Special Purpose Entity

iv

CAF Large Balance Loan Agreement
#49332641_v1

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of October 29, 2021 (this "**Agreement**"), is made between COREVEST AMERICAN FINANCE LENDER LLC, a Delaware limited liability company (together with its successors and assigns, collectively, "**Lender**") and KPM INVESTMENT A 2 LLC, a Delaware limited liability company ("**Borrower**").

## RECITALS

**WHEREAS**, Borrower desires to obtain from Lender the Loan (as hereinafter defined) in connection with the financing of the Properties (as hereinafter defined);

**WHEREAS**, Lender is willing to make the Loan on the terms and subject to the conditions set forth in this Agreement; and

**NOW, THEREFORE**, In consideration of the agreements, provisions and covenants contained herein and in the other Loan Documents, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrower agree as follows:

## ARTICLE I   DEFINITIONS

**Section 1.1**     **Defined Terms**. When used in this Agreement, the following capitalized terms have the following meanings:

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

"**Approved Accounting Method**" shall mean GAAP or cash basis accounting, in each case consistently applied, as may be reasonably acceptable to Lender.

"**Allocated Loan Amount**" means with respect to each Property, the portion of the Loan Amount allocated thereto as set forth in **Schedule A**, as the same may be reduced in accordance with **Section 2.2(j)**.

"**Approved Management Agreement**" means the Property Management Agreement and any other property management agreement that is approved by Lender.

"**Approved Property Manager**" means Property Manager or any other property management company approved by Lender, until Lender requests the termination of that management company pursuant to **Section 6.9(b).**

"**Award**" means any compensation paid by any Governmental Authority in connection with a Condemnation in respect to all or any part of a Property.

"**Business Day**" means any day other than (i) a Saturday and a Sunday and (ii) a day on which federally insured depository institutions in the State of New York or the state in which the offices of Lender, its trustee, its Servicer are located are authorized or obligated by law, governmental decree or executive order to be closed.

"**Calculation Date**" means the last date of each calendar quarter, commencing with the calendar quarter ended immediately after the Closing Date; *provided*, that if the Closing Date is less than 45 days prior to the last day of the calendar quarter that includes the Closing Date, then the first Calculation

Date shall be the last day of the calendar quarter that immediately follows the calendar quarter that includes the Closing Date.

"**Capital Expenditure**" means hard and soft costs incurred by Borrower with respect to replacements and capital repairs made to a Property in each case to the extent capitalized in accordance with the Approved Accounting Method.

"**Closing Date**" means October 29, 2021.

"**Closing Fee**" means $94,500.00.

"**Code**" means the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto.

"**Collateral**" means, collectively, all of the real, personal and mixed property in which Liens are purported to be granted in favor of Lender pursuant to the Loan Documents as security for the Obligations.

"**Condemnation**" means a taking or voluntary conveyance of a Property or any interest in, right accruing to, use of or access to a Property, as the result of, or in settlement of, any condemnation or other eminent domain proceeding by any Governmental Authority.

"**Contingent Obligation**" means, with respect to any Person, any obligation of such Person directly or indirectly guaranteeing any Debt of any other Person in any manner and any contingent obligation to purchase, to provide funds for payment, to supply funds to invest in any other Person or otherwise to assure a creditor against loss.

"**Control**" means the power to direct the management and policies of an entity, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise. The terms "Controlled" and "Controlling" shall have correlative meanings.

"**Cooperation Agreement**" means that certain Mortgage Loan Cooperation Agreement, dated as of the date hereof, among Borrower, Pledgor, Lender and Sponsor.

"**Damages**" to a Person means any and all liabilities, obligations, actual out-of-pocket losses, demands, actual damages, penalties, assessments, actions, causes of action, judgments, proceedings, suits, claims, and actual out-of-pocket costs, expenses and disbursements of any kind or nature whatsoever (including reasonable attorneys' fees and other costs of defense and/or enforcement whether or not suit is brought), fines, charges, fees, settlement costs and disbursements imposed on, incurred by or asserted against such party; provided, however, that "Damages" shall not include consequential or punitive damages, except to the extent imposed upon Lender by one or more third parties or otherwise required to be paid by Borrower under the Loan Documents.

"**Debt**" means: (i) all indebtedness for borrowed money, (ii) the deferred purchase price of property or services; (iii) letters of credit and all unreimbursed amounts drawn thereunder; (iv) indebtedness secured by a Lien on any property owned by the applicable Person (whether or not such indebtedness has been assumed), except obligations for Taxes that are not yet due and payable; (v) Contingent Obligations; (vi) payment obligations under any interest rate protection agreement (including any interest rate swaps, floors, collars or similar agreements) and similar agreements; (vii) any material actual or contingent liability to any Person or Governmental Authority with respect to any employee benefit plan (within the meaning of Section 3(3) of ERISA) subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code

2

and (viii) any other contractual obligation for the payment of money, including trade payables.

"**Default**" means the occurrence of any event that, but for the giving of notice or the passage of time, or both, would be an Event of Default.

"**Default Rate**" means a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law or (ii) five percent (5%) above the Interest Rate.

"**Disbursement Certificate**" means an Officer's Certificate that (A) describes all items of work to be funded, (B) certifies that the work to be funded has been performed at the applicable Property(ies), (C) states that such work has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (D) states that such work has not been the subject of a previous disbursement, and has been paid for in full by Borrower (including any cost in excess of the requested disbursement), (E) for any expenditure greater than $1,000, is delivered together with copies of any invoices for the work performed, and (F) is delivered with such mechanics lien releases and waivers that are requested by Lender.

"**Disqualified Property**" means any Property with respect to which there is an Event of Default that is specific to such Property (other than as a result of a voluntary act or omission of any Restricted Party).

"**Eligible Account**" means a separate and identifiable account from all other funds held by the holding institution that is an account (or a subaccount thereof) maintained with an Eligible Institution. An Eligible Account shall not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" means a federal or state-chartered depository institution or trust company insured by the Federal Deposit Insurance Corporation (i) whose long-term senior unsecured debt obligations are rated at "A3" by Moody's (or equivalent ratings by another rating agency approved by Lender if not rated by Moody's) or (ii) such other banking institution as is approved by Lender.

"**Eligible Lease**" means, unless otherwise approved by Lender in writing, a written Lease that (i) is executed by an Eligible Tenant and Borrower (or, in the case of a Lease existing on the Closing Date, such Lease has been assigned to Borrower), (ii) has a rental rate and terms consistent with rates and terms then prevailing in the local market where the Property is located, (iii) on its commencement date has a term of at least one year and not more than three years, (iv) complies with all applicable Legal Requirements in all material respects and includes all disclosures required by applicable Legal Requirements and (v) covers 100% of the habitable square footage of the applicable Residential Unit.

"**Eligible Tenant**" means a bona fide third-party Tenant of a Property who satisfies each of the following criteria:  (i)  prior to the time the Tenant executed a Lease, Borrower or Manager screened the Tenant and determined, based on bona fide written documentation, that the Tenant had sufficient financial resources to satisfy its obligations under the Lease for the Property, (ii) the Tenant is not subject to an ongoing Event of Bankruptcy as of such date of initial screening (or if not so initially screened, as of the Closing Date) and (iii) the Tenant is not a Restricted Party or any Affiliate thereof or an immediate family member (ancestor, spouse or lineal descendant) of any of the foregoing.

"**Embargoed Person**" means a Person subject to trade restrictions under any Federal Trade Embargo.

"**Environmental Indemnity**" means that certain Environmental Indemnity Agreement executed by Borrower as of the date hereof.

3

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.

"**ERISA Affiliate**" at any time, means each trade or business (whether or not incorporated) that would, at the time, be treated together with Borrower as a single employer under Title IV or Section 302 of ERISA or Section 412 of the Code.

"**Event of Bankruptcy**" means, with respect to any Person: (i) such Person shall fail generally to pay, or admit in writing it inability to pay, its debts as they come due, or shall make a general assignment for the benefit of creditors; (ii) any case or other proceeding shall be instituted by or with the consent or acquiescence of such Person seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, reorganization, debt arrangement, dissolution, winding up, or composition or readjustment of debts of it or its debts, or the appointment of a trustee, receiver, custodian, liquidator, assignee, sequestrator or the like for such Person or all or substantially all of its assets, or any similar action, or such Person shall take any corporate, partnership, limited partnership or limited liability company action to authorize any of such actions; or (iii) a case or other proceeding described in the foregoing clause (ii) shall be commenced, without the application, consent or acquiescence of such Person, and (A) such case or proceeding shall continue undismissed, or unstayed and in effect, for a period of sixty (60) consecutive days or (B) an order for relief in respect of such Person shall be entered in such case or proceeding or a decree or order granting such other requested relief shall be entered.

"**Excluded Taxes**" means Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes that are imposed by the jurisdiction in which Lender is organized or in which Lender's applicable lending officer is located.

"**Federal Trade Embargo**" means any federal law imposing trade restrictions, including (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended), (ii) the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 et seq., as amended), (iii) any enabling legislation or executive order relating to the foregoing, (iv) Executive Order 13224, and (v) the PATRIOT Act.

"**GAAP**" means generally accepted accounting principles in the United States of America, consistently applied.

"**Governmental Authority**" means any United States or foreign federal, state, county, regional, local or municipal government, any bureau, department, agency or political subdivision thereof and any Person with jurisdiction exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government or monetary policy (including any court).

"**HOA**" means a home owners or condominium association, board, corporation or a similar entity with authority to create a Lien on a Property as a result of the non-payment of HOA Fees that are payable with respect to such Property.

"**HOA Fees**" means all homeowner's and condominium dues, fees, assessments and impositions, and any other charges levied or assessed or imposed against a Property, or any part thereof, by an HOA.

"**Holdback Deposit Amount**" means $49,209.48.

"**Indebtedness**" means the Principal Indebtedness, together with interest and all other obligations and liabilities of Borrower under the Loan Documents, including all transaction costs, Yield Maintenance Premium, late fees and other amounts due or to become due to Lender pursuant to the Loan

CAF Large Balance Loan Agreement
#49332641_v1

Documents.

"**Indemnified Taxes**" means all Taxes (including any stamp, court, documentary, intangible, recording, filing or similar Taxes) that arise from or are imposed upon any payment made under, from the execution, delivery, performance, or enforcement of any of the Loan Documents, or the registration of, from the receipt or perfection of any Lien under any Loan Document, other than Excluded Taxes.

"**Individual Material Adverse Effect**" means, with respect to any Property any event or condition that has a material adverse effect on (a) the profitability, value, use, occupation, leasing or marketability of such Property or results in any material liability to, claim against or obligation of Lender or any Loan Party with respect to such Property or (b) the enforceability, validity, perfection or priority of the Lien of the Collateral Documents with respect to such Property.

"**Insurance Proceeds**" means property and business interruption insurance proceeds paid or payable to Borrower or Lender in connection with damage to or destruction of a Property.

"**Insurance Requirements**" means the terms of any insurance policy required pursuant to this Agreement.

"**Interest Accrual Period**" means each period from and including the first day of a calendar month through and including the last day of such calendar month; provided, that, prior to a Securitization, Lender shall have the right, in connection with a change in the Payment Date in accordance with the definition thereof, to make a corresponding change to the Interest Accrual Period. Notwithstanding the foregoing, the first Interest Accrual Period shall commence on and include the Closing Date.

"**Interest Rate**" means 4.67% per annum.

"**Lease**" means any agreement or arrangement pursuant to which any Person has or claims a possessory interest in, or right to use or occupy, a Residential Unit, and every modification, amendment or other agreement relating thereto, including any sublease, assignment and guarantee.

"**Legal Requirements**" means all governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities or any homeowners' or similar associations (including securities laws, Environmental Laws and zoning restrictions) affecting a Restricted Party, the Properties or any other Collateral or any portion thereof or the construction, ownership, use, alteration or operation thereof (whether now or hereafter enacted and in force), and all permits, licenses and authorizations relating thereto.

"**Lien**" means any mortgage, lien (statutory or other), pledge, hypothecation, assignment, preference, priority, security interest, restrictive covenant, easement, or any other encumbrance or charge on or affecting any Collateral or any portion thereof, or any interest therein, including any conditional sale or other title retention agreement, any sale-leaseback, any financing lease or similar transaction having substantially the same economic effect as any of the foregoing, the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction, and mechanics', materialmen's and similar liens and encumbrances, and any option to purchase, right of first refusal, right of first offer or similar right.

"**Loan Amount**": $9,450,000.00

"**Loan Documents**" means this Agreement, the Note, each of the Mortgages, the Environmental Indemnity, each Subordination of Property Management Agreement, the Cooperation

5

Agreement, the Sponsor Guaranty, the Pledgor Guaranty, the Pledge Agreement, and all other agreements, instruments, certificates and documents necessary to effectuate the granting to Lender of first-priority Liens on the Collateral or otherwise in satisfaction of the requirements of this Agreement or the other documents listed above or hereafter entered into by Lender and any Restricted Party in connection with the Loan.

"**Loan Parties**" means, collectively, Borrower and Pledgor, each of which shall individually be a "**Loan Party**".

"**Loss Proceeds**" means (i) Insurance Proceeds or (ii) Awards, whichever the case may be, and in each case after deduction of Lender's reasonable costs and expenses (including reasonable counsel fees) in collecting and disbursing the same.

"**Material Adverse Effect**" means a material adverse effect on (a) the property, business, operations or financial condition of a Restricted Party, (b) the use, operation or value of the Properties taken as a whole, (c) the ability of Borrower to repay the principal and interest of the Loan when due or the ability of a Restricted Party to satisfy its Obligations under the Loan Documents when due, or (d) the enforceability or validity of any Loan Document, the perfection or priority of any Lien created under any Loan Document or the rights, interests and remedies of Lender under any Loan Document.

"**Material Agreements**" means each contract and agreement (other than Leases) relating to the Properties, or otherwise imposing obligations on Borrower, under which Borrower would have the obligation to pay more than $20,000 per annum and that cannot be terminated by Borrower without cause upon thirty (30) days' notice or less without payment of a termination fee, or that is with an Affiliate of Borrower.

"**Maturity Date**" means the Stated Maturity Date, or such earlier date as may result from acceleration of the Loan in accordance with this Agreement.

"**Maximum Management Fee Percentage**" means 5% of Rents for the applicable calendar month.

"**Monthly Debt Service Payment**" means, for each Payment Date, a constant monthly payment of principal and interest sufficient to amortize the Loan over the Principal Amortization Period at the Interest Rate, as determined by Lender, which determination shall be final and binding on Borrower absent manifest error.

"**Moody's**" means Moody's Investors Service, Inc. and its successors.

"**Mortgage**" means, with respect to each Property, that certain mortgage, deed of trust or deed to secure debt, as the case may be, assignment of rents and leases, security agreement and fixture filing encumbering such Property, executed by Borrower as of the date hereof, as the same may from time to time be amended, restated, replaced, substituted, supplemented or otherwise modified in accordance herewith.

"**Note(s)**" means that certain promissory note, dated as of the date hereof, made by Borrower to the order of Lender to evidence the Loan, as such note may be replaced by multiple Notes in accordance with the Cooperation Agreement and as otherwise assigned (in whole or in part), amended, restated, replaced, supplemented or otherwise modified in accordance herewith.

"**Obligations**" means, collectively, each and all of the obligations of the Restricted Parties under the Loan Documents, including Borrower's obligations for payment of the Indebtedness and payment of all operating expenses necessary for the operation of the Properties and Capital Expenditures necessary to maintain the Properties in accordance with this Agreement.

6

"**OFAC List**" means the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and any other similar list maintained by the U.S. Treasury Department, Office of Foreign Assets Control pursuant to any applicable governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities, including trade embargo, economic sanctions, or other prohibitions imposed by Executive Order of the President of the United States. The OFAC List currently is accessible at http://www.treasury.gov/ofac/downloads/t11sdn.pdf.

"**Officer's Certificate**" means a certificate delivered to Lender that is signed by an authorized officer of Borrower and certifies the information therein to the best of such officer's knowledge.

"**Operating Account**" means an Eligible Account maintained by Borrower at an Eligible Institution.

"**Other Charges**" means (i) HOA Fees and (ii) any other charges levied or assessed or imposed against a Property, or any part thereof, other than Taxes.

"**Par Prepayment Date**" means the 114th Payment Date

"**PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended from time to time.

"**Payment Date**" means, with respect to each Interest Accrual Period, the ninth (9th) day of the calendar month immediately succeeding such Interest Accrual Period; provided, that prior to a Securitization, Lender shall have the right to change the Payment Date in connection with a change to the Interest Accrual Period.

"**Permits**" means all licenses, permits, variances and certificates used in connection with the ownership, operation, use or occupancy of each of the Properties (including certificates of occupancy, business licenses, state health department licenses, licenses to conduct business and all such other permits, licenses, consents, approvals and rights, obtained from any Governmental Authority or private Person concerning ownership, operation, use or occupancy of a Property).

"**Permitted Debt**" means with respect to Borrower, (i) the Obligations; (ii) Taxes not yet due and payable; (iii) Capital Expenditure costs permitted to be incurred under the Loan Documents that are paid on or prior to the date when due; (iv) security deposits and any interest thereon required to be paid to any Tenant pursuant to the applicable Lease or Legal Requirements and (v) trade payables not represented by a note, paid by Borrower within sixty (60) days of incurrence, which are incurred in the ordinary course of Borrower's ownership and operation of the Properties, in amounts reasonable and customary for similar properties and not exceeding three percent (3.0%) of the Loan Amount in the aggregate.

"**Permitted Encumbrances**" means: (i) the Liens created by the Loan Documents; (ii) all Liens and other matters specifically disclosed on Schedule B of the mortgagee title insurance policies obtained by Lender with respect to the Properties; (iii) Liens for Taxes not yet delinquent; (iv) Liens for Taxes or Other Charges becoming delinquent after the date hereof, in each case only if being diligently contested in good faith and by appropriate proceedings pursuant to and in accordance with **Section 6.4**, (v) any workers', mechanics' or other similar Liens on any Property arising after the date hereof that are (a) discharged of record within sixty (60) days of attachment, or by the expiration of such sixty (60) day period, Borrower deposits with Lender an amount that at all times equals at least 125% of the dollar amount of such Lien (including any increases thereto from time to time) or a bond in the aforementioned amount from such surety, and upon such terms and conditions, as is reasonably satisfactory to Lender as security for

7

payment or release of such Lien and (b) if contested, are contested in good faith and by appropriate proceedings pursuant to and in accordance with **Section 6.4** and (vi) rights of Tenants as tenants only pursuant to written Leases entered into in conformity with the provisions of this Agreement.

"**Permitted Investment**" means the investments described in **clause (a)** below, subject to qualifications set forth in **clause (b)** below:

(a)    (i) obligations of, or obligations guaranteed as to principal and interest by, the United States government or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the United States; (ii) federal funds, unsecured certificates of deposit, time deposits, banker's acceptances, and repurchase agreements having maturities of not more than 365 days of any bank, the short-term debt obligations of which are rated A-1+ (or the equivalent) by each of the Rating Agencies, it being understood that the A-1+ benchmark rating and other benchmark ratings in this Agreement are intended to be the ratings, or the equivalent of ratings, issued by S&P; (iii) deposits that are fully insured by the Federal Deposit Insurance Corp.; (iv) debt obligations that are rated AA (or the equivalent) by each of the Rating Agencies having maturities of not more than 365 days; (v) commercial paper rated A–1+ (or the equivalent) by each of the Rating Agencies and (vi) investment in money market funds rated AAAm or AAAm–G (or the equivalent) by each of the Rating Agencies.

(b)    Notwithstanding the foregoing, "**Permitted Investments**" shall (i) exclude any security with the S&P's "r" symbol (or any other Rating Agency's corresponding symbol) attached to the rating (indicating high volatility or dramatic fluctuations in their expected returns because of market risk), as well as any mortgage-backed securities and any security of the type commonly known as "strips"; (ii) not have maturities in excess of one year; (iii) be limited to those instruments that have a predetermined fixed dollar of principal due at maturity that cannot vary or change; and (iv) exclude any investment where the right to receive principal and interest derived from the underlying investment provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment.  Interest may either be fixed or variable, and any variable interest must be tied to a single interest rate index plus a single fixed spread (if any), and move proportionately with that index.  No investment shall be made which requires a payment above par for an obligation if the obligation may be prepaid at the option of the issuer thereof prior to its maturity.  All investments shall mature or be redeemable upon the option of the holder thereof on or prior to the earlier of (x) three months from the date of their purchase or (y) the Business Day preceding the day before the date such amounts are required to be applied hereunder.

"**Permitted Transfer**" means (a) a residential Lease for a Residential Unit entered into in accordance with the Loan Documents; (b) a Permitted Encumbrance; (c) a Transfer of a Property in accordance with **Section 3.5**, (d) a Condemnation, provided Borrower complies with **Section 6.15** with respect to such Condemnation, (e) Transfers (of the interest itself, but not any pledge or grant or creation of any Lien) of indirect equity interests in Borrower which in the aggregate (i) do not exceed forty-nine percent (49%) of the total indirect legal or beneficial ownership interests in Borrower, (ii) do not result in any Person's interest in Borrower exceeding forty-nine percent (49%) of the total indirect legal or beneficial ownership interests in Borrower (other than a Person that owned forty-nine percent (49%) of the total indirect legal or beneficial ownership interests in Borrower on the date hereof) and (iii) do not result in a change in Control of Borrower, (f) an inter vivos or testamentary Transfer of an indirect equity interest in Borrower to (i) one or more immediate family members (ancestors, spouse or lineal descendants) of the current holders of such equity interests (a "**Current Owner**"), or (ii) a trust or other entity in which all of the beneficial interest is held by a Current Owner or one or more immediate family members of a Current Owner; provided, that in each case under this clause (f), (x) such Transfer is made in connection with a Current Owner's bona fide, good faith estate planning and (y) no change in Control of Borrower results

8

therefrom; and (g) with the prior written consent of Lender and the payment by Borrower to Lender of a nonrefundable fee in an amount equal to 1.0% of the Principal Indebtedness, any other Transfer of any direct or indirect interest in Borrower. Borrower shall pay all actual out-of-pocket costs and expenses of Lender in connection with a Transfer contemplated by clause (g), whether or not such Transfer is approved by Lender, including all reasonable fees and expenses of Lender's counsel, whether internal or outside, the cost of any required counsel opinions related to REMIC or other securitization or tax issues, any Rating Agency fees and the greater of $20,000 and the customary fee assessed by the Servicer in connection with Transfer approvals. Borrower shall provide prior written notice to Lender of any Transfer contemplated by clauses (e), (f) and (g) above and all documentation relating thereto.

"**Person**" means any natural person, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association or Governmental Authority and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Plan Assets**" means assets of any (i) employee benefit plan (as defined in Section 3(3) of ERISA) subject to Title I of ERISA, (ii) plan (as defined in Section 4975(e)(1) of the Code) subject to Section 4975 of the Code, or (iii) governmental plan (as defined in Section 3(32) of ERISA) subject to federal, state or local laws, rules or regulations substantially similar to Title I of ERISA or Section 4975 of the Code.

"**Pledge Agreement**" means that certain Pledge Agreement, dated as of the date hereof, by and between Pledgor and Lender.

"**Pledgor**": means KPM Investment B 2 LLC, a Delaware limited liability company.

"**Pledgor Guaranty**" means that certain Pledgor Guaranty, dated as of the date hereof, executed by Pledgor for the benefit of the Lender.

"**Pledgor Permitted Debt**" means with respect to Pledgor, (i) Debt incurred under the Pledgor Guaranty and (ii) unsecured trade payables not represented by a note, paid by Pledgor within sixty (60) days of incurrence, which are incurred in the ordinary course of Pledgor's ownership of the membership interest in Borrower, in amounts reasonable and customary for similar properties and not exceeding at any time $10,000.

"**Prepayment Rate**" means the bond equivalent yield (in the secondary market) on the United States Treasury Security that as of the Prepayment Rate Determination Date has a remaining term to maturity closest to, but not exceeding, the remaining term to the Par Prepayment Date as most recently published in the "Treasury Bonds, Notes and Bills" section in The Wall Street Journal as of such Prepayment Rate Determination Date. If more than one issue of United States Treasury Securities has the same remaining term to the Par Prepayment Date, the "Prepayment Rate" shall be the yield on such United States Treasury Security most recently issued as of the Prepayment Rate Determination Date. The rate so published shall control absent manifest error. If the publication of the Prepayment Rate in The Wall Street Journal is discontinued, Lender shall determine the Prepayment Rate on the basis of "Statistical Release H.15 (519), Selected Interest Rates," or any successor publication, published by the Board of Governors of the Federal Reserve System, or on the basis of such other publication or statistical guide as Lender may reasonably select.

"**Prepayment Rate Determination Date**" means the date that is five (5) Business Days prior to the date of a prepayment of principal.

"**Principal Amortization Period**" means 30 years.

9

"**Principal Indebtedness**" means the principal balance of the Loan outstanding from time to time.

"**Properties**" means the real property described on Schedule A hereto, together with all buildings and other improvements thereon and all personal property owned by Borrower and encumbered by the Mortgages, together with all rights pertaining to such property; and "Property" means an individual property included in the Properties or all Properties collectively, as the context may require.

"**Property Management Agreement**" means that certain Property Management Agreement, dated on or about the date hereof, between Borrower and Property Manager.

"**Property Manager**" means BMGA Properties Corp, a Georgia corporation.

"**Rating Agency**" means, prior to the final Securitization of the Loan, each of S&P, Moody's, Fitch, Inc., DBRS, Inc., Morningstar Credit Ratings, LLC, Kroll Bond Rating Agency, Inc. (or, in each case, its Affiliates and successors), or any other nationally-recognized statistical rating agency that has been designated by Lender and, after the Securitization of the Loan, shall mean any of the foregoing that have rated and continue to rate any of the Certificates (excluding unsolicited ratings).

"**Rating Agency Confirmation**" means a written affirmation from each of the Rating Agencies that the credit rating of the Certificates by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion. In the event that, at any given time, no Certificates are then outstanding, then the term Rating Agency Confirmation shall be deemed instead to require the written approval of Lender based on its reasonable, good faith determination of whether the Rating Agencies would issue a Rating Agency Confirmation if any such Certificates were outstanding.

"**Regulatory Change**" means any change after the Closing Date in Legal Requirements or the adoption or the making, after such date, of any interpretations, directives or requests applying to Lender, or any Person in Control of Lender or to a class of banks or companies Controlling banks of or under any Legal Requirements by any court or Governmental Authority.

"**Release Price**" means, for each Property, 120% of the initial Allocated Loan Amount for such Property.

"**REMIC**" means a "real estate mortgage investment conduit" as defined in Section 860D of the Code.

"**Rents**" means, with respect to each Property, all rents and rent equivalents and any fees, payments or other compensation from any Tenant.

"**Rent Statement**" means a schedule of the Properties in the form of, and containing the information included in, the rent roll attached hereto as **Exhibit A**.

"**Rent to Debt Service Ratio**" means, as of any date of determination, a ratio determined by Lender of (a) Revenues actually collected by Borrower for the Properties for the twelve (12) completed, full calendar months prior to such date of determination to (b) the Monthly Debt Service Payment as of the Payment Date immediately preceding such date of determination, annualized; provided that for any date of determination prior to the first anniversary of the Closing Date, the amount in clause (a) shall be determined by annualizing Revenues for the Properties actually collected by Borrower for the completed full calendar

months occurring after the Closing Date.

"**Request for Release**" means a request for release of a Property in connection with any Transfer of a Property, substantially in the form attached hereto as **Exhibit B**.

"**Required Rent to Debt Service Ratio**": 1.80:1.00.

"**Reserves**" means, collectively, the Tax Reserve, the Insurance Reserve, the Capital Expenditure Reserve and the Holdback Reserve, each of which shall, individually, be a "**Reserve**".

"**Residential Unit**" means each separate residential address comprising all or part of a Property.  For example, a Residential Unit may include a single family residence, a housing unit in a duplex or triplex, a condominium or a townhome.

"**Restoration**" means the repair and restoration of a Property after a Casualty or Condemnation as nearly as possible to the condition such Property was in immediately prior to such Casualty or Condemnation, with such material alterations as may be approved by Lender, which such approval shall not to be unreasonably withheld.

"**Restoration Conditions**" means (a) no Event of Default shall have occurred and be continuing, (b) within sixty (60) days after the occurrence of the Casualty or Condemnation, Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration of the affected Properties in accordance with the terms of this Agreement, (c) Lender shall be reasonably satisfied that any debt service and operating deficits which will be incurred with respect to the Properties as a result of the occurrence of the Casualty will be covered out of (i) the applicable Loss Proceeds, (ii) the insurance coverage referred to in **Exhibit C**, if applicable, or (iii) by other funds of Borrower; (d) Lender shall be reasonably satisfied that the Restoration will be completed on or before the earliest of (i) six (6) months prior to the Maturity Date, (ii) such time as may be required under applicable Legal Requirements or (iii) with respect to a Casualty, six (6) months prior to the expiration of the insurance coverage referred to in **Exhibit C** and (e) the Loss Proceeds together with any Loss Proceeds Deficiency deposited by Borrower with Lender are sufficient to cover the cost of the Restoration, as determined by Lender.

"**Restoration Threshold Amount**" means, as of any date of determination, an amount equal to three percent (3.00%) of the Principal Indebtedness.

"**Restricted Parties**" means, collectively, Borrower, Pledgor and Sponsor, each of which shall individually be a "**Restricted Party**".

"**Revenues**" means all Rents, moneys payable as damages pursuant to a Lease or in lieu of Rents (including lease termination fees), royalties, revenues, deposits (including security, utility and other deposits that have been forfeited), charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower from any and all sources including proceeds from the sale, lease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower and proceeds, if any, from business interruption or other loss of income insurance.

"**S&P**" means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc., and its successors.

"**Servicer**" means the entity or entities appointed by Lender from time to time to serve as servicer and/or special servicer of the Loan. If at any time no entity is so appointed, the term "Servicer"

11

shall be deemed to refer to Lender.

"**Solvent**" means, with respect to any Person on any date of determination, (i) the fair saleable value of such Person's assets exceeds its total liabilities, (ii) such Person's assets do not constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted and (iii) such Person is able to pay its liabilities as they mature.

"**Sponsor**" means Joseph Perlmutter and Isaac Perlmutter, each an individual resident of the State of New York.

"**Sponsor Financial Covenant**" means the requirement that Sponsor cumulatively (i) maintain liquidity of not less than 5% of the Loan Amount, (ii) have net worth in excess of 25% of the Loan Amount (exclusive of Sponsor's direct or indirect interest in Borrower) and (iii) not be subject to any Event of Bankruptcy.

"**Sponsor Guaranty**" means that certain Sponsor Guaranty, dated as of the date hereof, executed by Sponsor for the benefit of Lender.

"**Stated Maturity Date**" means November 9, 2031.

"**Subordination of Property Management Agreement**" means an Assignment of Management Agreement and Subordination of Management Fees among Borrower, an Approved Property Manager and Lender, substantially in the form delivered on the date hereof by Borrower, the initial Approved Property Manager and Lender.

"**Taxes**" means all real estate and personal property taxes, assessments, fees, taxes on rents or rentals, water rates or sewer rents, facilities and other governmental, municipal and utility district charges or other similar taxes or assessments now or hereafter levied or assessed or imposed against the Properties or Borrower with respect to the Properties or rents therefrom or that may become Liens upon any of the Properties, without deduction for any amounts reimbursable to Borrower by third parties and including any interest, additions to tax or penalties applicable thereto.

"**Tenant**" means any Person liable by contract or otherwise to pay monies pursuant to a Lease.

"**Transfer**" means any transfer of any kind (including any gift, conveyance, lease, sublease, sale, or Lien) with respect to all or any part of or any interest (whether direct or indirect, ownership, beneficial or otherwise, and irrespective of the number of tiers of parties having interests) in any Collateral or Borrower, or any direct or indirect constituent of Borrower, whether voluntarily or involuntarily and whether directly or indirectly, by operation of law or otherwise. Without limitation, "Transfer" includes (i) an installment sales agreement wherein by which a Property or any part thereof is to be sold for a price to be paid in installments; (ii) an agreement for the leasing of a Residential Unit for any purpose other than the actual residential occupancy by a Tenant thereunder; (iii) a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Revenues; (iv) if any direct or indirect constituent is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock, or the creation or issuance of new stock, or entering into any agreement to do any of the foregoing; (v) if Borrower or any direct or indirect constituent is a partnership, limited liability company, or other entity, any change, withdrawal, removal, resignation, addition, or change of control of any partner, member, or other interest holder, or the issuance of any new partnership, membership or other entity interest, or the transfer of any partnership, membership or other entity interest, or entering into any agreement to do any of the foregoing; (vi) any pledge, hypothecation, assignment, transfer or other Lien or encumbrance of any direct or indirect ownership interest in Borrower;

12

and (vii) granting or sufferance of any purchase option, right of first refusal, right of first offer or other similar rights in favor of any Tenant or other Persons.

"**Waste**" means any material abuse or destructive use (whether by action or inaction) of the Property.

"**Yield Maintenance Premium**" means an amount determined by Lender to be equal to the greater of (a) one percent (1%) of the principal amount of the Loan prepaid and (b) the excess, if any, of (i) the sum of the present values of all then-scheduled payments of principal and interest on the principal amount of the Loan being prepaid through the Par Prepayment Date (including a balloon payment on the Par Prepayment Date of the remaining principal on the Par Prepayment Date), with each such payment discounted to its present value at the date of prepayment at the rate which, when compounded monthly, is equivalent to the Prepayment Rate when compounded semi-annually, and deducting from the sum of such present values any interest paid for the period from the date of prepayment to the next succeeding Payment Date in the event such payment is not made on a Payment Date, over (ii) the principal amount of the Loan being prepaid.

Section 1.2    **Additional Definitions**. The following terms are defined in the documents, exhibits or Sections indicated below:

| Term | Location |
| --- | --- |
| "**Agreement**" | Preamble |
| "**Borrower**" | Preamble |
| "**Capital Expenditure Reserve**" | Section 4.3 |
| "**Casualty**" | Section 6.14 |
| "**Certificates**" | Cooperation Agreement |
| "**Environmental Laws**" | Environmental Indemnity |
| "**Event of Default**" | Section 8.1 |
| "**Fully Condemned Property**" | Section 6.15(b) |
| "**Fully Condemned Property Prepayment Amount**" | Section 6.15(b) |
| "**Holdback Reserve**" | Section 4.6 |
| "**Increased Costs**" | Section 2.4 |
| "**Indemnified Parties**" | Section 9.5(a) |
| "**Insurance Reserve**" | Section 4.2 |
| "**Lender**" | Preamble |
| "**Loan**" | Section 2.1 |
| "**Loss Proceeds Deficiency**" | Section 6.16(d) |
| "**Policy**" and "**Policies**" | Section 6.13(b) |
| "**Qualified Release Property Default**" | Section 3.5 |
| "**Release Conditions**" | Section 3.5 |
| "**Release Property**" | Section 3.5 |
| "**Securitization**" | Cooperation Agreement |
| "**Security Deposit Account**" | Section 6.7 |
| "**Severed Loan Documents**" | Section 8.2(g) |
| "**Sole Member**" | Schedule D |
| "**Special Member**" | Schedule D |
| "**Special Purpose Entity**" | Schedule D |
| "**Tax Reserve**" | Section 4.1 |

**ARTICLE II  GENERAL TERMS**

13

**Section 2.1**    **The Loan**. On the Closing Date, subject to the terms and conditions of this Agreement, Lender shall make a loan to Borrower (the "**Loan**") in an amount equal to the Loan Amount. Any amount borrowed and repaid in respect of the Loan may not be reborrowed.  The Loan shall be evidenced by one or more Notes.

**Section 2.2**    **Interest and Principal**.

(a)    The Principal Indebtedness shall accrue interest at the Interest Rate.

(b)    Interest on the Loan and other portions of the Indebtedness shall be calculated by multiplying (a) the actual number of days in the Interest Accrual Period or other period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (i.e., the Interest Rate expressed as an annual rate divided by 360) by (c) the Principal Indebtedness as of the first day of the applicable Interest Accrual Period or the amount of such other portions of the Indebtedness, as applicable.

(c)    For so long as any Event of Default is continuing, the Principal Indebtedness and all other portions of the Indebtedness, shall accrue interest at the Default Rate.  Interest at the Default Rate shall be paid immediately upon demand, which demand may be made as frequently as Lender shall determine.

(d)    On each Payment Date, Borrower shall pay to Lender a monthly payment of principal and interest equal to the Monthly Debt Service Payment.  Notwithstanding the foregoing, on the Closing Date, Borrower shall pay interest from and including the Closing Date through the end of the first Interest Accrual Period, in lieu of making such payment on the first Payment Date following the Closing Date.  Except during an Event of Default, all payments received from Borrower shall be applied by Lender in the following order of priority: (i) *first*, to the payment of interest then due and payable; (ii) *second,* to the payment of principal then due and payable; and (iii) *third*, to all other amounts then due and payable under the Loan Documents.

(e)    If a prepayment of principal is made, then Lender will adjust the Monthly Debt Service Payment to reflect the remaining Principal Indebtedness outstanding and, if the Loan is amortizing, the remaining portion of the Principal Amortization Period.  Lender will notify Borrower in writing of its determination of the adjusted Monthly Debt Service Payment, which notice shall be conclusive and binding absent manifest error.  Borrower will pay the new Monthly Debt Service Payment commencing with the Payment Date for the Interest Accrual Period that follows the date of such prepayment.

(f)    Borrower shall pay to Lender on the Maturity Date the remaining Principal Indebtedness, all accrued and unpaid interest and all other amounts due under the Loan Documents.

(g)    Notwithstanding anything to the contrary contained herein, amounts received by Lender in respect of the Indebtedness during the continuance of an Event of Default and amounts on deposit in the Reserves during the continuance of an Event of Default may be applied by Lender toward interest, principal and other components of the Indebtedness or to other Obligations in such order as Lender shall determine.

(h)    If any amount due under the Loan Documents is not paid on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of (i) five percent (5.00%) of such unpaid sum or (ii) the maximum amount permitted by Legal Requirements in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.

CAF Large Balance Loan Agreement
#49332641_v1

(i)    Whenever any payment to be made under any Loan Document shall be stated to be due on a day that is not a Business Day, the due date thereof shall be deemed to be the immediately preceding Business Day.

(j)    All reductions of principal, whether prepayments or regularly scheduled amortization, shall reduce the Allocated Loan Amounts of the Properties on a pro rata basis, except only that prepayments of the Release Price for any Property released shall reduce the Allocated Loan Amount for such Property until the same is zero, and then any excess of such principal shall reduce the Allocated Loan Amounts of the remaining Properties on a pro rata basis.

**Section 2.3    Method and Place of Payment**. Except as otherwise specifically provided in this Agreement, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 p.m., New York City time, on the date when due and shall be made in lawful money of the United States of America by wire transfer in federal or other immediately available funds to the account specified from time to time by Lender. Any funds received by Lender after such time shall be deemed to have been paid on the next succeeding Business Day. Lender shall notify Borrower in writing of any changes in the account to which payments are to be made.

**Section 2.4    Increased Costs**. If as a result of any Regulatory Change or compliance of Lender therewith, the basis of taxation to Lender or its Affiliate of payments in respect of a Loan is changed or Lender or its Affiliate becomes subject to any increased cost, reduction in income or additional expense in respect of the Loan Documents, including, without limitation (i) any Indemnified Tax or (ii) any reserve, special deposit or similar requirements relating to any extensions of credit or other assets of, or any deposits with or other liabilities (such increase in cost, reduction in income or additional expense being herein called "**Increased Costs**"), then Borrower shall within ten (10) Business Days following written demand promptly pay to Lender such Increased Costs to the extent that Lender reasonably determines that such Increased Costs are allocable to the Loan.

**Section 2.5    Taxes**. Any payments by or on account of any obligation of Borrower under any Loan Document shall be made without deduction or withholding for any Tax; provided, however, that if Legal Requirements require deduction or withholding of a Tax, then Borrower shall deduct or withhold and pay such Tax to the relevant Governmental Authority in accordance with Legal Requirements, and, if such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased so that after such deduction or withholding (including deductions or withholdings applicable to additional amounts payable) Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made. Borrower shall promptly indemnify Lender for all Indemnified Taxes (including Taxes in respect of additional amounts payable) and related expenses, and such indemnity obligation shall survive any assignment or replacement of Lender or satisfaction or discharge of other obligations under the Loan Documents. Borrower shall promptly deliver evidence satisfactory to Lender of any payments made pursuant to this **Section 2.5**. Borrower shall pay (i) to the applicable Governmental Authority as and when due all Indemnified Taxes, in accordance with the applicable Legal Requirements, and (ii) to Lender, within ten (10) Business Days after written request by Lender, all other Indemnified Taxes. Promptly following written request therefor by Lender, Borrower shall deliver to Lender evidence, reasonably satisfactory to Lender, of payment of Indemnified Taxes.

**Section 2.6    Closing Fee**. Borrower shall pay the Closing Fee to Lender on the Closing Date. The Closing Fee shall be payable by wire transfer of immediately available funds or may be paid by netting the Closing Fee from the Loan proceeds funded to Borrower on the Closing Date. The Closing Fee is deemed earned by Lender on the Closing Date and will be non-refundable.

**Section 2.7    ACH Payment.** Borrower agree that all payments due and owing under this Agreement or any other Loan Documents shall be made through automated clearing house ("ACH")

15

transfers from the Borrower's designated Operating Account (the "Payment Account") directly to Lender's Servicer.  In this regard, Borrower hereby agrees to execute and deliver to Lender an authorization agreement for direct payments whereby, among other things, Lender's Servicer shall be irrevocably authorized to initiate ACH transfers from the Payment Account to Lender or as otherwise provided in this Agreement and the other Loan Documents in the amounts required or permitted under this Agreement and all other Loan Documents, including for scheduled payments of principal, interest and Reserves and payment of all other fees or charges due under this Agreement or any other Loan Documents. Lender's authorization for direct ACH transfers as hereby provided shall be irrevocable and such ACH transfers shall continue until all Obligations are paid in full. For so long as any Obligations remain outstanding, Borrower shall: (i) not revoke Lender's authority to initiate ACH transfers as hereby contemplated; (ii) not change, modify, close or otherwise affect the Payment Account; (iii) deposit all Revenues of any nature or kind whatsoever only into the Payment Account; and (iv) be responsible for all costs, expenses or other fees and charges incurred by Lender as a result of any failed or returned ACH transfers, whether resulting from insufficient sums being available in the Payment Account, or otherwise. The Borrower hereby agrees to undertake any and all required actions, execute any required documents, instruments or agreements, or to otherwise do any other thing required or requested by Lender in order to effectuate the requirements of this Section 2.7.  The failure of the Borrower to abide by any of the provisions of this Section 2.7 shall constitute an Event of Default without further notice.

## ARTICLE III  PREPAYMENT; PROPERTY RELEASES

**Section 3.1     Voluntary Prepayment**. Borrower may, at its option, upon not less than thirty (30) days' prior written notice to Lender, prepay the Loan in whole or in part on any Business Day, which prepayment shall be made together with the amounts required by **Section 3.7**.  Borrower's notice of prepayment shall create an obligation of Borrower to prepay the Loan as set forth therein, but may be rescinded with five (5) days' written notice to Lender (subject to payment of any reasonable costs and expenses resulting from such rescission).  Each such prepayment in part shall be in a minimum principal amount equal to $100,000 and in integral multiples of $100,000 in excess thereof.  If, during the continuance of an Event of Default, payment of all or part of the Indebtedness is tendered by Borrower and accepted by Lender or is otherwise recovered by Lender (including through application of any Reserves), such tender or recovery shall be deemed to be a voluntary prepayment by Borrower and, in connection with any such prepayment, Borrower shall pay, as part of the Indebtedness, all amounts required by **Section 3.7**.

**Section 3.2     Condemnation**.  If Borrower is required to make any prepayment under **Section 6.15** as a result of a Condemnation, on the next occurring Monthly Payment Date following the date on which the applicable Award is paid to Lender, Lender shall apply the Loss Proceeds thereof toward the prepayment of the Indebtedness in the amount required by **Section 6.15** and Borrower shall prepay the Indebtedness in the amount, if any, required by **Section 6.15**.

**Section 3.3     Casualty**.  If Borrower is required to make any prepayment under **Section 6.16** as a result of a Casualty, on the next occurring Monthly Payment Date following the date on which the applicable Insurance Proceeds are paid to Lender, Lender shall apply the Loss Proceeds thereof toward the prepayment of the Indebtedness in the amount required by **Section 6.16** and Borrower shall prepay the Indebtedness in the amount, if any, required by **Section 6.16**.

**Section 3.4     [Reserved.]**

**Section 3.5     Property Releases**. Borrower shall have the right, at its option, on not less than thirty (30) days' prior written notice to Lender, to obtain the release of any Property (each, a "**Release Property**") from the Liens of the Loan Documents, provided that the following conditions shall have been satisfied (the "**Release Conditions**").  If a Disqualified Property is released in accordance with the Release

16

Conditions, then the release of such Property shall be deemed to cure each Event of Default that relates solely to such Disqualified Property (a "**Qualified Release Property Default**").

     (a)    Borrower shall submit to Lender, not less than ten (10) nor more than thirty (30) Business Days prior to the proposed Transfer date, a Request for Release, together with evidence reasonably satisfactory to Lender that the Release Conditions will be satisfied upon the consummation of such Transfer; provided, however, that as to any release of a Disqualified Property to cure each Qualified Release Property Default with respect to such Disqualified Property, such notice shall be given not more than ten (10) Business Days after the occurrence of the first Qualified Release Property Default with respect to such Disqualified Property, and the Transfer date shall be not later than ten (10) Business Days thereafter;

     (b)    No Event of Default has occurred and is continuing, other than if such Release Property is a Disqualified Property, and the only Event of Default is a Qualified Release Property Default with respect to such Disqualified Property and each Qualified Release Property Default applicable to such Disqualified Property would be cured as a result of the release of the Disqualified Property;

     (c)    The Release Property shall be Transferred to a Person who is not a Restricted Party or an Affiliate of a Restricted Party, pursuant to a bona fide all-cash sale on arms-length terms and conditions; except that if the Transfer and release is to cure a Qualified Release Property Default, then the Release Property may be Transferred to a Person who is an Affiliate of Borrower or Pledgor but is not a direct or indirect subsidiary of either of them, for consideration then paid in cash equal to not less than the appraised value of the Property, as determined by Lender;

     (d)    On the Transfer date, Borrower shall prepay the Principal Indebtedness in an amount equal to the applicable Release Price, together with the amounts required by **Section 3.7** (including Yield Maintenance Premium), which aggregate amount shall be transferred directly to Lender by the closing title company or escrow agent for the Transfer;

     (e)    The pro forma Rent to Debt Service Ratio as of the last day of the most recent calendar month ended immediately prior to such release, after giving pro forma effect for the elimination of the Revenues for the applicable Property and, if applicable, reduction of the Monthly Debt Service Payment as determined by Lender pursuant to **Section 2.2(e)** shall equal or exceed the greater of (i) the Required Rent to Debt Service Ratio and (ii) the actual Rent to Debt Service Ratio as of the last day of the most recent calendar month ended immediately prior to such release;

     (f)    Borrower shall reimburse Lender for any actual out-of-pocket costs and expenses incurred by Lender in connection with this **Section 3.5** (including the reasonable fees and expenses of legal counsel and the reasonable out-of-pocket expenses of the Servicer);

     (g)    Borrower shall pay all Taxes and all reasonable costs and expenses (including reasonable attorneys' fees and expenses) of Lender and/or its Servicer in connection with the release and, in addition, the current reasonable and customary fee being assessed by Lender and/or its Servicer to effect the release; and

     (h)    Borrower shall submit to Lender, not less than five (5) Business Days' prior to the proposed Transfer date, a draft release for the applicable Mortgage (and, in the event the Mortgage applicable to the Release Property encumbers other Property(ies) in addition to the Release Property, such release shall be a partial release that relates only to the Release Property and does not affect the Liens and security interests encumbering or the other Property(ies)) in form and substance appropriate for the jurisdiction in which the Release Property is located and which shall

17

contain standard provisions protecting the rights of Lender; and in addition, Borrower shall provide all other documentation of a ministerial or administrative nature that Lender reasonably requires to be delivered by Borrower in connection with such release or assignment.

**Section 3.6    REMIC Savings Clause**.  Notwithstanding anything to the contrary contained herein, including **Sections 3.5, 6.15 and 6.16**, if the Loan is included in a REMIC trust and the ratio of the unpaid principal balance of the Loan to the value of the remaining Properties (as determined by Lender using any commercially reasonable method permitted to a REMIC trust, and which shall exclude the value of any personal property (other than fixtures) or going concern value, if any) exceeds or would exceed 125% immediately after giving effect to the release of a Property, no release of such Property will be permitted unless the principal balance of the Loan is prepaid by an amount not less than the greater of (i) the Release Price or (ii) the least amount that is a "qualified amount" as that term is defined in Internal Revenue Service Revenue Procedure 2010-30, as the same may be amended, replaced, supplemented or modified from time to time, unless Lender receives an opinion of counsel that, if this paragraph is applicable but not followed or is no longer applicable at the time of such release, the REMIC trust will not fail to maintain its status as a REMIC trust as a result of the release of such Property.

**Section 3.7    Prepayment Requirements.**

(a)    Any prepayment of principal shall be accompanied by (i) all interest accrued on the amount prepaid, plus, the amount of interest that would have accrued on the amount prepaid had the Loan remained outstanding through the end of the Interest Accrual Period in which such prepayment occurs, (ii) if such prepayment is made prior to the Par Prepayment Date, the applicable Yield Maintenance Premium (except with respect to any prepayment pursuant to **Sections 3.2** or **3.3**), (iii) all reasonable out-of-pocket costs and expenses of Lender incurred in connection with the prepayment (including reasonable attorneys' fees) and (iv) all other amounts then due under the Loan Documents.

(b)    Except during the continuance of an Event of Default, funds delivered to Lender in connection with any prepayment shall be applied in the following order of priority: (i) first, to any amounts (other than principal, interest and Yield Maintenance Premium) then due and payable under the Loan Documents, including any reasonable out-of-pocket costs and expenses of Lender in connection with such prepayment; (ii) second, interest on the principal amount being prepaid through the end of the Interest Accrual Period in which such prepayment occurs; (iii) third, if applicable, Yield Maintenance Premium on the principal amount being prepaid; and (iv) fourth, to principal.  Any partial prepayment of the Loan shall be applied to the last payments of principal due under the Loan.

(c)    Borrower acknowledges that (i) a prepayment will cause damage to Lender; (ii) the Yield Maintenance Premium is intended to compensate Lender for the loss of its investment and the expense incurred and time and effort associated with making the Loan, which will not be fully repaid if the Loan is prepaid; (iii) it will be extremely difficult and impractical to ascertain the extent of Lender's damages caused by a prepayment after an acceleration or any other prepayment not permitted by the Loan Documents; and (iv) the Yield Maintenance Premium represents Lender's and Borrower's reasonable estimate of Lender's damages from the prepayment and is not a penalty.

**ARTICLE IV  LOAN RESERVES**

**Section 4.1    Tax Reserve.**  Borrower shall deposit with Lender (i) on the Closing Date an amount sufficient to pay all Taxes by the 30th day prior to the date they come due, assuming subsequent monthly fundings on Payment Dates of one-twelfth (1/12) of projected annual Taxes, plus (ii) on each

18

Payment Date, an amount equal to one-twelfth (1/12) of the Taxes that Lender estimates will be payable during the next ensuing twelve (12) months (the "**Tax Reserve**").  If at any time Lender reasonably determines that the amount in the Tax Reserve will not be sufficient to accumulate (upon payment of subsequent monthly amounts in accordance with the provisions of this Agreement) the full amount of all installments of Taxes by the date on which such amounts come due, then Lender shall notify Borrower of such determination and Borrower shall increase its monthly deposit to the Tax Reserve by the amount that Lender reasonably estimates is sufficient to achieve such accumulation.  Borrower shall provide Lender with copies of all tax bills relating to each Property promptly after Borrower's receipt thereof. Provided that no Event of Default is continuing, Lender shall release funds from the Tax Reserve to pay Taxes due, subject to such conditions as Lender may reasonably require, including that Lender shall have received Tax bills for the same not less than thirty (30) days before the due dates thereof.  Borrower shall provide, at Borrower's expense, a tax service contract for the term of the Loan issued by a tax reporting agency reasonably acceptable to Lender.

Section 4.2    **Insurance Reserve**.  Borrower shall deposit with Lender on the Closing Date an amount sufficient to pay all insurance costs for the Properties that Lender estimates will be payable for the ensuing twelve (12) months and thereafter on each Payment Date one-twelfth (1/12) of the insurance premiums that Lender reasonably estimates will be payable during the ensuing twelve (12) months for renewal or replacement of the Policies upon the expiration thereof (the "**Insurance Reserve**").  If at any time Lender reasonably determines that the amount in the Insurance Reserve will not be sufficient to pay the insurance premiums becoming due, Lender may so notify Borrower, and then commencing with the first Payment Date thereafter, the monthly deposits to the Insurance Reserve shall be increased by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to expiration of the Policies. Provided no Event of Default is continuing, Lender shall release funds in the Insurance Reserve to pay insurance premiums due with respect to the Policies, subject to such conditions as Lender may reasonably require, including that Lender shall have received invoices for the same not less than thirty (30) days before the due dates thereof.

Section 4.3    **Capital Expenditure Reserve**.  Borrower shall deposit with Lender on the Closing Date the initial amount for each Property and on each Payment Date the monthly amount for each Property set forth on **Schedule C** (the "**Capital Expenditure Reserve**").  Provided no Event of Default is continuing, Lender shall release funds in the Capital Expenditure Reserve to reimburse Borrower for completed work constituting bona fide Capital Expenditures with respect to the Properties actually paid for by Borrower, subject to the satisfaction or waiver by Lender of the following conditions:  (i) Borrower shall have complied with **Section 6.2** if applicable to the work for which the release is sought, (ii) the request for disbursement shall be accompanied by a Disbursement Certificate, (iii) if the amount of Capital Expenditure funds requested to be released with respect to a Property exceeds $10,000, Lender shall have completed a Property inspection reasonably satisfactory to Lender and (iv) Borrower shall have reimbursed Lender for the reasonable out-of-pocket costs and expenses incurred by Lender in connection with Borrower's request for disbursement under this **Section 4.3** (including any reasonable administrative fees or costs and expenses incurred by Servicer).  Borrower shall not be entitled to receive funds from the Capital Expenditure Reserve for work as to which Borrower is entitled to reimbursement from any security deposit, Insurance Proceeds or Awards.  Disbursements of funds from the Capital Expenditure Reserve shall occur only once per calendar month on a date that is not less than five (5) Business Days after a written request for release provided by Borrower to Lender; provided, that if the amount requested to be released is less than $2,500, then such funds shall remain on deposit with Lender until an amount equal to or greater than $2,500 is to be disbursed.

Section 4.4    **Reserve Funds Generally**. Any funds remaining in the Reserves (other than earnings or interest thereon) after the Obligations have been paid in full shall be returned to Borrower. Borrower shall not be entitled to any earnings or interest on funds deposited into the Reserves.

19

**Section 4.5**     **Security Interest**. As security for the Obligations, Borrower hereby grants to Lender a first-priority security interest in each Reserve and all amounts at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest therein, including filing UCC-1 financing statements and continuations thereof.

**Section 4.6**     **Holdback Reserve**.  Borrower shall deposit with Lender on the Closing Date the Holdback Deposit Amount as a reserve for the payment of principal, interest, property taxes, insurance premiums, operating expenses and Capital Expenditures with respect to the Properties and other amounts due with respect to the Obligations (the "Holdback Reserve").  At any time during the continuance of an Event of Default, Lender shall have the right, but not the obligation, in its sole and absolute discretion, to apply any funds in the Holdback Reserve to the payment of principal, interest, property taxes, insurance premiums, operating expenses and Capital Expenditures with respect to the Properties or to any other Obligations, in such order and in such manner as Lender shall determine.  Borrower shall, within five (5) days of a written request by Lender, deposit such additional funds into the Holdback Reserve as are necessary to return the amount in the Holdback Reserve to the Holdback Deposit Amount.  Any funds remaining in the Holdback Reserve after the Indebtedness has been paid in full in cash shall be returned to Borrower. The Holdback Reserve shall not be credited toward the satisfaction of the liquidity or net worth requirements set forth in the Sponsor Financial Covenant.

## ARTICLE V  REPRESENTATIONS

Borrower represents to Lender that, as of the Closing Date, except as set forth in **Schedule B**:

**Section 5.1**     **Organization**. Each Restricted Party that is an entity is duly organized, validly existing and in good standing under the laws of the state of its organization, and is in good standing in each other jurisdiction where ownership of its properties or the conduct of its business requires it to be so, and each such Restricted Party has all power and authority under such laws and its organizational documents and all material governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted. The sole business of Borrower is the acquisition, development, management, leasing, ownership, maintenance and operation of Properties and activities incidental thereto.

**Section 5.2**     **Authorization; Capacity**. Each Restricted Party that is an entity has the power and authority to enter into the Loan Documents to which it is a party, to perform its Obligations thereunder and to consummate the transactions contemplated thereby and has by proper action duly authorized the execution and delivery of the Loan Documents to which it is a party.  Each natural person who executed a Loan Document, either on behalf of a Restricted Party or on his or her own behalf, had capacity to do so and executed such Loan Document free from coercion and duress.

**Section 5.3**     **No Conflicts**. Neither the execution and delivery by any Restricted Party of the Loan Documents to which it is a party, nor the consummation of the transactions contemplated therein, nor performance of and compliance with the terms and provisions thereof will (i) violate or conflict with any provision of the formation and governance documents for any Restricted Party that is an entity, (ii) violate any Legal Requirement, (iii) violate or conflict with contractual provisions of any indenture, loan agreement, mortgage, contract or other Material Agreement to which Borrower or any of its direct or indirect equityholders is a party or may be bound, or (iv) result in or require the creation of any Lien or other charge or encumbrance upon or with respect to the Collateral in favor of any Person other than Lender.

**Section 5.4**     **Consents**. No consent, approval, authorization or order of, or qualification with, any court or Governmental Authority is required in connection with the execution, delivery or performance by any Restricted Party of the Loan Documents to which such Restricted Party is a party, except for any of the foregoing that have already been obtained.

20

**Section 5.5    Enforceable Obligations**. The Loan Documents have been duly executed and delivered by each Restricted Party party thereto and constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms, subject to bankruptcy, insolvency and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. The Loan Documents are not subject to any right of rescission, offset, abatement, counterclaim or defense by any Restricted Party, including the defense of usury or fraud.

**Section 5.6    Payment of Taxes** . Borrower has filed all tax returns (federal, state, local and foreign) required to be filed by it (including interest and penalties).  Borrower is not liable for Taxes payable by any other Person.  All transfer Taxes, deed stamps, intangible Taxes and other amounts required to be paid under applicable Legal Requirements in connection with the transfer of each Property to Borrower have been paid.  All Taxes and governmental assessments due and owing in respect of each Property have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established hereunder and none of the same is delinquent.

**Section 5.7    Compliance with Law**. Borrower, each Property and the residential use thereof comply in all material respects with all applicable Insurance Requirements and Legal Requirements (including with respect to security deposits) and is neither an illegal nor a legal nonconforming use. Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority the violation of which could adversely affect any Property or the condition (financial or otherwise) or business of Borrower in any material respect. There has not been committed by or on behalf of Borrower or, to Borrower's knowledge, any other person in occupancy of or involved with the operation or use of any Residential Unit, any act or omission affording any Governmental Authority the right of forfeiture as against any Property or any portion thereof or any monies paid in performance of its Obligations under any of the Loan Documents. No Restricted Party or any of its Affiliates has purchased any portion of the Properties with proceeds of any illegal activity.

**Section 5.8    ERISA**. Neither Borrower nor any ERISA Affiliate of Borrower has incurred or could be subjected to any liability under Title IV or Section 302 of ERISA or Section 412 of the Code or maintains or contributes to, or is or has been required to maintain or contribute to, any employee benefit plan (as defined in Section 3(3) of ERISA) subject to Title IV or Section 302 of ERISA or Section 412 of the Code. The consummation of the transactions contemplated by this Agreement will not constitute or result in any non-exempt prohibited transaction under Section 406 of ERISA, Section 4975 of the Code or substantially similar provisions under federal, state or local laws, rules or regulations.

**Section 5.9    Investment Company Act**. Borrower is not an "investment company", or a company "controlled" by an "investment company", registered or required to be registered under the Investment Company Act of 1940, as amended.

**Section 5.10    Other Debt**. Borrower has no Debt outstanding other than Permitted Debt. Pledgor has no Debt other than Pledgor Permitted Debt.

**Section 5.11    Litigation**. There are no actions, suits, proceedings, arbitrations or governmental investigations by or before any Governmental Authority now filed or otherwise pending, and to Borrower's knowledge there are no such actions, suits, proceedings, arbitrations or governmental investigations threatened, against or affecting any Restricted Party or any of the Collateral, except as listed on **Schedule B** and none of the matters listed on **Schedule B**, even if determined against such Restricted Party or such Collateral, would reasonably be expected to have a Material Adverse Effect or an Individual Material Adverse Effect with respect to any Property.

**Section 5.12    Leases; Material Agreements**.

(a)    Borrower has delivered to Lender true and complete copies of all Leases, including all modifications and amendments thereto. No person has any possessory interest in any of the Residential Units or right to occupy the same except under and pursuant to the provisions of such Leases. The initial Rent Statement attached to this Agreement as **Exhibit A** is accurate and complete in all material respects as of the Closing Date. Except as indicated **Exhibit A**, no security deposits are being held by Borrower (including bonds or letters of credit being held in lieu of cash security deposits), no Tenant has any termination options (except in connection with a Casualty or Condemnation), no Tenant has any extension or renewal rights (except as set forth in its Lease), no Tenant or other party has any option, right of first refusal or similar preferential right to purchase all or any portion of any Property, no rent has been paid more than thirty (30) days in advance of its due date and no payments of rent are more than thirty (30) days delinquent. Each of the following is true and correct with respect to each Lease:

(i)    such Lease is an Eligible Lease with an Eligible Tenant;

(ii)    such Lease is valid and enforceable and full force and effect;

(iii)    Borrower is the sole owner of the entire lessor's interest in such Lease;

(iv)    neither Borrower nor, to Borrower's knowledge, any other party under such Lease is in default thereunder in any material respect, and there exist no offsets or defenses to the payment of any portion of the Rents thereunder;

(v)    each Tenant is in actual, physical occupancy of the premises demised under its Lease and no event has occurred giving any Tenant the right to terminate its Lease or pay reduced rent to Borrower under any of the terms of such Lease; and

(vi)    all conditions to each Tenant's obligations thereunder have been satisfied, no Tenant has the right to require Borrower to perform or finance alterations at any Property (except to the extent required pursuant to Legal Requirements), no leasing commissions or finder's fees are owed or would be owed upon the exercise of any Tenant's existing renewal options and Borrower has no other monetary obligation to any Tenant under any Lease.

(b)    Borrower has made available to Lender true and complete copies of all Material Agreements. Each Material Agreement has been entered into at arm's length in the ordinary course of business by or on behalf of Borrower. The Material Agreements are in full force and effect and there are no defaults thereunder by Borrower or, to Borrower's knowledge, any other party thereto. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or any of the Properties is bound.

**Section 5.13    Full and Accurate Disclosure**. No documents or information heretofore delivered by, or on behalf of any Restricted Party or any of their Affiliates to Lender in respect of the Properties or any Restricted Party contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading unless subsequently corrected (except that the foregoing representation, as it relates to any title policy delivered to Lender in connection with the closing of the Loan, shall be limited to Borrower's knowledge). There is no event or condition that has not been disclosed to Lender that has had or could reasonably be expected to have a Material Adverse Effect or Individual Material Adverse Effect.

CAF Large Balance Loan Agreement
#49332641_v1

**Section 5.14    Financial Condition**. The financial statements and operating statements with respect to the Properties heretofore delivered to Lender are accurate and complete in all material respects and fairly present in all material respects in accordance with the Approved Accounting Method the financial results of the Properties as of their respective dates and do not omit to state any material fact necessary to make statements contained herein or therein not misleading.

**Section 5.15    Use of Loan Proceeds**. The Loan is solely for the business purpose of Borrower or for distribution to Borrower's equityholders in accordance with Legal Requirements and no portion thereof shall be used for personal, consumer, household purposes for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal Reserve System or for any other purpose.

**Section 5.16    Labor Matters**. Borrower has no employees.

**Section 5.17    Title**. Borrower owns good, marketable and insurable fee title to the Properties and the Loan Parties own good and marketable title to the related personal property included in the Collateral, in each case free and clear of all Liens whatsoever except the Permitted Encumbrances. The Mortgages, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements to be filed in connection therewith, will create (i) valid, perfected first priority Liens on the Properties and the rents therefrom, enforceable as such against creditors of and purchasers from Borrower and subject only to Permitted Encumbrances, and (ii) perfected Liens in and to all personalty, all in accordance with the terms thereof, in each case subject only to any Permitted Encumbrances. The Permitted Encumbrances do not and will not, individually or in the aggregate, materially and adversely affect or interfere with the value, or current or contemplated use or operation, of the Properties, or the security intended to be provided by the Mortgage, the ability of any Property to generate net cash flow sufficient to service the Loan or Borrower's ability to pay its obligations as and when they come due, including its ability to repay the Indebtedness in accordance with the terms of the Loan Documents. There are no claims for payment for work, labor or materials affecting the Properties that are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents. No creditor of Borrower other than Lender has in its possession any goods that constitute or evidence the Collateral. No Person, including any Person that previously occupied any of the Properties, has any right of redemption or similar right or claim with respect to any Property.

**Section 5.18    No Encroachments**. All of the improvements on each Property lie wholly within the boundaries and building restriction lines of such Property, and no improvements on adjoining property encroach upon any Property, and no easements or other encumbrances upon any Property encroach upon any of the improvements, so as, in either case, to materially adversely affect the value, use or marketability of the applicable Property.

**Section 5.19    Physical Condition**. Each Property and all building systems (including sidewalks, storm drainage system, roof, plumbing system, HVAC system, fire protection system, electrical system, equipment, exterior sidings and doors, irrigation system and all structural components) are free of all material damage and are in good condition, order and repair in all respects material to such Property's use, operation and value. Borrower is not aware of any material structural or other material defect or damages in any of the Properties, whether latent or otherwise, that may have an Individual Material Adverse Effect on such Property.

**Section 5.20    Fraudulent Conveyance**. No Restricted Party has entered into the Loan Documents with the actual intent to hinder, delay or defraud any creditor and no Affiliate of Borrower has transferred any Property to Borrower with the actual intent to hinder, delay or defraud any creditor. Each Restricted Party has received reasonably equivalent value in exchange for its Obligations under the Loan

Documents.  After giving effect to the transactions contemplated by the Loan Documents, each Restricted Party is Solvent.

**Section 5.21     Management**. Except for any Approved Management Agreement, no property management agreements are in effect with respect to the Properties. The Approved Management Agreement is in full force and effect and there is no event of default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.

**Section 5.22     Condemnation**. No Condemnation has been commenced or, to Borrower's knowledge, is contemplated or threatened with respect to all or any portion of any of the Properties or for the relocation of roadways providing access to any of the Properties.

**Section 5.23     Utilities and Public Access**. Each Property has adequate rights of access to dedicated public ways (and makes no material use of any means of access or egress that is not pursuant to such dedicated public ways or recorded, irrevocable rights-of-way or easements) and is adequately served by all public utilities, including water and sewer (or well and septic), necessary to the continued use and enjoyment of such Property as presently used and enjoyed.

**Section 5.24     Assessments**. There are no pending or, to Borrower's knowledge, proposed special or other assessments (whether by any Governmental Authority or homeowners association or any similar association) for public improvements or otherwise affecting any of the Properties, nor are there any contemplated improvements to any of the Properties that may result in such special or other assessments. No extension of time for assessment or payment by Borrower of any federal, state or local tax is in effect. As of the Closing Date, there are no delinquent Other Charges outstanding with respect to any Property and there are no pending or, to Borrower's knowledge, proposed, special or other assessments for HOA improvements affecting any Property.

**Section 5.25     No Joint Assessment**. Neither Borrower nor any of its Affiliates have suffered, permitted or initiated the joint assessment of any Property (i) with any other real property constituting a separate tax lot, or (ii) with any personal property, or any other procedure whereby the Lien of any Taxes that may be levied against such other real property or personal property shall be assessed or levied or charged to any of the Properties as a single Lien.

**Section 5.26     Separate Lots**. No portion of any of the Properties is part of a tax lot that also includes any real property that is not Collateral.

**Section 5.27     Permits; Certificate of Occupancy**. Borrower has obtained all Permits necessary for the present and contemplated use and operation of each Property. The uses being made of each Property are in conformity in all material respects with the certificate of occupancy and/or Permits for such Property and any other restrictions, covenants or conditions affecting such Property (including any homeowners association requirements). The certificate of occupancy for each Property does not permit the use of such Property for any purpose other than as a one to four unit single-family residential home or residential condominium. No Property is (i) zoned for, or being used for, any purpose other than a one to four unit single-family residential or residential condominium occupancy, (ii) an assisted living or similar facility, (iii) subject to any rent control, rent stabilization or similar Legal Requirements limiting, or placing conditions upon, the amount of rent that can be charged under a Lease or the ability of a landlord to decline the renewal or extension of a Lease.

**Section 5.28     Flood Zone**. None of the improvements on any of the Properties is located in an area identified by the Federal Emergency Management Agency or the Federal Insurance Administration as a "100 year flood plain" or as having special flood hazards (including Zones A and V), or, to the extent that

24

any portion of any of the Properties is located in such an area, such Property is covered by flood insurance meeting the requirements set forth in **Section 6.13**.

Section 5.29     **Insurance**. Borrower has obtained insurance policies reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. All premiums on such insurance policies required to be paid as of the Closing Date have been paid for the current policy period. No Person, including Borrower, has done, by act or omission, anything that would impair the coverage of any such policy.

Section 5.30     **Federal Trade Embargos**. Each Restricted Party is in compliance with all Federal Trade Embargos in all material respects. No Embargoed Person owns any direct or indirect equity interest in Borrower. No Tenant at any Property is identified on the OFAC List. Borrower has implemented procedures, and will consistently apply those procedures throughout the term of the Loan, to ensure that the foregoing representations and warranties remain true and correct with respect to each Tenant at each Property at the time such Tenant is initially screened by Borrower or an Approved Property Manager prior to entering into a Lease with such Tenant.

Section 5.31     **Survival**. All of the representations of the Restricted Parties set forth in the Loan Documents shall survive for so long as any portion of the Indebtedness is outstanding. All representations, covenants and agreements made by Borrower in the Loan Documents shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## ARTICLE VI  AFFIRMATIVE COVENANTS

Borrower covenants and agrees as follows:

Section 6.1     **Existence; Licenses; Tax Status**. Borrower shall, and shall cause Pledgor to, do or cause to be done all things necessary to (a) be a limited liability company, (b) maintain its entity existence, rights, franchises and privileges in the State of Delaware and (c) preserve, renew and keep in full force and effect all rights, licenses, Permits, franchises, certificates of occupancy, consents, approvals and other agreements necessary for the continued use and operation of each Property. Borrower shall deliver to Lender a copy of each amendment or other modification to any of its or Pledgor's organizational documents promptly after the execution thereof.  Borrower shall at all times elect, and shall cause Pledgor to elect, to be treated for tax purposes as a "disregarded entity" that is not taxable as a corporation for U.S. federal tax purposes.

Section 6.2     **Maintenance of Properties**.  Borrower shall cause each Property to be maintained in good and safe working order and repair, reasonable wear and tear excepted, and in keeping with the condition and repair of properties of a similar use, value, age, nature and construction and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto; **provided** that Borrower shall not make any structural alterations to any Property (including, without limitation, any alterations to the roof of a Property) that exceed $15,000 (in the aggregate, together with all other alterations then being undertaken) or any repairs or alterations that might have an Individual Material Adverse Effect, without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Borrower shall not use, maintain or operate any Property in any manner that constitutes a public or private nuisance. No improvements or equipment located at or on any Property shall be removed, demolished or materially altered without the prior written consent of Lender (except with respect to equipment owned by a Tenant, or for replacement of equipment in the ordinary course of Borrower's business with items of the same utility and of equal or greater value and sales of obsolete equipment no longer needed for the operation of the applicable Property). Borrower shall not make any change in the use of any Property or do or permit to be done thereon anything that could reasonably be expected to result in an Individual Material Adverse Effect. Borrower shall not install or

25

permit to be installed on any Property any underground storage tank. Except as approved by Lender in writing, Borrower shall not permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of any Property, regardless of the depth thereof or the method of mining or extraction thereof.

**Section 6.3    Compliance with Legal Requirements**. Borrower shall comply with, and shall cause each Property to comply with and be leased, operated, maintained, repaired and improved in compliance, in all material respects, with all Legal Requirements, Insurance Requirements and all material contractual obligations by which Borrower is bound.  Borrower shall not, and shall not permit Pledgor to, commit or suffer to be committed any act or omission affording any Governmental Authority the right of forfeiture as against any Property or any part thereof.

**Section 6.4    Taxes, Other Charges and Other Claims**. Borrower shall, and shall cause Pledgor to, pay and discharge all Taxes and Other Charges levied upon it, its income and its assets as and when such Taxes and Other Charges are due and payable, as well as all lawful claims for labor, materials and supplies or otherwise.  Borrower shall, and shall cause Pledgor to, file all federal, state and local tax returns and other reports that it is required by law to file. Notwithstanding the foregoing, after prior written notice to Lender, a Loan Party may contest by appropriate legal proceedings conducted in good faith and with due diligence, the amount or validity of any such Taxes, Other Charges and claims and, in such event, may permit such Taxes, Other Charges and claims being so contested to remain unsatisfied or unpaid during such contest so long as (a) no Event of Default shall exist, (b) such proceeding shall be permitted under and conducted in accordance with all applicable Legal Requirements, (c) no Property or other Collateral nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, as determined by Lender, (d) enforcement of the contested such Taxes, Other Charges and claims is effectively stayed for the entire duration of such contest, (e) any such Taxes, Other Charges and claims determined to be due, together with any interest or penalties thereon, shall be promptly paid as required after final resolution of such contest, (f) the applicable Loan Party has set aside on its books adequate reserves in accordance with the Approved Accounting Method, (g) Borrower shall deliver to Lender cash security in an amount determined by Lender to be sufficient to insure the payment of such Taxes, Other Charges and other claims, together with all interest and penalties thereon, (h) failure to pay such Taxes, Other Charges and other claims will not, as determined by Lender, present an unreasonable risk of any civil or criminal liability to Lender or any Material Adverse Effect or Individual Material Adverse Effect, (i) such contest shall not affect the ownership, use or occupancy of any Property or other Collateral, and (j) Borrower shall, upon request by Lender, give Lender prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the conditions set forth above.  Notwithstanding the foregoing, Borrower shall, and shall cause Pledgor to, comply with all Legal Requirements and pay any contested Taxes, Other Charges and other amounts (or, if cash or other security has been provided, Lender may pay over any such cash or other security held by Lender to the claimant) if, in the Lender's reasonable judgment, any of the foregoing conditions is not satisfied at any time or there shall be any danger of the Lien of any Collateral Document being extinguished.  Borrower shall promptly pay for all utility services provided to each Property as they become due and payable (other than any such utilities, which are, pursuant to the terms of any Lease, required to be paid by the Tenant thereunder directly to the applicable service provider).

**Section 6.5    Access to Properties.**

(a)    Borrower shall permit agents, representatives and employees of Lender and the Servicer to enter and inspect the Properties or any portion thereof, and/or inspect, examine, audit and copy the books and records of Borrower (including all recorded data of any kind or nature, regardless of the medium of recording), at such reasonable times as may be requested by Lender upon reasonable advance notice. The cost of such inspections, examinations, audits and copying, if

not paid for by Borrower following demand, may be added to the Indebtedness and shall bear interest thereafter until paid at the Default Rate. Except to the extent (i) Lender reasonably believes a Material Adverse Effect has occurred regarding the PRoperty, (ii) required by a Rating Agency, or (iii) during the continuance of an Event of Default, the reasonable cost of such inspections, examinations, audits and copying under this Section 6.5(a) shall not exceed $7,500 per calendar year.

(b)    If, in connection with any inspection of any Property, Lender reasonably determines that the condition of such Property has deteriorated (ordinary wear and tear excepted) since the Closing Date, Lender may obtain, at Borrower's expense, a physical needs assessment of such Property. Lender's right to obtain a physical needs assessment pursuant to this **Section 6.5(b)** shall be in addition to any other rights available to Lender under this Loan Agreement in connection with any such deterioration. Any such inspection or physical needs assessment may result in Lender requiring additional Capital Expenditures at the applicable Property and/or an increase in monthly deposits to the Capital Expenditure Reserve.

Section 6.6    **Cooperate in Legal Proceedings**. Except with respect to any claim by Borrower against Lender, Borrower shall reasonably cooperate with Lender with respect to any proceedings before any Governmental Authority that may in any way affect the rights of Lender under any of the Loan Documents and, Lender may, at its election, participate or designate a representative to participate in any such proceedings.

Section 6.7    **Security Deposits**. All security deposits of Tenants shall be deposited into one or more Eligible Accounts (each, a "**Security Deposit Account**"), held in compliance with all Legal Requirements, and shall not be commingled with any other funds of Borrower. Borrower shall maintain books and records of sufficient detail to identify all security deposits of Tenants separate and apart from other payments received from Tenants. Borrower shall cause all security deposits received by Borrower or an Approved Property Manager after the Closing Date to be deposited into a Security Deposit Account within three (3) Business Days of receipt. If a Tenant under any Lease defaults such that the applicable security deposit may be drawn upon on account of such default, the proceeds of such draw shall constitute Revenues. Upon Lender's written request following the occurrence and during the continuance of an Event of Default, Borrower shall deliver (or cause to be delivered) to Lender or to one or more accounts designated by Lender the security deposits, and upon a foreclosure of any Property or action in lieu thereof, Borrower shall deliver to Lender or to an account designated by Lender the security deposit applicable to the Leases with respect to such Property, in each case, for safe-keeping and not for application against the Indebtedness, except to the extent such security deposit is forfeited pursuant to the terms of the applicable Leases.

Section 6.8    **Plan Assets, etc**. Borrower will do, or cause to be done, all things necessary to ensure that it will not be deemed to hold Plan Assets at any time.

Section 6.9    **Management of Collateral.**

(a)    Each Property shall be managed at all times by an Approved Property Manager pursuant to an Approved Management Agreement. Borrower may from time to time appoint a replacement Approved Property Manager to manage the applicable Property pursuant to an Approved Management Agreement, provided that (i) no Event of Default is continuing, (ii) Lender receives at least sixty (60) days' prior written notice of same and (iii) such successor manager shall execute and deliver to Lender for Lender's benefit a Subordination of Property Management Agreement in form and substance reasonably satisfactory to Lender. The management fees payable to any Approved Property Manager shall not exceed management fees calculated at the Maximum Management Fee Percentage.

27

(b)    Lender may terminate or require Borrower to terminate the engagement of the Property Manager and engage an Approved Property Manager selected by Lender to serve as replacement Approved Property Manager pursuant to an Approved Management Agreement (i) during the continuance of an Event of Default, (ii) following any foreclosure, conveyance in lieu of foreclosure or other similar transaction, (iii) during the continuance of a material default by the Approved Property Manager under the Approved Management Agreement (after the expiration of any applicable notice and/or cure periods), (iv) if an Event of Bankruptcy occurs in respect of the Approved Property Manager or (v) if the Approved Property Manager engages in gross negligence, willful misconduct, fraud or misappropriation of funds in respect of the Properties or its duties with respect thereto.

(c)    Without limitation of the foregoing, if the Approved Management Agreement is terminated pursuant to the Subordination of Property Management Agreement, ceases to be in full force or effect or is for any other reason no longer in effect, then Lender may require Borrower to engage, in accordance with the terms and conditions set forth herein and in the Subordination of Property Management Agreement, a new Approved Property Manager to manage the Property, which such new Approved Property Manager shall be engaged pursuant to an Approved Management Agreement.

(d)    Notwithstanding that the Properties will be managed by an Approved Property Manager, Borrower shall ensure that the Properties are managed in a commercially reasonable manner and that its obligations as the lessor under all Leases are performed.  Borrower shall enforce, in a commercially reasonable manner, the obligations of the Tenants under such Leases.

**Section 6.10    Notice of Material Event**. Borrower shall give Lender prompt notice (containing reasonable detail) of (i) any material change in the financial or physical condition of any Property, (ii) the termination or cancellation of any insurance required by this Agreement, (iii) any default under the Approved Management Agreement beyond any applicable notice and cure periods, (iv) any litigation or governmental proceedings pending or threatened in writing against Borrower or any Property that is reasonably expected to result in a Material Adverse Effect, (v) an Event of Bankruptcy occurs in respect of Borrower, Pledgor, Sponsor, Approved Property Manager or an Affiliate of any of the foregoing, (vi) any Default or Event of Default and (vii) any other circumstance or event that could reasonably be expected to result in a Material Adverse Effect.

**Section 6.11    Financial Reporting**. Borrower shall deliver to Lender the following financial reports:

(a)    As soon as available, and in any event within ninety (90) days after the end of each calendar year, Borrower shall deliver to Lender annual reviewed financial statements for such calendar year, together with related statements of operations, equityholders' capital and cash flows, a balance sheet and such other information or reports as shall be reasonably requested by Lender, for Borrower for such calendar year, in each case prepared in reasonable detail, such reviewed financial statements to be accompanied by a report of an independent accountant selected by Borrower that is reasonably satisfactory to Lender (which report on such information shall be without (i) any qualification as to the scope of such review or (ii) a "going concern" or like qualification (other than a going concern qualification that relates solely to the near term maturity of the Loan hereunder)), together with a written statement of such accountants (x) to the effect that, in making the examination necessary for their review of such financial statements, the independent accountant has not obtained any knowledge of the existence of an Event of Default or a Default and (y) if the independent accountant has obtained any knowledge of the existence of an Event of Default or Default, describing the nature thereof.

CAF Large Balance Loan Agreement
#49332641_v1

(b)      As soon as available, and in any event within thirty (30) days after the end of each calendar quarter (including year end), Borrower shall deliver to Lender quarterly and year-to-date unaudited financial statements for such calendar quarter of Borrower, including a balance sheet of Borrower as of the end of such calendar quarter, together with related statements of operations, equityholders' capital and cash flows for Borrower for such calendar quarter and for the portion of the calendar year ending with such calendar quarter, which such statements shall be accompanied by an Officer's Certificate in the form of **Exhibit D** together with all attachments contemplated thereby. Each quarterly report shall be accompanied by (i) a statement in reasonable detail that calculates the Rent to Debt Service Ratio for such calendar quarter and year-to-date and (ii) such other information as Lender shall reasonably request.

(c)      Within thirty (30) days following the end of each calendar quarter, Borrower shall deliver to Lender a true, complete, correct and accurate Rent Statement for such calendar quarter (including year end), certified by Borrower.

(d)      All financial statements and other documents to be delivered pursuant to this **Section 6.11** shall (i) be in form and substance reasonably acceptable to Lender, (ii) be prepared in accordance with the Approved Accounting Method consistently applied, and (iii) be certified by an authorized officer of Borrower as being true, correct, complete and accurate in all material respects and fairly reflecting the results of operations and financial condition of Borrower for the relevant period.

(e)      In addition to Lender's other rights and remedies hereunder, if any financial statement or other document to be delivered pursuant to this **Section 6.11** is not timely delivered, and such failure continues for ten (10) days after written notice from Lender, then Borrower shall promptly pay to Lender, as a late charge, the sum of $500 per delinquent item.  In addition, Borrower shall promptly pay to Lender an additional late charge of $500 per each such delinquent item for each full month during which such item remains undelivered following written notice from Lender.  Borrower acknowledges that Lender will incur additional expenses as a result of any such late deliveries, which expenses would be impracticable to quantify, and that Borrower's payments under this **Section 6.11(e)** are a reasonable estimate of such expenses.  Borrower acknowledges further that the payment by Borrower of this late charge does not in any manner affect or otherwise impair or waive any rights and remedies Lender may have hereunder, under the Loan Documents or pursuant to any Legal Requirements for any Event of Default.

**Section 6.12      Other Reports**.

(a)      Borrower shall deliver to Lender within five (5) Business Days after Borrower obtains knowledge of the occurrence of any event or circumstance that has or would reasonably be expected to have a Material Adverse Effect or Individual Material Adverse Effect, written notice thereof that includes the details of such event or circumstance and the action which Borrower is taking or proposes to take with respect thereto.

(b)      Borrower shall deliver to Lender within five (5) Business Days after Borrower obtains knowledge of any litigation or governmental proceedings, pending or threatened, against any Restricted Party or against Manager with respect to any Property that has or would reasonably be expected to have an Individual Material Adverse Effect or Material Adverse Effect, written notice thereof that includes a reasonably detailed summary of such litigation or proceeding.

(c)      Borrower shall deliver to Lender within five (5) Business Days after Borrower obtains knowledge of any Event of Default or Default, a written statement setting forth the details

29

of such Event of Default or Default and the action that the Restricted Parties are taking or propose to take to cure such Default or Event of Default.

(d)     Borrower shall deliver to Lender within five (5) Business Days of receipt or service thereof, as applicable, a true and complete copy of each and every notice of default received or served by Borrower with respect to any obligations under any agreement to which Borrower is a party or any Permitted Encumbrance (other than defaults by Tenants under Leases).

(e)     Borrower shall deliver to Lender, within ten (10) Business Days of Lender's request therefor, copies of any requested Tax, Other Charge or insurance bills, statements or invoices received by Borrower with respect to the Properties and evidence reasonably satisfactory to Lender of payment thereof.

(f)     Borrower shall, as soon as reasonably practicable after request by Lender, furnish or cause to be furnished to Lender in such manner and in such detail as may be reasonably requested by Lender, such evidence of compliance with the Loan Documents, copies of Leases and such additional information, documents, records or reports as may be reasonably requested with respect to any Property or the conditions or operations, financial or otherwise, of the Restricted Parties.

**Section 6.13     Insurance**.

(a)     <u>Insurance Policies</u>.  Borrower shall obtain and maintain insurance policies for Borrower and the Properties providing at least the coverages set forth in **Exhibit C**.

(b)     All insurance policies required pursuant to this **Section 6.13** (collectively, the "Policies" or in the singular, the "Policy") shall (i) be subject to the approval of Lender as to insurance companies, limits, deductibles, terms and conditions, loss payees and named- or additional- insureds, and (ii) be issued by insurance companies having a claims paying ability rating of "A3" or better by Moody's, or, if such insurance company is not rated by Moody's, (1) "A-" or better by S&P or "A:X" or better in the current Best's Insurance Reports.

(c)     Certificates of insurance evidencing the Policies shall be delivered to Lender on the Closing Date with respect to the current Policies. Not less than ten (10) days prior to the expiration dates of the Policies evidenced to Lender, Borrower shall deliver to Lender certificates of insurance evidencing the renewed or replacement Policies and provide evidence satisfactory to Lender of payment of the premiums due thereunder. Upon written request by Lender Borrower will provide: (i) copies of the binders within ten (10) days after inception, and/or, (ii) copies of the in-force Policies to be delivered within sixty (60) days after inception.

(d)     All policies of insurance except Worker's Compensation shall: (i) name the applicable Borrower as the named insured; (ii) name Lender and its successors and/or assigns as mortgagee and loss payee, as its interests may appear, (iii) with respect to all liability policies, name Lender and its successors and/or assigns as additional insured, and (iv) with respect to all Property Insurance policies, contain a mortgagee clause in favor of Lender providing that the loss shall be payable to Lender.

(e)     If at any time Lender is not in receipt of written evidence all insurance required herein is in full force and effect, Lender has the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Properties, including, without limitation, obtaining such insurance coverage as Lender determines. All cost incurred by Lender in connection with such action or in obtaining such insurance and keeping insurance in-force shall be

30

paid by Borrower to Lender upon demand and, until paid, shall be secured by the Loan Documents and shall bear interest at the Default Rate.

(f)    Insurance Proceeds and Awards.  Borrower shall cooperate with Lender, in accordance with this Agreement, to enable Lender to receive the benefits of any Insurance Proceeds or Awards payable in connection with any Property, and Lender shall be reimbursed for any expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements, and the payment by Borrower of the reasonable expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting any Property or any part thereof) out of such Insurance Proceeds or Awards.

Section 6.14    Casualty. If a Property is damaged or destroyed, in whole or in part, by fire or other casualty (in either case, a "**Casualty**"), Borrower shall give prompt written notice thereof to Lender. Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower.  In addition, Lender may participate in any settlement discussions with any insurance companies and Borrower shall not settle or permit any settlement without Lender's approval, (i) if an Event of Default is continuing or (ii) with respect to any Casualty in which the Loss Proceeds thereof or the costs of completing the Restoration are reasonably expected to be equal to or greater than the Restoration Threshold Amount and Borrower shall deliver to Lender all instruments required by Lender to permit such participation.  Any Insurance Proceeds in connection with any Casualty (whether or not Lender elects to settle and adjust the claim or Borrower settles such claim) shall be due and payable solely to Lender and held and disbursed by Lender in accordance with the terms of this Agreement.  If Borrower or any party other than Lender receives any Insurance Proceeds, Borrower shall immediately deliver such proceeds to Lender and shall endorse, and cause all such third parties to endorse, checks payable therefor to the order of Lender.  Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to endorse any such check payable to the order of Lender.  Borrower hereby releases Lender from any and all liability with respect to the settlement and adjustment by Lender of any claims in respect of any Casualty, other than for actions that constitute gross negligence or intentional misconduct.

Section 6.15    Condemnation. Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of all or any portion of a Property and shall deliver to Lender copies of any and all papers served in connection with such proceedings.  Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation.  Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings which is reasonably expected to involve an Award of an amount greater than the Restoration Threshold Amount.  Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Indebtedness at the time and in the manner provided for in this Agreement and the Indebtedness shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Indebtedness.  If Borrower or any party other than Lender receives any Award, Borrower shall immediately deliver such proceeds to Lender and shall endorse, and cause all such third parties to endorse, a check payable therefore to the order of Lender.  Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the applicable rate provided herein.  Loss Proceeds from a Condemnation shall be applied as follows:

(a)    If a partial Condemnation of a Property does not interfere with the use of such Property as a residential rental property, as determined by Lender, then, unless Lender approves the use of Loss Proceeds for the restoration of the applicable Property and the Restoration

31

Conditions are satisfied with respect to the Restoration of such Property, the Loss Proceeds thereof paid by the condemning authority shall be applied to the prepayment of the Indebtedness in accordance with **Section 3.2**.

(b)    If a partial Condemnation of a Property does interfere with the use of such Property as a residential rental property, as determined by Lender, or if there occurs a complete Condemnation of a Property (each, a "**Fully Condemned Property**"), then (i) Lender may retain any Award received by it, (ii) Borrower shall immediately deliver to Lender any Award paid to Borrower, (iii) the Loss Proceeds of such Award shall be applied to the prepayment of the Indebtedness pursuant to **Section 3.2** in an amount equal to the Release Price for the Fully Condemned Property, together with interest and other amounts required to be paid in connection therewith under **Section 3.7** (collectively, the "**Fully Condemned Property Prepayment Amount**") and (iv) Borrower shall prepay the Loan in an amount equal to the excess, if any, of the Fully Condemned Property Prepayment Amount over the Loss Proceeds of the Award.  Following Borrower's written request after receipt by Lender of the Fully Condemned Property Prepayment Amount, Lender shall (x) release the Fully Condemned Property from the applicable Mortgages and related Lien, **provided** that (A) Borrower has delivered to Lender a draft release (and, in the event the Mortgage applicable to the Fully Condemned Property encumbers other Property(ies) in addition to the Fully Condemned Property, such release shall be a partial release that relates only to the Fully Condemned Property and does not affect the Liens and security interests encumbering or on the other Property(ies)) in form and substance appropriate for the jurisdiction in which such Fully Condemned Property is located and shall contain standard provisions protecting the rights of Lender and (B) Borrower shall pay all costs, Taxes and expenses associated with such release (including cost to file and record the release and Lender's reasonable attorneys' fees) and (y) disburse to Borrower the Loss Proceeds paid by the condemning authority and held by Lender in excess of the Fully Condemned Property Prepayment Amount for such Property.

**Section 6.16    Restoration**. The following provisions shall apply in connection with the Restoration of Properties affected by a Casualty:

(a)    If (i) the Loss Proceeds reasonably expected to be received in connection with any single Casualty event is less than the Restoration Threshold Amount and (ii) the Restoration Conditions are satisfied, then (A) if Insurance Proceeds are paid by the insurance company directly to Borrower subsequent to delivering the undertaking required by the Restoration Conditions, such Insurance Proceeds may be retained by Borrower (for the avoidance of doubt, Insurance Proceeds received by Borrower prior to delivering the undertaking required by the Restoration Conditions shall be immediately paid to Lender as required by **Section 6.14**), (B) if Insurance Proceeds are paid by the insurance company to Lender, such Insurance Proceeds will be disbursed by Lender to Borrower and (C) Borrower shall conduct the Restoration of the affected Properties in accordance with the terms of **Section 6.16(d)** and **6.16(e)**.

(b)    If (i) the Loss Proceeds reasonably expected to be received in connection with any single Casualty event is greater than the Restoration Threshold Amount and (ii) the Restoration Conditions are satisfied, then (A) Borrower shall immediately deliver to Lender any Insurance Proceeds paid to Borrower and (B) Borrower shall conduct the Restoration of the affected Properties in accordance with the terms of and subject to the conditions of **Sections 6.16(d)** and **6.16(e)**.

(c)    If following a Casualty, the Restoration Conditions are not satisfied, then (i) Lender may retain any Insurance Proceeds received by it, (ii) Borrower shall immediately deliver to Lender any Insurance Proceeds paid to Borrower, (iii) the Loss Proceeds of such Insurance

32

Proceeds shall be applied to the prepayment of the Indebtedness pursuant to **Section 3.3** in an amount equal to the Release Price for the applicable Property, together with interest and other amounts required to be paid in connection therewith under **Section 3.7** (collectively, the "**Casualty Prepayment Amount**"), (iv) Borrower shall prepay the Loan in an amount equal to the excess, if any, of the Casualty Prepayment Amount over such Loss Proceeds, and (v) following Borrower's written request after receipt by Lender of the Casualty Prepayment Amount, Lender shall (x) release the affected Properties from the applicable Mortgages and related Liens, **provided** that (A) Borrower has delivered to Lender draft releases (and, in the event any of the Mortgages applicable to any of the affected Properties encumber other Property(ies) in addition to the affected Properties, such release shall be a partial release that relates only to the affected Property(ies) and does not affect the Liens and security interests encumbering or on the other Property(ies)) in form and substance appropriate for the jurisdiction in which such affected Properties are located and shall contain standard provisions protecting the rights of Lender and (B) Borrower shall pay all costs, Taxes and expenses associated with such release (including cost to file and record the release and Lender's reasonable attorneys' fees) and (y) disburse to Borrower the Loss Proceeds paid by the applicable insurance company and held by Lender in excess of the Casualty Prepayment Amount for such Property.

(d)     If the Restoration Conditions are satisfied then (i) Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after payment of Loss Proceeds by the insurance company or condemning authority (as applicable) with respect to the Casualty or Condemnation) and shall diligently pursue the Restoration to satisfactory completion; (ii) Borrower shall cause the affected Property and the use thereof after the Restoration to be in compliance with and permitted under all applicable Legal Requirements and such Property, after Restoration, shall be of the same character as prior to such damage or destruction; (iii) the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements and (iv) Borrower shall deliver, or cause to be delivered, to Lender a signed detailed budget approved in writing by Borrower's architect or engineer stating the entire cost of completing the Restoration, which budget shall be reasonably acceptable to Lender.  If at any time the Loss Proceeds or the unused portion thereof shall not, in the opinion of Lender, be sufficient to pay in full the balance of the costs which are estimated by Lender to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Loss Proceeds Deficiency**") with Lender before any further use or disbursement of the Loss Proceeds shall be made.  The Loss Proceeds Deficiency deposited with Lender shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Loss Proceeds pursuant to **Section 6.16(e)**, and until so disbursed, shall constitute additional security for the Obligations.

(e)     If the Restoration Conditions are satisfied, then Lender may impose such reasonable requirements on the use or expenditure of Loss Proceeds as Lender may require, in accordance with Lender's standard construction lending practices or in any other manner approved by Lender.  Without limiting the generality of the foregoing, Lender may, at its option, reasonably condition disbursement of Loss Proceeds on (i) delivery of a Disbursement Certificate reasonably satisfactory to Lender, (ii) completion of a property inspection reasonably satisfactory to Lender, (iii) Lender's reasonable approval of plans and specifications of an architect reasonably satisfactory to Lender; (iv) the identity, experience, reputation and financial condition of contractors and subcontractors; (v) contractor's cost estimates; (vi) architect's certificates; (vii) waivers of liens; (viii) sworn statements of mechanics and materialmen and such other evidence of costs; (ix) percentage completion of construction; (x) frequency of disbursements; (xi) application of payments; (xii) customary retainage and satisfaction of liens, in each case, as Lender may reasonably require.  The excess, if any, of the Loss Proceeds and the remaining balance, if any, of

the Loss Proceeds Deficiency deposited with Lender after the Restoration has been completed, and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, **provided** no Event of Default shall have occurred and shall be continuing.

(f)    All reasonable out-of-pocket costs and expenses incurred by Lender in connection with any Restoration including reasonable attorneys' fees and disbursements, shall be paid by Borrower within ten (10) Business Days of Lender's written request therefor.

(g)    In the event of foreclosure of a Mortgage, or other transfer of title to a Property or Properties in extinguishment in whole or in part of the Indebtedness, then all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning such Property or Properties and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

**Section 6.17    Compliance with Material Agreements**. Borrower shall not, and shall cause Pledgor not to, enter into any agreement or instrument or become subject to any restriction which would reasonably be expected to have a Material Adverse Effect or an Individual Material Adverse Effect. Borrower shall (a) comply with all material terms, conditions and covenants of each Material Agreement and each material Permitted Encumbrance, including any reciprocal easement agreement, ground lease, declaration of covenants, conditions and restrictions, and any condominium arrangements, (b) promptly deliver to Lender a true and complete copy of each and every notice of default received or served by Borrower with respect to any obligations under the provisions of any Material Agreement and/or Permitted Encumbrance, (c) deliver to each other party to any Permitted Encumbrance and any Material Agreement notice of the identity of Lender and each assignee of Lender of which Borrower is aware if such notice is required in order to protect Lender's interest thereunder, and (d) enforce, short of termination thereof, the performance and observance of each and every material term, covenant and provision of each Material Agreement and Permitted Encumbrance to be performed or observed, if any.

**Section 6.18    Prohibited Persons**. Borrower shall not (i) knowingly conduct any business, or engage in any transaction or dealing, with any Embargoed Person, including the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Embargoed Person, or (ii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any Federal Trade Embargo. Borrower shall cause the representation set forth in **Section 5.30** to remain true and correct at all times.

**Section 6.19    Notice to Tenant**. Borrower shall notify and advise each current and future Tenant to make all payments of rent and other Revenues payable to Borrower.

**Section 6.20    Special Purpose Entity**. Borrower at all times shall, and shall cause Pledgor to at all times, be a Special Purpose Entity.

### ARTICLE VII    NEGATIVE COVENANTS

Borrower covenants and agrees as follows:

**Section 7.1    Liens on the Collateral**. Borrower shall not permit or suffer the existence of any Lien on any of its assets, other than Permitted Encumbrances. Borrower will cause Pledgor not to permit or suffer the existence of any Lien on any of the Collateral owned by Pledgor.

**Section 7.2    Ownership**. Borrower shall not own any assets other than the Properties and related personal property and fixtures located therein or used in connection therewith.

34

**Section 7.3**    **Leases**. Borrower shall not enter into any Lease (including any renewal or extension of any existing Lease) for any Property unless such Lease is an Eligible Lease with an Eligible Tenant.

**Section 7.4**    **Transfers**. Borrower shall not cause or suffer to occur any Transfer other than a Permitted Transfer.

**Section 7.5**    **Debt**. Borrower shall not have any Debt other than Permitted Debt. Pledgor shall not have any Debt other than Pledgor Permitted Debt.

**Section 7.6**    **Dissolution; Merger or Consolidation**. Borrower shall not and shall cause Pledgor not to dissolve, terminate, liquidate, merge with or consolidate into another Person.

**Section 7.7**    **Change in Business**. Borrower shall not, and shall cause Pledgor not to, make any material change in the scope or nature of its business objectives, purposes or operations or undertake or participate in activities other than the continuance of its present business.

**Section 7.8**    **Affiliate Transactions**. Borrower shall not, and shall cause Pledgor not to, enter into, or be a party to, any transaction with any Affiliate of Borrower or Pledgor (as applicable), except on terms that are intrinsically fair, commercially reasonable and substantially similar to those that Borrower would have obtained in a comparable arm's length transaction with an unrelated third party.

**Section 7.9**    **Jurisdiction of Formation; Name**. Borrower shall not, and shall cause Pledgor not to, change its jurisdiction of formation or name without receiving Lender's prior written consent and promptly providing Lender such information and replacement Uniform Commercial Code financing statements as Lender may reasonably request in connection therewith.

**Section 7.10**    **Modifications and Waivers**. Unless otherwise consented to in writing by Lender:

(a)    Borrower shall not, and shall cause Pledgor not to, terminate, amend or modify its organizational documents;

(b)    Borrower shall not terminate or, in any material respect, amend or modify the Approved Management Agreement; and

(c)    Borrower shall not (x) enter into any Material Agreement, or amend, modify, surrender, grant or withhold any material consent, approval or waiver under any Material Agreement or waive any material rights or remedies under any Material Agreement, except, in each case, on arms-length commercially reasonable terms, (y) terminate any Material Agreement, except for terminations in connection with a material default thereunder, or (y) default in its obligations under any Material Agreement.

**Section 7.11**    **ERISA**. Borrower shall not, and shall cause Pledgor not to, maintain or contribute to, or agree to maintain or contribute to, or permit any ERISA Affiliate of Borrower or Pledgor (as applicable) to maintain or contribute to or agree to maintain or contribute to, any employee benefit plan (as defined in Section 3(3) of ERISA) subject to Title IV or Section 302 of ERISA or Section 412 of the Code. Borrower shall not engage in a non-exempt prohibited transaction under Section 406 of ERISA, Section 4975 of the Code, or substantially similar provisions under federal, state or local laws, rules or regulations or in any transaction that would cause any obligation or action taken or to be taken hereunder (or the exercise by Lender of any of its rights under any other Loan Document) to be a non-exempt prohibited transaction under such provisions.

CAF Large Balance Loan Agreement
#49332641_v1

**Section 7.12     Advances and Investments**. Borrower shall not, and shall cause Pledgor not to, lend money or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other interest in, or make any capital contribution to, any Person, except for Permitted Investments.

**Section 7.13     Zoning and Uses**. Borrower shall not do any of the following without the prior written consent of Lender:

(a)     initiate or support any limiting change in the permitted uses of any of the Properties (or to the extent applicable, zoning reclassification of any of the Properties) or any portion thereof, seek any variance under existing land use restrictions, laws, rules or regulations (or, to the extent applicable, zoning ordinances) applicable to a Property, use or permit the use of a Property in a manner that would result in the use of such Property becoming a nonconforming use under applicable land-use restrictions or zoning ordinances or that would violate the terms of any Lease, Material Agreement or Legal Requirement (and if under applicable zoning ordinances the use of all or any portion of any Property is a nonconforming use, Borrower shall not cause or permit such nonconforming use to be discontinued or abandoned) or use or permit the use of a Property or any Residential Unit therein for any purpose other than as a residential property;

(b)     execute or file any subdivision plat affecting any of the Properties, or institute, or permit the institution of, proceedings to alter any tax lot comprising any of the Properties; or

(c)     permit or consent to any of the Properties being used by the public or any Person in such manner as might make possible a claim of adverse usage or possession or of any implied dedication or easement.

**Section 7.14     Waste**. Borrower shall not commit or permit any Waste on any of the Properties, nor take any actions that might invalidate any insurance carried on any of the Properties (and Borrower shall promptly correct any such actions of which Borrower becomes aware).

## ARTICLE VIII     DEFAULTS

**Section 8.1     Event of Default**. The occurrence of any one or more of the following events shall be, and shall constitute the commencement of, an "**Event of Default**" hereunder:

(a)     Payment.

(i)     Borrower shall default in (A) the payment when due of any principal or interest owing hereunder or under the Note (including any mandatory prepayment required hereunder), (B) the payment when due of the Yield Maintenance Premium or (C) the payment when due of any deposit required to be made to any Reserve; or

(ii)     Borrower shall default, and such default shall continue for at least five (5) Business Days after notice to Borrower that such amounts are owing, in the payment when due of fees, expenses or other amounts owing under the Loan Documents (other than amounts described in the foregoing clause (i)).

(b)     Representations. Any representation made by any Restricted Party in any of the Loan Documents, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect (or, with respect to any representation that itself contains a materiality qualifier, in any respect) as of the date such representation was made.

36

CAF Large Balance Loan Agreement
#49332641_v1

(c)    <u>Other Loan Documents</u>. Any Loan Document shall fail to be in full force and effect or to convey the Liens, rights, powers and privileges purported to be created thereby; any Restricted Party shall disaffirm or contest in writing such effectiveness; or a default by any Restricted Party or any of their respective Affiliates shall occur under any of the other Loan Documents, in each case, beyond the expiration of any applicable cure period.

(d)    <u>Event of Bankruptcy</u>. An Event of Bankruptcy shall occur with respect to any Restricted Party.

(e)    <u>Prohibited Transfers</u>. A Transfer other than a Permitted Transfer shall occur.

(f)    <u>Insurance</u>. Borrower shall fail to maintain in full force and effect all Policies required hereunder.

(g)    <u>ERISA; Negative Covenants</u>. A Default shall occur in the due performance or observance by Borrower of any term, covenant or agreement contained in **Section 6.8** or in **Article VII**, provided that such default shall not constitute an Event of Default unless and until it shall remain uncured for ten (10) days after Borrower receives written notice thereof.

(h)    <u>Financial Statements</u>. Borrower shall fail to provide to Lender the financial statements and other information specified in **Section 6.11** within the respective time periods specified therein and such failure continues for five (5) Business Days following written notice from Lender.

(i)    <u>Replacement of Property Manager</u>. If (i) Borrower shall fail to replace any Approved Property Manager as required by **Section 6.9(b)**, (ii) without Lender's prior written consent, any Approved Management Agreement is terminated (unless simultaneously therewith, Borrower and a new Approved Property Manager enter into a replacement Approved Management Agreement in accordance with **Section 6.9**), or (iii) there is a default by Borrower under any Approved Management Agreement beyond any applicable notice or grace period that permits such Approved Property Manager to terminate or cancel the applicable Approved Management Agreement (unless, within thirty (30) days after the expiration of such notice or grace period, Borrower and a new Approved Property Manager enter into a replacement Approved Management Agreement in accordance with **Section 6.9**).

(j)    <u>Federal Trade Embargoes</u>. Any failure on the part of Borrower to duly observe or perform any of its covenants set forth in **Section 5.30**.

(k)    <u>Judgments</u>. One or more final judgments for the payment of five percent (5%) of the initial Loan Amount or more rendered against Borrower, and such amount is not covered by insurance or indemnity or not discharged, paid or stayed within sixty (60) days after (i) the date on which the right to appeal thereof has expired if no such appeal has commenced, or (ii) the date on which all rights to appeal have been extinguished.

(l)    <u>Sponsor Financial Covenant</u>.  If as of any Calculation Date, Sponsor fails to comply with the Sponsor Financial Covenant.

(m)    <u>Other Covenants</u>. A Default shall occur in the due performance or observance by any Restricted Party of any term, covenant or agreement (other than those referred to in any other subsection of this Section) contained in any Loan Document, except that in the case of a Default that can be cured by the payment of money, such Default shall not constitute an Event of Default unless and until it shall remain uncured for ten (10) days after such Restricted Party receives written

notice thereof; and in the case of a Default that cannot be cured by the payment of money but is susceptible of being cured within thirty (30) days, such Default shall not constitute an Event of Default unless and until it remains uncured for thirty (30) days after such Restricted Party receives written notice thereof; and if such non-monetary Default is not cured within such thirty (30) day period despite such Restricted Party's diligent efforts but is susceptible of being cured within ninety (90) days of such Restricted Party's receipt of Lender's original notice, then such Restricted Party shall have such additional time as is reasonably necessary to effect such cure, but in no event in excess of ninety (90) days from such Restricted Party's receipt of Lender's original notice, provided that such Restricted Party promptly delivers written notice to Lender of its intention and ability to effect such cure prior to the expiration of such ninety (90) day period.

**Section 8.2      Remedies**.

(a)      During the continuance of an Event of Default, Lender may by written notice to Borrower, in addition to any other rights or remedies available pursuant to the Loan Documents, at law or in equity, declare all or any portion of the Indebtedness to be immediately due and payable, whereupon all or such portion of the Indebtedness shall so become due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Collateral (including all rights or remedies available at law or in equity); provided, however, that, notwithstanding the foregoing, if an Event of Default specified in **Section 8.1(d)** shall occur, then the Indebtedness shall immediately become due and payable without the giving of any notice or other action by Lender. Any actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents.

(b)      If Lender forecloses on any Collateral, Lender shall apply all net proceeds of such foreclosure to repay the Indebtedness, the Indebtedness shall be reduced to the extent of such net proceeds and the remaining portion of the Indebtedness shall remain outstanding and secured by the remaining Collateral. At the election of Lender, the Note shall be deemed to have been accelerated only to the extent of the net proceeds actually received by Lender with respect to the Properties and applied in reduction of the Indebtedness.

(c)      If any Loan Party fails to pay or perform any obligation under any Loan Document or any Management Agreement, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, take any action to cure such failure. Lender may enter upon any or all of the Properties upon reasonable notice to Borrower for such purposes or appear in, defend, or bring any action or proceeding to protect its interest in the Collateral or to foreclose the Mortgage and the other Loan Documents or collect the Indebtedness. The costs and expenses incurred by Lender in exercising rights under this Section (including reasonable attorneys' fees), with interest at the Default Rate for the period after notice from Lender that such costs or expenses were incurred to the date of payment to Lender, shall constitute a portion of the Indebtedness, shall be secured by the Mortgage and other Loan Documents and shall be due and payable to Lender upon demand therefor.

(d)      Interest shall accrue on any judgment obtained by Lender in connection with its enforcement of the Loan at a rate of interest equal to the Default Rate.

(e)      Each of the rights, powers and remedies of Lender under this Agreement and the other Loan Documents and Legal Requirements and at equity shall be cumulative and not exclusive of any other such right, power or remedy.  Lender's rights, powers and remedies may be pursued

independently, singly, successively, together or otherwise, at such times and from time to time and as often and in such order as Lender may determine, to the fullest extent permitted by law, without impairing or otherwise affecting any of the other such rights, powers and remedies of Lender. Without limiting the generality of the foregoing, if an Event of Default is continuing (a) Lender shall not be subject to any "one action" or "election of remedies" law or rule, (b) all Liens and other rights, powers and remedies provided to Lender shall remain in full force and effect until all of the Obligations have been paid in full and (c) Lender may pursue any right, power or remedy against any Person or Collateral with or without accelerating the Obligations or pursuing any other right, power or remedy against any other Person or Collateral.

(f)        Notwithstanding the availability of legal remedies, Lender will be entitled to obtain specific performance, mandatory or prohibitory injunctive relief, or other equitable relief requiring Borrower to cure or refrain from repeating any Default.

(g)        Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to execute the Severed Loan Documents (Borrower ratifying all that its said attorney shall do by virtue thereof); provided, however, that Lender shall not make or execute any such Severed Loan Documents under such power unless Borrower or Pledgor fails to do so within three (3) days after written demand by Lender.  Borrower shall be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents. The Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents, and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

**Section 8.3        Duration and Cure of Events of Default**.  If any Event of Default shall occur (irrespective of whether or not the same consists of an ongoing condition, a one-time occurrence, or otherwise), the same shall be deemed to continue at all times thereafter; **provided, however**, that such Event of Default shall cease to continue, irrespective of subsequent performance or acceptance of the same, only (a) in the case of any Event of Default that consists of the failure to pay money, if the same is paid to Lender (together with any applicable late charge and interest at the Default Rate), (b) in the case of any Qualified Release Property Default, if Borrower satisfies the Release Conditions as set forth in **Section 3.5**, or (c) in the case of any of the foregoing Events of Default or any other Event of Default, if Lender shall execute and deliver a written agreement or waiver in which Lender expressly states that such Event of Default has ceased to continue.  Except only as expressly required by law or as to a Qualified Release Property Default in accordance with **Section 3.5**, Borrower shall have no right to cure any Event of Default, and Lender shall not be obligated under any circumstances whatsoever to accept such cure or performance or to execute and deliver any such writing.  Without limitation, this **Section 8.3** shall govern in any case where reference is made in the Loan Documents to (i) any "cure" (whether by use of such word or otherwise) of any Event of Default, (ii) "during an Event of Default" or "the continuance of an Event of Default" (in each case, whether by use of such words or otherwise), or (iii) any condition or event which continues beyond the time when the same becomes an Event of Default.

### ARTICLE IX  MISCELLANEOUS

39

**Section 9.1** **Notices**. All notices, consents, approvals and requests required or permitted under any Loan Document shall be given in writing by expedited prepaid delivery service, either commercial or United States Postal Service, with proof of delivery or attempted delivery, addressed as follows (except that any party hereto may change its address and other contact information for purposes hereof at any time by sending a written notice to the other parties to this Agreement in the manner provided for in this Section). A notice shall be deemed to have been given when delivered or upon refusal to accept delivery.

| If to Lender: | If to Borrower: |
|---|---|
| CoreVest American Finance Lender LLC | KPM Investment A 2 LLC |
| 4 Park Plaza, Suite 900 | 123 Taaffe Place |
| Irvine, CA 92614 | Brooklyn, New York 11211 |
| Attention:  Head of Term Lending | Attention: Joseph Perlmutter |
| Email:  termloannotices@cvest.com | Email: JPerlmutter@bmgaproperties.com |
| | |
| With a copy to: | with a copy to: |
| | |
| Harrison & Held, LLP | Blaivas & Associates, P.C. |
| 333 West Wacker Drive, Suite 1700 | 1430 Broadway, Suite 1603 |
| Chicago, IL 60606 | New York, New York 10018 |
| Attention:  Anthony L. Frink, Esq. | David Rosenbaum, Esq. |
| Email:  afrink@harrisonheld.com | Email:  drosenbaum@blpclaw.com |

**Section 9.2** **Preferences; Waiver of Marshalling of Assets**. Lender shall have no obligation to marshal any assets in favor of Borrower or any other party or against or in payment of any or all of the Obligations of Borrower pursuant to the Loan Documents.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Obligations of Borrower hereunder and under the Loan Documents.  If any payment to Lender is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then the Obligations hereunder or portion thereof intended to be satisfied by such payment shall be revived and continue in full force and effect, as if such payment had not been made.  Borrower hereby waives any legal right otherwise available to Borrower that would require the sale of any Collateral either separate or apart from other Collateral, or require Lender to exhaust its remedies against any Collateral before proceeding against any other Collateral.  Without limiting the foregoing, to the fullest extent permitted by law, Borrower hereby waives and shall not assert any rights in respect of a marshalling of Collateral, a sale in the inverse order of alienation, any homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Collateral or any portion thereof in any sequence and any combination as determined by Lender.

**Section 9.3** **Remedies of Borrower**. If a claim is made that Lender or its agents have unreasonably delayed acting or acted unreasonably in any case where by law or under any Loan Documents any of such Persons has an obligation to act promptly or reasonably, Borrower agrees that no such Person shall be liable for any monetary damages, and Borrower's sole remedy shall be limited to commencing an action seeking specific performance, injunctive relief and/or declaratory judgment; **provided**, **however**, that the foregoing shall not prevent Borrower from obtaining a monetary judgment against Lender if it is determined by a court of competent jurisdiction that Lender acted with gross negligence, bad faith or willful misconduct.  Notwithstanding anything herein to the contrary, Borrower shall not assert, and hereby waives, any claim against Lender and/or its Affiliates, directors, employees, attorneys, agents or sub-agents, on any theory of liability, for special, indirect, consequential or punitive damages (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable Legal Requirement) arising out of, as a result

40

of, or in any way related to, the Loan Documents or any agreement or instrument contemplated thereby or referred to therein, the transactions contemplated thereby, the Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and Borrower hereby waives, releases and agrees not to sue upon any such claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor, except for claims arising from any such Person's gross negligence, bad faith or willful misconduct.

**Section 9.4    Brokers and Financial Advisors**. Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower in connection with the transactions contemplated in this Agreement.  The provisions of this Section shall survive the expiration and termination of this Agreement and the repayment of the Indebtedness.

**Section 9.5    General Indemnity; Payment of Expenses**.

(a)    Borrower, at its sole cost and expense, shall protect, indemnify, reimburse, defend and hold harmless Lender and its officers, partners, members, directors, trustees, advisors, employees, agents, sub-agents, Affiliates, successors, participants and assigns of any and all of the foregoing (collectively, the "**Indemnified Parties**") for, from and against any and all Damages of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against any of the Indemnified Parties, in any way relating to or arising out of Lender's interest in the Loan; **provided**, **however**, that no Indemnified Party shall have the right to be so indemnified to the extent that such Damages have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnified Party.

(b)    If for any reason (including violation of law or public policy) the undertakings to defend, indemnify, pay and hold harmless set forth in this Section are unenforceable in whole or in part or are otherwise unavailable to an Indemnified Party or insufficient to hold it harmless, then Borrower shall contribute to the amount paid or payable by the Indemnified Party as a result of any Damages the maximum amount Borrower is permitted to pay under Legal Requirements.  The obligations of Borrower under this Section will be in addition to any liability that Borrower may otherwise have under the Loan Documents.  Any amounts payable to Lender by reason of the application of this Section shall be secured by the Loan Documents and shall become immediately due and payable and shall bear interest at the Default Rate from the date Damages are sustained by the Indemnified Parties until paid.

(c)    The provisions of and undertakings and indemnification set forth in this **Section 9.5** shall survive the satisfaction and payment in full of the Indebtedness and termination of this Agreement.

(d)    Borrower shall reimburse Lender upon receipt of written notice from Lender for (i) all reasonable out-of-pocket costs and expenses incurred by Lender (or any of its Affiliates) in connection with the origination of the Loan; (ii) all reasonable out-of-pocket costs and expenses incurred by Lender (or any of its Affiliates) in connection with (A) monitoring the Restricted Parties' ongoing performance of and compliance with the Restricted Parties' agreements and covenants contained in the Loan Documents on their part to be performed or complied with after the Closing Date, but not including any base monthly (or other periodic) servicing fees due to any master servicer on account of the day-to-day, routine servicing of the Loan, (B) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to the Loan Documents and any other documents or matters relating hereto (including Leases, Material Agreements, and Permitted Encumbrances), (C) filing, registration and recording fees and expenses and other similar expenses incurred in creating and perfecting the Liens in favor

CAF Large Balance Loan Agreement
#49332641_v1

of Lender pursuant to the Loan Documents (including the filing, registration or recording of any instrument of further assurance) and all federal, state, county and municipal, taxes (including, if applicable, documentary or intangible taxes), search fees, title insurance premiums, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Loan Documents, any mortgage supplemental thereto, any security instrument with respect to the Collateral or any instrument of further assurance, (D) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents or any Collateral, and (E) in connection with any Rating Agency Confirmation in respect of any matter required or requested by Borrower hereunder; and (iii) all actual out-of-pocket costs and expenses (including attorney's fees and, if the Loan has been Securitized, special servicing fees) incurred by Lender (or any of its Affiliates) in connection with the enforcement of any Obligations of any Restricted Party, or a Default or Event of Default by any Restricted Party, under the Loan Documents, including any actual or attempted foreclosure, deed-in-lieu of foreclosure, refinancing, restructuring, settlement or workout and any Event of Bankruptcy (including any applicable transfer taxes).  Without limiting the foregoing, Borrower shall pay all costs, expenses and fees of Lender and its Servicer, operating advisor and securitization trustee resulting from Defaults or Events of Default or reasonably imminent Defaults or Events of Default by any Restricted Party or requests by any Restricted Party (including enforcement expenses and any liquidation fees, workout fees, special servicing fees, operating advisor consulting fees or any other similar fees and interest payable on advances made by the Servicer or the securitization trustee with respect to delinquent debt service payments or expenses of curing any Restricted Party's defaults under the Loan Documents, and any expenses paid by Servicer or a trustee in respect of the protection and preservation of any Property, such as payment of taxes and insurance premiums); and the costs of all property inspections, appraisals and broker price opinions (or any updates to any existing inspection, appraisal or broker price opinion) that Servicer may be required to obtain due to a request by a Restricted Party or the occurrence of a Default or Event of Default.

**Section 9.6    Schedules and Exhibits Incorporated**. The Schedules and Exhibits attached hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 9.7    Successors**. Except as otherwise provided in this Agreement, whenever in this Agreement any of the parties to this Agreement is referred to, such reference shall be deemed to include the successors and permitted assigns of such party. All covenants, promises and agreements in this Agreement contained, by or on behalf of Borrower, shall inure to the benefit of Lender and its successors and assigns.

**Section 9.8    Modification, Waiver in Writing**. No Loan Document may be amended, changed, waived, discharged or terminated, nor shall any consent or approval of Lender be granted hereunder, unless such amendment, change, waiver, discharge, termination, consent or approval is in writing signed by Lender.

**Section 9.9    Severability**. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 9.10    Offsets, Counterclaims and Defenses**. All payments made by Borrower under the Loan Documents shall be made irrespective of, and without any deduction for, any offsets, counterclaims

42

or defenses.  Borrower waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with the Loan Documents or the Indebtedness.  Any assignee of Lender's interest in the Loan shall take the same free and clear of all offsets, counterclaims or defenses against the assigning Lender.

Section 9.11    **No Joint Venture**. Nothing in this Agreement is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between Borrower and Lender, nor to grant Lender any interest in any Property other than that of mortgagee or lender.

Section 9.12    **Conflict; Construction of Documents**. In the event of any conflict between the provisions of this Agreement and the provisions of the other Loan Documents, the provisions of this Agreement shall prevail.  The parties acknowledge that they were each represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted same.

Section 9.13    **Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Copies of originals, including copies delivered by facsimile, pdf or other electronic means, shall have the same import and effect as original counterparts and shall be valid, enforceable and binding for the purposes of this Agreement.

Section 9.14    **No Third-Party Beneficiaries**. The Loan Documents are solely for the benefit of the parties thereto, and nothing contained in the Loan Documents shall be deemed to confer upon anyone other than the parties thereto and Indemnified Parties any right to insist upon or to enforce the performance or observance of any of the Obligations contained herein or therein.

Section 9.15    **Right of Set-Off**. In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, during the continuance of an Event of Default, Lender may from time to time, without presentment, demand, protest or other notice of any kind (all of such rights being hereby expressly waived), set-off and appropriate and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by Lender (including branches, agencies or Affiliates of Lender wherever located) to or for the credit or the account of Borrower against the Obligations, irrespective of whether Lender shall have made any demand hereunder and although such Obligations may be contingent or unmatured.

Section 9.16    **Servicer**. Lender may delegate any and all rights and obligations of Lender under the Loan Documents to the Servicer upon notice by Lender to Borrower, whereupon any notice or consent from the Servicer to Borrower, and any action by Servicer on Lender's behalf, shall have the same force and effect as if Servicer were Lender.

Section 9.17    **Exculpation of Lender**. Lender neither undertakes nor assumes any responsibility or duty to Borrower or any other party to select, review, inspect, examine, supervise, pass judgment upon or inform Borrower or any third party of (a) the existence, quality, adequacy or suitability of appraisals of the Properties or other Collateral, (b) any environmental report, or (c) any other matters or items, including engineering, soils and seismic reports that are contemplated in the Loan Documents.  Any such selection, review, inspection, examination and the like, and any other due diligence conducted by Lender, is solely for the purpose of protecting Lender's rights under the Loan Documents, and shall not render Lender liable to Borrower or any third party for the existence, sufficiency, accuracy, completeness or legality thereof.

CAF Large Balance Loan Agreement
#49332641_v1

**Section 9.18    PATRIOT Act Records**. Lender hereby notifies Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Restricted Party and certain of their Affiliates.

**Section 9.19    Prior Agreements**. THE LOAN DOCUMENTS CONTAIN THE ENTIRE AGREEMENT OF THE PARTIES THERETO IN RESPECT OF THE TRANSACTIONS CONTEMPLATED THEREBY, AND ALL PRIOR AGREEMENTS AMONG OR BETWEEN SUCH PARTIES, WHETHER ORAL OR WRITTEN, INCLUDING ANY TERM SHEETS, CONFIDENTIALITY AGREEMENTS AND COMMITMENT LETTERS, ARE SUPERSEDED BY THE TERMS OF THE LOAN DOCUMENTS.

**Section 9.20    Governing Law**.

(a)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR ANY RESTRICTED PARTY ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS (OTHER THAN ANY ACTION IN RESPECT OF THE CREATION, PERFECTION OR ENFORCEMENT OF A LIEN OR SECURITY INTEREST CREATED PURSUANT TO ANY LOAN DOCUMENTS NOT GOVERNED BY THE LAWS OF THE STATE OF NEW YORK) MAY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK.  BORROWER AND LENDER HEREBY (i) IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, (ii) IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING, AND (iii) IRREVOCABLY CONSENT  TO SERVICE OF PROCESS BY MAIL, PERSONAL SERVICE OR IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW, AT THE ADDRESS SPECIFIED IN <u>SECTION 9.1</u> (AND AGREES THAT SUCH SERVICE AT SUCH ADDRESS IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER ITSELF IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT).

**Section 9.21    Trial by Jury**. LENDER AND BORROWER, TO THE FULLEST EXTENT THAT THEY MAY LAWFULLY DO SO, HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY LENDER AND BORROWER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LENDER AND BORROWER ARE EACH HEREBY INDIVIDUALLY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

**Section 9.22    Delay Not a Waiver**. Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege under any Loan Document or under any other instrument given as security

44

therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 9.23    Rules of Construction**. Unless otherwise specified, (i) all references to sections, schedules and exhibits are to sections, schedules and exhibits in or to this Agreement, (ii) all meanings attributed to defined terms in this Agreement shall be equally applicable to both the singular and plural forms of the terms so defined, (iii) "including" means "including, but not limited to", (iv) "mortgage" means a mortgage, deed of trust, deed to secure debt or similar instrument, as applicable, and "mortgagee" means the secured party under a mortgage, deed of trust, deed to secure debt or similar instrument, (v) the words "hereof," "herein," "hereby," "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision, article, section or other subdivision of this Agreement, (vi) unless otherwise indicated, all references to "this Section" shall refer to the Section of this Agreement in which such reference appears in its entirety and not to any particular clause or subsection or such Section, (vii) the use of the phrases "an Event of Default exists", "during the continuance of an Event of Default" or similar phrases in the Loan Documents shall not be deemed to grant Borrower any right to cure an Event of Default, and each Event of Default shall continue unless and until the same is waived by Lender in writing in accordance with the requirements of the Loan Documents and (viii) terms used herein and defined by cross-reference to another agreement or document shall have the meaning set forth in such other agreement or document as of the Closing Date, notwithstanding any subsequent amendment or restatement of or modification to such other agreement or document.  Except as otherwise indicated, all accounting terms not specifically defined in this Agreement shall be construed in accordance with GAAP, as the same may be modified in this Agreement.

**Section 9.24    Lender's Discretion; Rating Agency Review**. Whenever pursuant to this Agreement or any other Loan Document (a) Lender has any right to approve or disapprove any matter or grant any consent or waiver, (b) Lender is entitled to make any determination, or (c) any matter is to be satisfactory to Lender, then Lender shall have the right to so approve, disapprove, grant or withhold, determine, or be satisfied or unsatisfied, as applicable, in its sole discretion, and any such decision shall be final and conclusive and may be conditioned upon obtaining a Rating Agency Confirmation.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Lender and Borrower are executing this Agreement as of the date hereof.

BORROWER:
KPM INVESTMENT A 2 LLC,
a Delaware limited liability company

By: _____
Name: Joseph Perlmutter
Title: President

*[ADDITIONAL SIGNATURE PAGE FOLLOWS]*

SIGNATURE PAGE TO LOAN AGREEMENT

#49332641_v1

**LENDER:**

**COREVEST AMERICAN FINANCE LENDER LLC**,
a Delaware limited liability company

By: _____

Name:  J. Christopher Hoeffel
Title:  CFO

SIGNATURE PAGE TO LOAN AGREEMENT

#49332641_v1

**EXHIBIT A**

Form of Rent Statement

| Property ID | Address | City | State | Zip | County | Leased | Monthly Rent | Security Deposit | Last Payment | Lease Start Date | Lease End Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 736929 | 6370 Shannon Pkwy Apt 1001 | Union City | GA | 30291 | Fulton | Y | 875 | | 10/1/2021 | 3/19/2021 | 2/28/2022 |
| 736930 | 6370 Shannon Pkwy Apt 1002 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 9/17/2021 | 8/31/2022 |
| 736931 | 6370 Shannon Pkwy Apt 1003 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736932 | 6370 Shannon Pkwy Apt 1004 | Union City | GA | 30291 | Fulton | Y | 875 | 1,400 | 10/1/2021 | 9/17/2021 | 8/31/2022 |
| 736933 | 6370 Shannon Pkwy Apt 1005 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 9/17/2021 | 8/31/2022 |
| 736934 | 6370 Shannon Pkwy Apt 1006 | Union City | GA | 30291 | Fulton | Y | 675 | | 10/1/2021 | 5/1/2021 | 4/30/2022 |
| 736935 | 6370 Shannon Pkwy Apt 1007 | Union City | GA | 30291 | Fulton | Y | 675 | | 10/1/2021 | 5/27/2021 | 4/30/2022 |
| 736936 | 6370 Shannon Pkwy Apt 1008 | Union City | GA | 30291 | Fulton | Y | 675 | | 10/1/2021 | 3/5/2021 | 2/28/2022 |
| 736992 | 6370 Shannon Pkwy Apt 102 | Union City | GA | 30291 | Fulton | N | | | | | |
| 736993 | 6370 Shannon Pkwy Apt 103 | Union City | GA | 30291 | Fulton | N | | | | | |
| 736994 | 6370 Shannon Pkwy Apt 104 | Union City | GA | 30291 | Fulton | N | | | | | |
| 736995 | 6370 Shannon Pkwy Apt 105 | Union City | GA | 30291 | Fulton | N | | | | | |
| 736996 | 6370 Shannon Pkwy Apt 106 | Union City | GA | 30291 | Fulton | N | | | | | |
| 736890 | 6370 Shannon Pkwy Apt 107 | Union City | GA | 30291 | Fulton | N | | | | | |
| 736937 | 6370 Shannon Pkwy Apt 1101 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 11/1/2021 | 10/31/2022 |
| 736938 | 6370 Shannon Pkwy Apt 1102 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 11/1/2021 | 10/31/2022 |
| 736894 | 6370 Shannon Pkwy Apt 1103 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 11/1/2021 | 10/31/2022 |
| 736939 | 6370 Shannon Pkwy Apt 1104 | Union City | GA | 30291 | Fulton | Y | 875 | 1,200 | 10/1/2021 | 11/1/2021 | 10/31/2022 |
| 736940 | 6370 Shannon Pkwy Apt 1105 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 11/1/2021 | 10/31/2022 |
| 736941 | 6370 Shannon Pkwy Apt 1106 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 11/1/2021 | 10/31/2022 |
| 736942 | 6370 Shannon Pkwy Apt 1107 | Union City | GA | 30291 | Fulton | Y | 930 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736943 | 6370 Shannon Pkwy Apt 1108 | Union City | GA | 30291 | Fulton | Y | 930 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736944 | 6370 Shannon Pkwy Apt 1109 | Union City | GA | 30291 | Fulton | Y | 930 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736945 | 6370 Shannon Pkwy Apt 1110 | Union City | GA | 30291 | Fulton | Y | 930 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736946 | 6370 Shannon Pkwy Apt 1201 | Union City | GA | 30291 | Fulton | Y | 1,075 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736947 | 6370 Shannon Pkwy Apt 1202 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736948 | 6370 Shannon Pkwy Apt 1203 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736895 | 6370 Shannon Pkwy Apt 1204 | Union City | GA | 30291 | Fulton | Y | 775 | 700 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736949 | 6370 Shannon Pkwy Apt 1205 | Union City | GA | 30291 | Fulton | Y | 775 | 700 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736950 | 6370 Shannon Pkwy Apt 1206 | Union City | GA | 30291 | Fulton | Y | 775 | 700 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736951 | 6370 Shannon Pkwy Apt 1207 | Union City | GA | 30291 | Fulton | Y | 775 | 700 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736952 | 6370 Shannon Pkwy Apt 1208 | Union City | GA | 30291 | Fulton | Y | 1,075 | 1,000 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736953 | 6370 Shannon Pkwy Apt 1301 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736954 | 6370 Shannon Pkwy Apt 1302 | Union City | GA | 30291 | Fulton | Y | 975 | 900 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736955 | 6370 Shannon Pkwy Apt 1303 | Union City | GA | 30291 | Fulton | Y | 775 | 900 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736956 | 6370 Shannon Pkwy Apt 1304 | Union City | GA | 30291 | Fulton | Y | 875 | 900 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736957 | 6370 Shannon Pkwy Apt 1305 | Union City | GA | 30291 | Fulton | Y | 875 | 900 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736958 | 6370 Shannon Pkwy Apt 1306 | Union City | GA | 30291 | Fulton | Y | 775 | 900 | 10/1/2021 | 10/1/2021 | 9/30/2022 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 736896 | 6370 Shannon Pkwy Apt 1307 | Union City | GA | 30291 | Fulton | Y | 775 | 900 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736959 | 6370 Shannon Pkwy Apt 1401 | Union City | GA | 30291 | Fulton | Y | 950 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736960 | 6370 Shannon Pkwy Apt 1402 | Union City | GA | 30291 | Fulton | Y | 950 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736961 | 6370 Shannon Pkwy Apt 1403 | Union City | GA | 30291 | Fulton | Y | 950 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736962 | 6370 Shannon Pkwy Apt 1404 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 11/1/2021 | 10/31/2022 |
| 736963 | 6370 Shannon Pkwy Apt 1405 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736964 | 6370 Shannon Pkwy Apt 1406 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736965 | 6370 Shannon Pkwy Apt 1407 | Union City | GA | 30291 | Fulton | Y | 875 | 1,400 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736966 | 6370 Shannon Pkwy Apt 1408 | Union City | GA | 30291 | Fulton | Y | 950 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736967 | 6370 Shannon Pkwy Apt 1501 | Union City | GA | 30291 | Fulton | Y | 950 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736968 | 6370 Shannon Pkwy Apt 1502 | Union City | GA | 30291 | Fulton | Y | 950 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736897 | 6370 Shannon Pkwy Apt 1503 | Union City | GA | 30291 | Fulton | Y | 1,075 | 1,000 | 10/1/2021 | 11/1/2021 | 10/31/2022 |
| 736969 | 6370 Shannon Pkwy Apt 1504 | Union City | GA | 30291 | Fulton | Y | 1,075 | 1,000 | 10/1/2021 | 11/1/2021 | 10/31/2022 |
| 736970 | 6370 Shannon Pkwy Apt 1505 | Union City | GA | 30291 | Fulton | Y | 950 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736971 | 6370 Shannon Pkwy Apt 1506 | Union City | GA | 30291 | Fulton | Y | 930 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736972 | 6370 Shannon Pkwy Apt 1507 | Union City | GA | 30291 | Fulton | Y | 930 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736973 | 6370 Shannon Pkwy Apt 1601 | Union City | GA | 30291 | Fulton | Y | 1,000 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736974 | 6370 Shannon Pkwy Apt 1602 | Union City | GA | 30291 | Fulton | Y | 1,000 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736975 | 6370 Shannon Pkwy Apt 1603 | Union City | GA | 30291 | Fulton | Y | 1,000 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736976 | 6370 Shannon Pkwy Apt 1604 | Union City | GA | 30291 | Fulton | Y | 675 | | 10/1/2021 | 5/1/2021 | 4/30/2022 |
| 736977 | 6370 Shannon Pkwy Apt 1605 | Union City | GA | 30291 | Fulton | Y | 1,010 | | 10/1/2021 | 8/1/2021 | 7/31/2022 |
| 736978 | 6370 Shannon Pkwy Apt 1606 | Union City | GA | 30291 | Fulton | Y | 1,010 | | 10/1/2021 | 8/1/2021 | 7/31/2022 |
| 736898 | 6370 Shannon Pkwy Apt 1607 | Union City | GA | 30291 | Fulton | Y | 1,010 | | 10/1/2021 | 8/1/2021 | 7/31/2022 |
| 736979 | 6370 Shannon Pkwy Apt 1608 | Union City | GA | 30291 | Fulton | Y | 1,010 | | 10/1/2021 | 8/1/2021 | 7/31/2022 |
| 736980 | 6370 Shannon Pkwy Apt 1701 | Union City | GA | 30291 | Fulton | Y | 1,000 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736981 | 6370 Shannon Pkwy Apt 1702 | Union City | GA | 30291 | Fulton | Y | 1,000 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736982 | 6370 Shannon Pkwy Apt 1703 | Union City | GA | 30291 | Fulton | Y | 1,000 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736983 | 6370 Shannon Pkwy Apt 1704 | Union City | GA | 30291 | Fulton | Y | 1,000 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736984 | 6370 Shannon Pkwy Apt 1705 | Union City | GA | 30291 | Fulton | Y | 1,000 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736985 | 6370 Shannon Pkwy Apt 1706 | Union City | GA | 30291 | Fulton | Y | 1,000 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736986 | 6370 Shannon Pkwy Apt 1707 | Union City | GA | 30291 | Fulton | Y | 1,000 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736987 | 6370 Shannon Pkwy Apt 1708 | Union City | GA | 30291 | Fulton | Y | 1,000 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736899 | 6370 Shannon Pkwy Apt 201 | Union City | GA | 30291 | Fulton | Y | 1,075 | 1,000 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736989 | 6370 Shannon Pkwy Apt 202 | Union City | GA | 30291 | Fulton | Y | 825 | | 10/1/2021 | 6/1/2021 | 5/31/2022 |
| 736997 | 6370 Shannon Pkwy Apt 203 | Union City | GA | 30291 | Fulton | Y | 775 | | 10/1/2021 | 7/2/2020 | 6/30/2021 |
| 736998 | 6370 Shannon Pkwy Apt 204 | Union City | GA | 30291 | Fulton | Y | 775 | | 10/1/2021 | 10/4/2019 | 9/30/2020 |
| 736900 | 6370 Shannon Pkwy Apt 205 | Union City | GA | 30291 | Fulton | Y | 775 | | 10/1/2021 | 7/1/2021 | 6/30/2022 |
| 736999 | 6370 Shannon Pkwy Apt 206 | Union City | GA | 30291 | Fulton | Y | 735 | | 10/1/2021 | 1/1/2021 | 12/31/2021 |
| 737000 | 6370 Shannon Pkwy Apt 207 | Union City | GA | 30291 | Fulton | Y | 925 | | 10/1/2021 | 12/15/2020 | 11/30/2021 |
| 737001 | 6370 Shannon Pkwy Apt 208 | Union City | GA | 30291 | Fulton | Y | 975 | | 10/1/2021 | 5/28/2021 | 4/30/2022 |
| 737002 | 6370 Shannon Pkwy Apt 301 | Union City | GA | 30291 | Fulton | Y | 750 | | 10/1/2021 | 11/3/2020 | 10/31/2021 |
| 737003 | 6370 Shannon Pkwy Apt 302 | Union City | GA | 30291 | Fulton | Y | 775 | | 10/1/2021 | 7/6/2020 | 6/30/2021 |
| 737004 | 6370 Shannon Pkwy Apt 303 | Union City | GA | 30291 | Fulton | Y | 725 | | 10/1/2021 | 6/1/2021 | 6/30/2023 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 737005 | 6370 Shannon Pkwy Apt 304 | Union City | GA | 30291 | Fulton | Y | 925 | | 10/1/2021 | 12/1/2020 | 11/30/2021 |
| 737006 | 6370 Shannon Pkwy Apt 305 | Union City | GA | 30291 | Fulton | Y | 725 | | 10/1/2021 | 11/19/2018 | 11/30/2019 |
| 737007 | 6370 Shannon Pkwy Apt 306 | Union City | GA | 30291 | Fulton | Y | 675 | | 10/1/2021 | 11/2/2018 | 10/31/2019 |
| 737008 | 6370 Shannon Pkwy Apt 307 | Union City | GA | 30291 | Fulton | Y | 875 | 1,200 | 10/1/2021 | 11/1/2021 | 10/31/2022 |
| 736901 | 6370 Shannon Pkwy Apt 308 | Union City | GA | 30291 | Fulton | Y | 800 | | 10/1/2021 | 12/9/2020 | 11/30/2021 |
| 737009 | 6370 Shannon Pkwy Apt 401 | Union City | GA | 30291 | Fulton | Y | 1,075 | 1,000 | 10/1/2021 | 11/1/2021 | 10/31/2022 |
| 737010 | 6370 Shannon Pkwy Apt 402 | Union City | GA | 30291 | Fulton | Y | 975 | 800 | 10/1/2021 | 8/26/2021 | 7/31/2022 |
| 737011 | 6370 Shannon Pkwy Apt 403 | Union City | GA | 30291 | Fulton | Y | 875 | | 10/1/2021 | 6/1/2021 | 5/31/2022 |
| 737012 | 6370 Shannon Pkwy Apt 404 | Union City | GA | 30291 | Fulton | Y | 975 | | 10/1/2021 | 2/5/2021 | 1/31/2022 |
| 737013 | 6370 Shannon Pkwy Apt 405 | Union City | GA | 30291 | Fulton | Y | 925 | | 10/1/2021 | 6/1/2021 | 5/31/2022 |
| 737014 | 6370 Shannon Pkwy Apt 406 | Union City | GA | 30291 | Fulton | Y | 925 | | 10/1/2021 | 2/22/2019 | 2/28/2020 |
| 737015 | 6370 Shannon Pkwy Apt 501 | Union City | GA | 30291 | Fulton | Y | 755 | | 10/1/2021 | 7/1/2021 | 6/30/2022 |
| 737016 | 6370 Shannon Pkwy Apt 502 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 737017 | 6370 Shannon Pkwy Apt 503 | Union City | GA | 30291 | Fulton | Y | 825 | 800 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 737018 | 6370 Shannon Pkwy Apt 504 | Union City | GA | 30291 | Fulton | Y | 725 | | 10/1/2021 | 5/21/2019 | 5/31/2020 |
| 736902 | 6370 Shannon Pkwy Apt 505 | Union City | GA | 30291 | Fulton | Y | 825 | | 10/1/2021 | 7/31/2021 | 6/30/2022 |
| 737019 | 6370 Shannon Pkwy Apt 506 | Union City | GA | 30291 | Fulton | Y | 775 | | 10/1/2021 | 9/1/2020 | 8/31/2021 |
| 737020 | 6370 Shannon Pkwy Apt 507 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 737021 | 6370 Shannon Pkwy Apt 508 | Union City | GA | 30291 | Fulton | Y | 925 | | 10/1/2021 | 2/3/2021 | 1/31/2022 |
| 737022 | 6370 Shannon Pkwy Apt 601 | Union City | GA | 30291 | Fulton | N | | | | | |
| 737023 | 6370 Shannon Pkwy Apt 602 | Union City | GA | 30291 | Fulton | N | | | | | |
| 737024 | 6370 Shannon Pkwy Apt 603 | Union City | GA | 30291 | Fulton | N | | | | | |
| 737025 | 6370 Shannon Pkwy Apt 604 | Union City | GA | 30291 | Fulton | N | | | | | |
| 736903 | 6370 Shannon Pkwy Apt 605 | Union City | GA | 30291 | Fulton | N | | | | | |
| 736904 | 6370 Shannon Pkwy Apt 606 | Union City | GA | 30291 | Fulton | N | | | | | |
| 736905 | 6370 Shannon Pkwy Apt 607 | Union City | GA | 30291 | Fulton | N | | | | | |
| 736906 | 6370 Shannon Pkwy Apt 608 | Union City | GA | 30291 | Fulton | N | | | | | |
| 736907 | 6370 Shannon Pkwy Apt 701 | Union City | GA | 30291 | Fulton | Y | 775 | | 10/1/2021 | 6/1/2019 | 5/31/2020 |
| 736908 | 6370 Shannon Pkwy Apt 702 | Union City | GA | 30291 | Fulton | Y | 700 | | 10/1/2021 | 6/1/2020 | 5/31/2021 |
| 736891 | 6370 Shannon Pkwy Apt 703 | Union City | GA | 30291 | Fulton | Y | 925 | | 10/1/2021 | 2/4/2021 | 1/31/2022 |
| 736909 | 6370 Shannon Pkwy Apt 704 | Union City | GA | 30291 | Fulton | Y | 825 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736910 | 6370 Shannon Pkwy Apt 705 | Union City | GA | 30291 | Fulton | Y | 825 | | 10/1/2021 | 7/1/2021 | 6/30/2022 |
| 736911 | 6370 Shannon Pkwy Apt 706 | Union City | GA | 30291 | Fulton | Y | 850 | | 10/1/2021 | 12/1/2020 | 11/30/2021 |
| 736912 | 6370 Shannon Pkwy Apt 801 | Union City | GA | 30291 | Fulton | Y | 950 | | 10/1/2021 | 10/27/2020 | 10/31/2021 |
| 736913 | 6370 Shannon Pkwy Apt 802 | Union City | GA | 30291 | Fulton | Y | 825 | | 10/1/2021 | 6/1/2021 | 5/31/2022 |
| 736914 | 6370 Shannon Pkwy Apt 803 | Union City | GA | 30291 | Fulton | Y | 975 | | 10/1/2021 | 8/1/2021 | 7/31/2022 |
| 736915 | 6370 Shannon Pkwy Apt 804 | Union City | GA | 30291 | Fulton | Y | 775 | 700 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736916 | 6370 Shannon Pkwy Apt 805 | Union City | GA | 30291 | Fulton | Y | 665 | | 10/1/2021 | 1/1/2021 | 12/31/2021 |
| 736917 | 6370 Shannon Pkwy Apt 806 | Union City | GA | 30291 | Fulton | Y | 775 | | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736918 | 6370 Shannon Pkwy Apt 807 | Union City | GA | 30291 | Fulton | Y | 775 | 700 | 10/1/2021 | 10/1/2021 | 9/30/2022 |
| 736892 | 6370 Shannon Pkwy Apt 808 | Union City | GA | 30291 | Fulton | Y | 775 | | 10/1/2021 | 11/1/2021 | 10/31/2022 |
| 736919 | 6370 Shannon Pkwy Apt 809 | Union City | GA | 30291 | Fulton | Y | 725 | | 10/1/2021 | 11/1/2020 | 10/31/2021 |
| 736920 | 6370 Shannon Pkwy Apt 901 | Union City | GA | 30291 | Fulton | Y | 875 | 800 | 10/1/2021 | 10/1/2021 | 9/30/2022 |

Exhibit A – Form of Rent Statement
#49332641_v1

| 736921 | 6370 Shannon Pkwy Apt 902 | Union City | GA | 30291 | Fulton | Y | 775 | | 10/1/2021 | 7/8/2020 | 6/30/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 736922 | 6370 Shannon Pkwy Apt 903 | Union City | GA | 30291 | Fulton | Y | 775 | | 10/1/2021 | 8/19/2020 | 7/31/2021 |
| 736923 | 6370 Shannon Pkwy Apt 904 | Union City | GA | 30291 | Fulton | Y | 775 | | 10/1/2021 | 5/1/2021 | 4/30/2022 |
| 736924 | 6370 Shannon Pkwy Apt 905 | Union City | GA | 30291 | Fulton | Y | 825 | | 10/1/2021 | 8/1/2021 | 7/31/2022 |
| 736925 | 6370 Shannon Pkwy Apt 906 | Union City | GA | 30291 | Fulton | Y | 875 | 500 | 10/1/2021 | 6/25/2021 | 5/31/2022 |
| 736926 | 6370 Shannon Pkwy Apt 907 | Union City | GA | 30291 | Fulton | Y | 675 | | 10/1/2021 | 12/1/2020 | 11/30/2021 |
| 736927 | 6370 Shannon Pkwy Apt 908 | Union City | GA | 30291 | Fulton | Y | 725 | | 10/1/2021 | 8/1/2021 | 7/31/2022 |
| 736928 | 6370 Shannon Pkwy Apt 909 | Union City | GA | 30291 | Fulton | Y | 675 | | 10/1/2021 | 4/13/2021 | 3/31/2022 |
| 736893 | 6370 Shannon Pkwy Apt 910 | Union City | GA | 30291 | Fulton | Y | 675 | | 10/1/2021 | 10/8/2020 | 9/30/2021 |
| 736990 | 6370 Shannon Pkwy Leasing Office 1 | Union City | GA | 30291 | Fulton | Y | | | 10/1/2021 | | |
| 736991 | 6370 Shannon Pkwy Leasing Office 2 | Union City | GA | 30291 | Fulton | Y | | | 10/1/2021 | | |
| 736988 | 6370 Shannon Pkwy Unit 99 (Laundry) | Union City | GA | 30291 | Fulton | Y | | | 10/1/2021 | | |

**EXHIBIT B**

Form of Request for Release

[_____] [__], 20[__]

COREVEST AMERICAN FINANCE LENDER LLC, a Delaware limited liability company (the "**Lender**").

From:   [_____], [_____] (the "**Borrower**")

Re: Loan Agreement, dated as of [_____], by and between Borrower and Lender (as amended, restated, supplemented or otherwise modified from time to time, the "**Agreement**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Agreement.

Borrower hereby gives notice of its intent to Transfer each of the Properties listed on **Annex I** hereto (collectively, the "**Release Properties**").  In connection with such Transfer, Borrower hereby certifies, as of the date hereof, the following:

(a)  enclosed herewith are true, correct and complete copies of each material agreement relating to the proposed Transfer, including any HUD-1 or other closing statements;

(b)  **Annex I** hereto sets forth for each Release Property the following:  (i) gross sales price (including any earnest money, down payment or similar deposit included in the total sales price paid by the purchaser of such Release Property), (ii) Transfer expenses, (iii) Transfer proceeds and (iv) the applicable **Release Price**;

(c)  the date of the proposed Transfer (the "**Transfer Date**") is [_____], 20[__];

(d)  as set forth on **Annex II** hereto, the Rent to Debt Service Ratio as of the last day of the most recent calendar month ended, after giving pro forma effect for the elimination of the Revenue for the applicable Release Property and reduction of the Monthly Debt Service Payment as determined by Lender pursuant to **Section 2.2(e)**, is at least equal to the greater of (i) the Required Rent to Debt Service Ratio and (ii) the Rent to Debt Service Ratio as of the last day of the most recent calendar month ended;

(e)  no Event of Default has occurred and is continuing [other than a Qualified Release Property Default that is applicable to [describe applicable Disqualified Property and include a statement of the Qualified Release Property Default], which Qualified Release Property Default will be cured as a result of the release of such Disqualified Property]; and

(f)  [the Release Property is being Transferred to a Person that is not a Restricted Party or an Affiliate of a Restricted Party, pursuant to a bona fide all-cash sale on arms-length terms and conditions][the Release Property is a Disqualified Property and the Transfer and release of such Disqualified Property will cure each Qualified Release Property Default with respect to such Disqualified Property and such Disqualified Property is being Transferred in consideration of cash equal to not less than the appraised value of the Property, as determined by Lender].

Borrower hereby requests that Lender provide a release with respect to the Release Properties.

**IN WITNESS WHEREOF**, Borrower has caused this certificate to be executed on its behalf this [__] day of [_____], 20[__].

[_____],
[_____]

Exhibit B – Form of Request for Release
#49332641_v1

By: _____
Name:
Title:

**ANNEX I**

**PROPERTIES TO BE TRANSFERRED**

| Unit Number | Property Address | Gross Transfer Proceeds | Transfer Expenses | Transfer Proceeds | Applicable Release Price |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

**ANNEX II**

**CALCULATION OF PRO FORMA RENT TO DEBT SERVICE RATIO**

A.      Numerator calculation

     1.   Revenues actually collected for the Properties for the twelve (12) completed, full calendar months prior to the date hereof[1]:      $_____

     2.   Revenues for the Properties released actually collected for the twelve (12) completed, full calendar months prior to the date hereof[1]:      $_____

     3.   Line A1 minus Line A2 (pro forma Revenue):      $_____

B.      Denominator calculation

     1.   Monthly Debt Service Payment, as of the Payment Date immediately preceding the date hereof, multiplied by twelve (12):      $_____

     2.   New Monthly Debt Service Payment, as adjusted pursuant to Section 2.2(e), multiplied by twelve (12):      $_____

C.      Pro Forma Rent to Debt Service Ratio (Line A3 ÷ Line B2)      _____ : 1.00

D.      Rent to Debt Service Ratio as of the last day of the most recent calendar month ended (Line A1 ÷ B1)      _____ : 1.00

E.      Required Rent to Debt Service Ratio:      1.80: 1.00

---

[1] If twelve (12) completed, full calendar months have not elapsed since the Closing Date, this amount shall be determined by annualizing Revenues actually collected by Borrower for the completed full calendar months occurring after the Closing Date.

**EXHIBIT C**

Required Insurance

1.  **Property & Business Income/Rental Value Insurance**. Borrower shall obtain for all Properties, their improvements and their personal property, an "All Risk" or Special Form policy using the most recent Insurance Services Offices (ISO) policy form DP3 (DP 00 03), its equivalent or better, with no exclusion or sublimit for theft, vandalism, malicious mischief, riot, civil commotion or vacancy, in each case without approval by Lender; such policy subject to the following:

(a)  Policy limit per occurrence equal to combined (i) and (ii) below and per the noted terms and conditions:

(i)  Insurance replacement cost value of the Properties per Marshall & Swift (or an equivalent insurance valuation tool, or as specified by Lender).  Such policy shall contain no coinsurance requirement and shall cover the cost to repair or replace (whichever is less) at the time and place of the loss with materials of like kind and quality, without deduction for depreciation and obsolescence.

(ii)  Business Income / Rental Value in an amount equal to one hundred percent (100%) of the aggregate projected net income plus continuing expenses from the operation of the Properties for a period of at least six (6) months after the date a Property is damaged or destroyed, in whole or in part. Such policy shall contain no coinsurance requirement and shall be written on (x) an actual loss sustained or (y) a business income basis.

(b)  Unless otherwise approved by Lender, for Blanket Limit Insurance (policies covering more than one Property), the per occurrence policy limit, if not 100% of the combined values of (i) and (ii) above for all covered Properties, shall be the greater of the Loan Amount or the highest combined values within a single postal code, but shall not be required to exceed $25,000,000.

(c)  If any Property is located in Florida or Hawaii or within 25 miles of the coast in Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Virginia or Texas, Borrower shall obtain for such Property coverage equal to the combined values of 1(a)(i) and (ii) above for windstorm (including named storm and hail) or an endorsement covering damage from windstorm (including named storm and hail).

(d)  For condominiums or townhomes where an association assumes responsibility for the Building Insurance, a Building Insurance policy must be in place at all times and all terms and conditions thereof must be satisfactory to Lender.  Unless otherwise approved by Lender, for Property located in Florida, Hawaii or within 25 miles of the coast in Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Virginia and Texas, the association must provide 100% Building Insurance replacement cost windstorm (including named storm and hail) coverage with deductible(s) not exceeding 10% of the Building full insurance replacement cost and twelve months Business Income/Rental Value.

(e)  No deductible in excess of (i) for a Loan Amount of $1,000,000 or less, up to 2.5% of the Loan Amount or (ii) for a Loan Amount greater than $1,000,000, up to $25,000 per occurrence for any and all damaged locations is allowed except the windstorm (including named storm and hail) deductible may be up to 10% of a damaged Property's combined total insurance value (replacement cost plus twelve (12) months business income/rental values) and in the case of a policy covering more than one Property for windstorm (including named storm and hail) be allowed a deductible of up to $250,000 per occurrence for any and all damaged Properties.  Upon approval by Lender, Borrower may utilize an aggregate deductible stop loss (additional self-insured retention in the form of an annual aggregate deductible) not to be eroded by windstorm (including named storm and hail), flood or earthquake with aggregate limits approved by Lender.

Exhibit C – Required Insurance
#49332641_v1

(f)  A Property located in a Special Flood Hazard Area (FEMA Flood Zone prefix "A" or "V") must be provided with either a National Flood Insurance Program (NFIP) policy or a private insurance equivalent policy compliant with the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, written at the maximum NFIP limit available for the Property.

2.  **Builder's Risk**.  During construction, renovation or structural repairs, if coverage is not included in the property insurance policy, Borrower shall obtain a separate so-called Builder's Risk completed value form policy (ISO form CP 00 20, its equivalent, or better) including coverage for all insurable hard and soft costs of construction on a non-reporting basis, including permission to occupy such Property and with coverage equivalent to that proscribed in (a)(i) and (a)(ii) above and without coinsurance.  In addition, if coverage is not included in the Commercial General Liability Policy, Borrower shall obtain a separate Owner Contractor's Protective Liability (ISO form CPO 00 09, its equivalent, or better).

3.  **Commercial General Liability (CGL) and Excess (Umbrella) Liability**.  Borrower shall obtain a primary commercial general liability policy against claims for personal injury, bodily injury, death or property damage occurring upon, in or about any Property.  Such insurance shall be at least as broad as ISO policy "occurrence" form CG 00 01 with a limit of at least $1,000,000 per occurrence and $2,000,000 in the aggregate "per location".  For loan amounts over $5,000,000, an umbrella or excess liability policy in an amount not less than $2,000,000 per occurrence and in the aggregate on terms consistent with the commercial general liability insurance policy is required.  The Lender may require a greater combined amount at any time so long as 30 days' written notice is provided for any required limit increase.  No deductible in excess of $5,000 per occurrence is allowed without approval by Lender.  Upon approval by Lender, Borrower may utilize an aggregate deductible stop loss (additional self-insured retention in the form of an annual aggregate deductible) with aggregate limits approved by Lender.

4.  **Auto**. If applicable, Borrower shall obtain automobile liability coverage for all owned and non-owned vehicles, including rented and leased vehicles, containing a minimum $1,000,000 limit per occurrence.

5.  **Worker's Compensation**. If applicable, Borrower shall obtain worker's compensation insurance subject to the worker's compensation laws of the applicable state, and employer's liability in amounts acceptable to Lender in respect of any work or operations on or about a Property, or in connection with a Property or its operation.

6.  **Other**. Upon sixty (60) days' written notice, (i) increases in the amounts of coverage required hereunder as may be reasonably requested by Lender taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices and (ii) such other reasonable insurance, and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for properties similar to the Properties located in or around the region in which Properties are located.

Exhibit C – Required Insurance
#49332641_v1

**EXHIBIT D**

Form of Officer's Certificate for Quarterly Reporting

[_____] [___], 20[___]

To:    COREVEST AMERICAN FINANCE LENDER LLC
4 Park Plaza, Suite 900
Irvine, CA 92614
Attention:  Head of Term Lending
Email:  termloannotices@cvest.com

Re:    Quarterly Financial Statements

Ladies and Gentlemen:

Reference is made to that certain Loan Agreement, dated as of [_____] (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and between [_____], [_____] (together with its permitted successors and assigns, collectively, "Borrower"), and COREVEST AMERICAN FINANCE LENDER LLC, a Delaware limited liability company (together with its permitted successors and assigns, collectively, "**Lender**").  Capitalized terms used in this Officer's Certificate have the meanings set forth in the Loan Agreement unless specifically defined herein.

Pursuant to **Section 6.11(b)** of the Loan Agreement, the undersigned officer of Borrower hereby certifies that:

1.    The financial information of Borrower required to be provided for the calendar [quarter][year] ended [March 31][June 30][September 30][December 31], 20[___] (the "**Calculation Date**") pursuant to **Section 6.11(b)** of the Loan Agreement, and the calculations attached as **Schedule 1** hereto, have been prepared in accordance with GAAP, consistently applied, and fairly present the financial condition of Borrower.

2.    Such officer has reviewed the terms of the Loan Agreement and has made, or caused to be made under his/her supervision, a review in reasonable detail of the transactions and condition of Borrower during the accounting period covered by the financial statements delivered pursuant to **Section 6.11(b)** of the Loan Agreement.

3.    Such officer has reviewed the financial condition of Sponsor and has made, or caused to be made under his/her supervision, a review in reasonable detail of the transactions and condition of Sponsor, and hereby certifies that Sponsor is in compliance with the Sponsor Financial Covenant as of the Calculation Date.

4.    Such review has not disclosed the existence on and as of the date hereof, and the undersigned does not have knowledge of the existence, as of the date hereof, of any event or condition that constitutes a Default or Event of Default, except for such conditions or events listed on **Schedule 2** hereto, specifying the nature and period of existence thereof and what action Borrower has taken, is taking, or proposes to take with respect thereto.

IN WITNESS WHEREOF, this Officer's Certificate is executed by the undersigned this _____ day of _____, 20__.

**[_____]**,

[_____]


By: _____
Name:
Title:

**Schedule 1**

Rent to Debt Service Ratio

**Schedule 2**

Events of Default

**SCHEDULE A**

Properties and Allocated Loan Amounts

| Asset ID | Address | City | State | Zip | County | ALA |
|---|---|---|---|---|---|---|
| 736929 | 6370 Shannon Pkwy Apt 1001 | Union City | GA | 30291 | Fulton | 9,450,000.00 |
| 736930 | 6370 Shannon Pkwy Apt 1002 | Union City | GA | 30291 | Fulton | |
| 736931 | 6370 Shannon Pkwy Apt 1003 | Union City | GA | 30291 | Fulton | |
| 736932 | 6370 Shannon Pkwy Apt 1004 | Union City | GA | 30291 | Fulton | |
| 736933 | 6370 Shannon Pkwy Apt 1005 | Union City | GA | 30291 | Fulton | |
| 736934 | 6370 Shannon Pkwy Apt 1006 | Union City | GA | 30291 | Fulton | |
| 736935 | 6370 Shannon Pkwy Apt 1007 | Union City | GA | 30291 | Fulton | |
| 736936 | 6370 Shannon Pkwy Apt 1008 | Union City | GA | 30291 | Fulton | |
| 736992 | 6370 Shannon Pkwy Apt 102 | Union City | GA | 30291 | Fulton | |
| 736993 | 6370 Shannon Pkwy Apt 103 | Union City | GA | 30291 | Fulton | |
| 736994 | 6370 Shannon Pkwy Apt 104 | Union City | GA | 30291 | Fulton | |
| 736995 | 6370 Shannon Pkwy Apt 105 | Union City | GA | 30291 | Fulton | |
| 736996 | 6370 Shannon Pkwy Apt 106 | Union City | GA | 30291 | Fulton | |
| 736890 | 6370 Shannon Pkwy Apt 107 | Union City | GA | 30291 | Fulton | |
| 736937 | 6370 Shannon Pkwy Apt 1101 | Union City | GA | 30291 | Fulton | |
| 736938 | 6370 Shannon Pkwy Apt 1102 | Union City | GA | 30291 | Fulton | |
| 736894 | 6370 Shannon Pkwy Apt 1103 | Union City | GA | 30291 | Fulton | |
| 736939 | 6370 Shannon Pkwy Apt 1104 | Union City | GA | 30291 | Fulton | |
| 736940 | 6370 Shannon Pkwy Apt 1105 | Union City | GA | 30291 | Fulton | |
| 736941 | 6370 Shannon Pkwy Apt 1106 | Union City | GA | 30291 | Fulton | |
| 736942 | 6370 Shannon Pkwy Apt 1107 | Union City | GA | 30291 | Fulton | |
| 736943 | 6370 Shannon Pkwy Apt 1108 | Union City | GA | 30291 | Fulton | |
| 736944 | 6370 Shannon Pkwy Apt 1109 | Union City | GA | 30291 | Fulton | |
| 736945 | 6370 Shannon Pkwy Apt 1110 | Union City | GA | 30291 | Fulton | |
| 736946 | 6370 Shannon Pkwy Apt 1201 | Union City | GA | 30291 | Fulton | |
| 736947 | 6370 Shannon Pkwy Apt 1202 | Union City | GA | 30291 | Fulton | |
| 736948 | 6370 Shannon Pkwy Apt 1203 | Union City | GA | 30291 | Fulton | |
| 736895 | 6370 Shannon Pkwy Apt 1204 | Union City | GA | 30291 | Fulton | |
| 736949 | 6370 Shannon Pkwy Apt 1205 | Union City | GA | 30291 | Fulton | |
| 736950 | 6370 Shannon Pkwy Apt 1206 | Union City | GA | 30291 | Fulton | |
| 736951 | 6370 Shannon Pkwy Apt 1207 | Union City | GA | 30291 | Fulton | |
| 736952 | 6370 Shannon Pkwy Apt 1208 | Union City | GA | 30291 | Fulton | |
| 736953 | 6370 Shannon Pkwy Apt 1301 | Union City | GA | 30291 | Fulton | |
| 736954 | 6370 Shannon Pkwy Apt 1302 | Union City | GA | 30291 | Fulton | |
| 736955 | 6370 Shannon Pkwy Apt 1303 | Union City | GA | 30291 | Fulton | |
| 736956 | 6370 Shannon Pkwy Apt 1304 | Union City | GA | 30291 | Fulton | |
| 736957 | 6370 Shannon Pkwy Apt 1305 | Union City | GA | 30291 | Fulton | |

| 736958 | 6370 Shannon Pkwy Apt 1306 | Union City | GA | 30291 | Fulton | |
|---|---|---|---|---|---|---|
| 736896 | 6370 Shannon Pkwy Apt 1307 | Union City | GA | 30291 | Fulton | |
| 736959 | 6370 Shannon Pkwy Apt 1401 | Union City | GA | 30291 | Fulton | |
| 736960 | 6370 Shannon Pkwy Apt 1402 | Union City | GA | 30291 | Fulton | |
| 736961 | 6370 Shannon Pkwy Apt 1403 | Union City | GA | 30291 | Fulton | |
| 736962 | 6370 Shannon Pkwy Apt 1404 | Union City | GA | 30291 | Fulton | |
| 736963 | 6370 Shannon Pkwy Apt 1405 | Union City | GA | 30291 | Fulton | |
| 736964 | 6370 Shannon Pkwy Apt 1406 | Union City | GA | 30291 | Fulton | |
| 736965 | 6370 Shannon Pkwy Apt 1407 | Union City | GA | 30291 | Fulton | |
| 736966 | 6370 Shannon Pkwy Apt 1408 | Union City | GA | 30291 | Fulton | |
| 736967 | 6370 Shannon Pkwy Apt 1501 | Union City | GA | 30291 | Fulton | |
| 736968 | 6370 Shannon Pkwy Apt 1502 | Union City | GA | 30291 | Fulton | |
| 736897 | 6370 Shannon Pkwy Apt 1503 | Union City | GA | 30291 | Fulton | |
| 736969 | 6370 Shannon Pkwy Apt 1504 | Union City | GA | 30291 | Fulton | |
| 736970 | 6370 Shannon Pkwy Apt 1505 | Union City | GA | 30291 | Fulton | |
| 736971 | 6370 Shannon Pkwy Apt 1506 | Union City | GA | 30291 | Fulton | |
| 736972 | 6370 Shannon Pkwy Apt 1507 | Union City | GA | 30291 | Fulton | |
| 736973 | 6370 Shannon Pkwy Apt 1601 | Union City | GA | 30291 | Fulton | |
| 736974 | 6370 Shannon Pkwy Apt 1602 | Union City | GA | 30291 | Fulton | |
| 736975 | 6370 Shannon Pkwy Apt 1603 | Union City | GA | 30291 | Fulton | |
| 736976 | 6370 Shannon Pkwy Apt 1604 | Union City | GA | 30291 | Fulton | |
| 736977 | 6370 Shannon Pkwy Apt 1605 | Union City | GA | 30291 | Fulton | |
| 736978 | 6370 Shannon Pkwy Apt 1606 | Union City | GA | 30291 | Fulton | |
| 736898 | 6370 Shannon Pkwy Apt 1607 | Union City | GA | 30291 | Fulton | |
| 736979 | 6370 Shannon Pkwy Apt 1608 | Union City | GA | 30291 | Fulton | |
| 736980 | 6370 Shannon Pkwy Apt 1701 | Union City | GA | 30291 | Fulton | |
| 736981 | 6370 Shannon Pkwy Apt 1702 | Union City | GA | 30291 | Fulton | |
| 736982 | 6370 Shannon Pkwy Apt 1703 | Union City | GA | 30291 | Fulton | |
| 736983 | 6370 Shannon Pkwy Apt 1704 | Union City | GA | 30291 | Fulton | |
| 736984 | 6370 Shannon Pkwy Apt 1705 | Union City | GA | 30291 | Fulton | |
| 736985 | 6370 Shannon Pkwy Apt 1706 | Union City | GA | 30291 | Fulton | |
| 736986 | 6370 Shannon Pkwy Apt 1707 | Union City | GA | 30291 | Fulton | |
| 736987 | 6370 Shannon Pkwy Apt 1708 | Union City | GA | 30291 | Fulton | |
| 736899 | 6370 Shannon Pkwy Apt 201 | Union City | GA | 30291 | Fulton | |
| 736989 | 6370 Shannon Pkwy Apt 202 | Union City | GA | 30291 | Fulton | |
| 736997 | 6370 Shannon Pkwy Apt 203 | Union City | GA | 30291 | Fulton | |
| 736998 | 6370 Shannon Pkwy Apt 204 | Union City | GA | 30291 | Fulton | |
| 736900 | 6370 Shannon Pkwy Apt 205 | Union City | GA | 30291 | Fulton | |
| 736999 | 6370 Shannon Pkwy Apt 206 | Union City | GA | 30291 | Fulton | |
| 737000 | 6370 Shannon Pkwy Apt 207 | Union City | GA | 30291 | Fulton | |
| 737001 | 6370 Shannon Pkwy Apt 208 | Union City | GA | 30291 | Fulton | |
| 737002 | 6370 Shannon Pkwy Apt 301 | Union City | GA | 30291 | Fulton | |
| 737003 | 6370 Shannon Pkwy Apt 302 | Union City | GA | 30291 | Fulton | |

Schedule A – Properties and Allocated Loan Amounts
#49332641_v1

| 737004 | 6370 Shannon Pkwy Apt 303 | Union City | GA | 30291 | Fulton | |
|---|---|---|---|---|---|---|
| 737005 | 6370 Shannon Pkwy Apt 304 | Union City | GA | 30291 | Fulton | |
| 737006 | 6370 Shannon Pkwy Apt 305 | Union City | GA | 30291 | Fulton | |
| 737007 | 6370 Shannon Pkwy Apt 306 | Union City | GA | 30291 | Fulton | |
| 737008 | 6370 Shannon Pkwy Apt 307 | Union City | GA | 30291 | Fulton | |
| 736901 | 6370 Shannon Pkwy Apt 308 | Union City | GA | 30291 | Fulton | |
| 737009 | 6370 Shannon Pkwy Apt 401 | Union City | GA | 30291 | Fulton | |
| 737010 | 6370 Shannon Pkwy Apt 402 | Union City | GA | 30291 | Fulton | |
| 737011 | 6370 Shannon Pkwy Apt 403 | Union City | GA | 30291 | Fulton | |
| 737012 | 6370 Shannon Pkwy Apt 404 | Union City | GA | 30291 | Fulton | |
| 737013 | 6370 Shannon Pkwy Apt 405 | Union City | GA | 30291 | Fulton | |
| 737014 | 6370 Shannon Pkwy Apt 406 | Union City | GA | 30291 | Fulton | |
| 737015 | 6370 Shannon Pkwy Apt 501 | Union City | GA | 30291 | Fulton | |
| 737016 | 6370 Shannon Pkwy Apt 502 | Union City | GA | 30291 | Fulton | |
| 737017 | 6370 Shannon Pkwy Apt 503 | Union City | GA | 30291 | Fulton | |
| 737018 | 6370 Shannon Pkwy Apt 504 | Union City | GA | 30291 | Fulton | |
| 736902 | 6370 Shannon Pkwy Apt 505 | Union City | GA | 30291 | Fulton | |
| 737019 | 6370 Shannon Pkwy Apt 506 | Union City | GA | 30291 | Fulton | |
| 737020 | 6370 Shannon Pkwy Apt 507 | Union City | GA | 30291 | Fulton | |
| 737021 | 6370 Shannon Pkwy Apt 508 | Union City | GA | 30291 | Fulton | |
| 737022 | 6370 Shannon Pkwy Apt 601 | Union City | GA | 30291 | Fulton | |
| 737023 | 6370 Shannon Pkwy Apt 602 | Union City | GA | 30291 | Fulton | |
| 737024 | 6370 Shannon Pkwy Apt 603 | Union City | GA | 30291 | Fulton | |
| 737025 | 6370 Shannon Pkwy Apt 604 | Union City | GA | 30291 | Fulton | |
| 736903 | 6370 Shannon Pkwy Apt 605 | Union City | GA | 30291 | Fulton | |
| 736904 | 6370 Shannon Pkwy Apt 606 | Union City | GA | 30291 | Fulton | |
| 736905 | 6370 Shannon Pkwy Apt 607 | Union City | GA | 30291 | Fulton | |
| 736906 | 6370 Shannon Pkwy Apt 608 | Union City | GA | 30291 | Fulton | |
| 736907 | 6370 Shannon Pkwy Apt 701 | Union City | GA | 30291 | Fulton | |
| 736908 | 6370 Shannon Pkwy Apt 702 | Union City | GA | 30291 | Fulton | |
| 736891 | 6370 Shannon Pkwy Apt 703 | Union City | GA | 30291 | Fulton | |
| 736909 | 6370 Shannon Pkwy Apt 704 | Union City | GA | 30291 | Fulton | |
| 736910 | 6370 Shannon Pkwy Apt 705 | Union City | GA | 30291 | Fulton | |
| 736911 | 6370 Shannon Pkwy Apt 706 | Union City | GA | 30291 | Fulton | |
| 736912 | 6370 Shannon Pkwy Apt 801 | Union City | GA | 30291 | Fulton | |
| 736913 | 6370 Shannon Pkwy Apt 802 | Union City | GA | 30291 | Fulton | |
| 736914 | 6370 Shannon Pkwy Apt 803 | Union City | GA | 30291 | Fulton | |
| 736915 | 6370 Shannon Pkwy Apt 804 | Union City | GA | 30291 | Fulton | |
| 736916 | 6370 Shannon Pkwy Apt 805 | Union City | GA | 30291 | Fulton | |
| 736917 | 6370 Shannon Pkwy Apt 806 | Union City | GA | 30291 | Fulton | |
| 736918 | 6370 Shannon Pkwy Apt 807 | Union City | GA | 30291 | Fulton | |
| 736892 | 6370 Shannon Pkwy Apt 808 | Union City | GA | 30291 | Fulton | |
| 736919 | 6370 Shannon Pkwy Apt 809 | Union City | GA | 30291 | Fulton | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 736920 | 6370 Shannon Pkwy Apt 901 | Union City | GA | 30291 | Fulton | |
| 736921 | 6370 Shannon Pkwy Apt 902 | Union City | GA | 30291 | Fulton | |
| 736922 | 6370 Shannon Pkwy Apt 903 | Union City | GA | 30291 | Fulton | |
| 736923 | 6370 Shannon Pkwy Apt 904 | Union City | GA | 30291 | Fulton | |
| 736924 | 6370 Shannon Pkwy Apt 905 | Union City | GA | 30291 | Fulton | |
| 736925 | 6370 Shannon Pkwy Apt 906 | Union City | GA | 30291 | Fulton | |
| 736926 | 6370 Shannon Pkwy Apt 907 | Union City | GA | 30291 | Fulton | |
| 736927 | 6370 Shannon Pkwy Apt 908 | Union City | GA | 30291 | Fulton | |
| 736928 | 6370 Shannon Pkwy Apt 909 | Union City | GA | 30291 | Fulton | |
| 736893 | 6370 Shannon Pkwy Apt 910 | Union City | GA | 30291 | Fulton | |
| 736990 | 6370 Shannon Pkwy Leasing Office 1 | Union City | GA | 30291 | Fulton | |
| 736991 | 6370 Shannon Pkwy Leasing Office 2 | Union City | GA | 30291 | Fulton | |
| 736988 | 6370 Shannon Pkwy Unit 99 (Laundry) | Union City | GA | 30291 | Fulton | |

9,450,000.00

Schedule A – Properties and Allocated Loan Amounts
#49332641_v1

**SCHEDULE B**

Exception Report

The Property is 136 units.

**SCHEDULE C**

Capital Expenditure Reserve Amounts

| ID | Address | City | State | Zip | County | Monthly Cap Ex | Yearly Cap Ex | Initial Cap Ex |
|---|---|---|---|---|---|---|---|---|
| 736929 | 6370 Shannon Pkwy Apt 1001 | Union City | GA | 30291 | Fulton | 3,650.00 | 43,800.00 | 7,300.00 |
| 736930 | 6370 Shannon Pkwy Apt 1002 | Union City | GA | 30291 | Fulton | | | |
| 736931 | 6370 Shannon Pkwy Apt 1003 | Union City | GA | 30291 | Fulton | | | |
| 736932 | 6370 Shannon Pkwy Apt 1004 | Union City | GA | 30291 | Fulton | | | |
| 736933 | 6370 Shannon Pkwy Apt 1005 | Union City | GA | 30291 | Fulton | | | |
| 736934 | 6370 Shannon Pkwy Apt 1006 | Union City | GA | 30291 | Fulton | | | |
| 736935 | 6370 Shannon Pkwy Apt 1007 | Union City | GA | 30291 | Fulton | | | |
| 736936 | 6370 Shannon Pkwy Apt 1008 | Union City | GA | 30291 | Fulton | | | |
| 736992 | 6370 Shannon Pkwy Apt 102 | Union City | GA | 30291 | Fulton | | | |
| 736993 | 6370 Shannon Pkwy Apt 103 | Union City | GA | 30291 | Fulton | | | |
| 736994 | 6370 Shannon Pkwy Apt 104 | Union City | GA | 30291 | Fulton | | | |
| 736995 | 6370 Shannon Pkwy Apt 105 | Union City | GA | 30291 | Fulton | | | |
| 736996 | 6370 Shannon Pkwy Apt 106 | Union City | GA | 30291 | Fulton | | | |
| 736890 | 6370 Shannon Pkwy Apt 107 | Union City | GA | 30291 | Fulton | | | |
| 736937 | 6370 Shannon Pkwy Apt 1101 | Union City | GA | 30291 | Fulton | | | |
| 736938 | 6370 Shannon Pkwy Apt 1102 | Union City | GA | 30291 | Fulton | | | |
| 736894 | 6370 Shannon Pkwy Apt 1103 | Union City | GA | 30291 | Fulton | | | |
| 736939 | 6370 Shannon Pkwy Apt 1104 | Union City | GA | 30291 | Fulton | | | |
| 736940 | 6370 Shannon Pkwy Apt 1105 | Union City | GA | 30291 | Fulton | | | |
| 736941 | 6370 Shannon Pkwy Apt 1106 | Union City | GA | 30291 | Fulton | | | |
| 736942 | 6370 Shannon Pkwy Apt 1107 | Union City | GA | 30291 | Fulton | | | |
| 736943 | 6370 Shannon Pkwy Apt 1108 | Union City | GA | 30291 | Fulton | | | |
| 736944 | 6370 Shannon Pkwy Apt 1109 | Union City | GA | 30291 | Fulton | | | |
| 736945 | 6370 Shannon Pkwy Apt 1110 | Union City | GA | 30291 | Fulton | | | |
| 736946 | 6370 Shannon Pkwy Apt 1201 | Union City | GA | 30291 | Fulton | | | |
| 736947 | 6370 Shannon Pkwy Apt 1202 | Union City | GA | 30291 | Fulton | | | |
| 736948 | 6370 Shannon Pkwy Apt 1203 | Union City | GA | 30291 | Fulton | | | |
| 736895 | 6370 Shannon Pkwy Apt 1204 | Union City | GA | 30291 | Fulton | | | |
| 736949 | 6370 Shannon Pkwy Apt 1205 | Union City | GA | 30291 | Fulton | | | |
| 736950 | 6370 Shannon Pkwy Apt 1206 | Union City | GA | 30291 | Fulton | | | |
| 736951 | 6370 Shannon Pkwy Apt 1207 | Union City | GA | 30291 | Fulton | | | |
| 736952 | 6370 Shannon Pkwy Apt 1208 | Union City | GA | 30291 | Fulton | | | |
| 736953 | 6370 Shannon Pkwy Apt 1301 | Union City | GA | 30291 | Fulton | | | |
| 736954 | 6370 Shannon Pkwy Apt 1302 | Union City | GA | 30291 | Fulton | | | |
| 736955 | 6370 Shannon Pkwy Apt 1303 | Union City | GA | 30291 | Fulton | | | |
| 736956 | 6370 Shannon Pkwy Apt 1304 | Union City | GA | 30291 | Fulton | | | |
| 736957 | 6370 Shannon Pkwy Apt 1305 | Union City | GA | 30291 | Fulton | | | |
| 736958 | 6370 Shannon Pkwy Apt 1306 | Union City | GA | 30291 | Fulton | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 736896 | 6370 Shannon Pkwy Apt 1307 | Union City | GA | 30291 | Fulton | | | |
| 736959 | 6370 Shannon Pkwy Apt 1401 | Union City | GA | 30291 | Fulton | | | |
| 736960 | 6370 Shannon Pkwy Apt 1402 | Union City | GA | 30291 | Fulton | | | |
| 736961 | 6370 Shannon Pkwy Apt 1403 | Union City | GA | 30291 | Fulton | | | |
| 736962 | 6370 Shannon Pkwy Apt 1404 | Union City | GA | 30291 | Fulton | | | |
| 736963 | 6370 Shannon Pkwy Apt 1405 | Union City | GA | 30291 | Fulton | | | |
| 736964 | 6370 Shannon Pkwy Apt 1406 | Union City | GA | 30291 | Fulton | | | |
| 736965 | 6370 Shannon Pkwy Apt 1407 | Union City | GA | 30291 | Fulton | | | |
| 736966 | 6370 Shannon Pkwy Apt 1408 | Union City | GA | 30291 | Fulton | | | |
| 736967 | 6370 Shannon Pkwy Apt 1501 | Union City | GA | 30291 | Fulton | | | |
| 736968 | 6370 Shannon Pkwy Apt 1502 | Union City | GA | 30291 | Fulton | | | |
| 736897 | 6370 Shannon Pkwy Apt 1503 | Union City | GA | 30291 | Fulton | | | |
| 736969 | 6370 Shannon Pkwy Apt 1504 | Union City | GA | 30291 | Fulton | | | |
| 736970 | 6370 Shannon Pkwy Apt 1505 | Union City | GA | 30291 | Fulton | | | |
| 736971 | 6370 Shannon Pkwy Apt 1506 | Union City | GA | 30291 | Fulton | | | |
| 736972 | 6370 Shannon Pkwy Apt 1507 | Union City | GA | 30291 | Fulton | | | |
| 736973 | 6370 Shannon Pkwy Apt 1601 | Union City | GA | 30291 | Fulton | | | |
| 736974 | 6370 Shannon Pkwy Apt 1602 | Union City | GA | 30291 | Fulton | | | |
| 736975 | 6370 Shannon Pkwy Apt 1603 | Union City | GA | 30291 | Fulton | | | |
| 736976 | 6370 Shannon Pkwy Apt 1604 | Union City | GA | 30291 | Fulton | | | |
| 736977 | 6370 Shannon Pkwy Apt 1605 | Union City | GA | 30291 | Fulton | | | |
| 736978 | 6370 Shannon Pkwy Apt 1606 | Union City | GA | 30291 | Fulton | | | |
| 736898 | 6370 Shannon Pkwy Apt 1607 | Union City | GA | 30291 | Fulton | | | |
| 736979 | 6370 Shannon Pkwy Apt 1608 | Union City | GA | 30291 | Fulton | | | |
| 736980 | 6370 Shannon Pkwy Apt 1701 | Union City | GA | 30291 | Fulton | | | |
| 736981 | 6370 Shannon Pkwy Apt 1702 | Union City | GA | 30291 | Fulton | | | |
| 736982 | 6370 Shannon Pkwy Apt 1703 | Union City | GA | 30291 | Fulton | | | |
| 736983 | 6370 Shannon Pkwy Apt 1704 | Union City | GA | 30291 | Fulton | | | |
| 736984 | 6370 Shannon Pkwy Apt 1705 | Union City | GA | 30291 | Fulton | | | |
| 736985 | 6370 Shannon Pkwy Apt 1706 | Union City | GA | 30291 | Fulton | | | |
| 736986 | 6370 Shannon Pkwy Apt 1707 | Union City | GA | 30291 | Fulton | | | |
| 736987 | 6370 Shannon Pkwy Apt 1708 | Union City | GA | 30291 | Fulton | | | |
| 736899 | 6370 Shannon Pkwy Apt 201 | Union City | GA | 30291 | Fulton | | | |
| 736989 | 6370 Shannon Pkwy Apt 202 | Union City | GA | 30291 | Fulton | | | |
| 736997 | 6370 Shannon Pkwy Apt 203 | Union City | GA | 30291 | Fulton | | | |
| 736998 | 6370 Shannon Pkwy Apt 204 | Union City | GA | 30291 | Fulton | | | |
| 736900 | 6370 Shannon Pkwy Apt 205 | Union City | GA | 30291 | Fulton | | | |
| 736999 | 6370 Shannon Pkwy Apt 206 | Union City | GA | 30291 | Fulton | | | |
| 737000 | 6370 Shannon Pkwy Apt 207 | Union City | GA | 30291 | Fulton | | | |
| 737001 | 6370 Shannon Pkwy Apt 208 | Union City | GA | 30291 | Fulton | | | |
| 737002 | 6370 Shannon Pkwy Apt 301 | Union City | GA | 30291 | Fulton | | | |
| 737003 | 6370 Shannon Pkwy Apt 302 | Union City | GA | 30291 | Fulton | | | |
| 737004 | 6370 Shannon Pkwy Apt 303 | Union City | GA | 30291 | Fulton | | | |

Schedule C – Capital Expenditure Reserve Amounts
#49332641_v1

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 737005 | 6370 Shannon Pkwy Apt 304 | Union City | GA | 30291 | Fulton | | | |
| 737006 | 6370 Shannon Pkwy Apt 305 | Union City | GA | 30291 | Fulton | | | |
| 737007 | 6370 Shannon Pkwy Apt 306 | Union City | GA | 30291 | Fulton | | | |
| 737008 | 6370 Shannon Pkwy Apt 307 | Union City | GA | 30291 | Fulton | | | |
| 736901 | 6370 Shannon Pkwy Apt 308 | Union City | GA | 30291 | Fulton | | | |
| 737009 | 6370 Shannon Pkwy Apt 401 | Union City | GA | 30291 | Fulton | | | |
| 737010 | 6370 Shannon Pkwy Apt 402 | Union City | GA | 30291 | Fulton | | | |
| 737011 | 6370 Shannon Pkwy Apt 403 | Union City | GA | 30291 | Fulton | | | |
| 737012 | 6370 Shannon Pkwy Apt 404 | Union City | GA | 30291 | Fulton | | | |
| 737013 | 6370 Shannon Pkwy Apt 405 | Union City | GA | 30291 | Fulton | | | |
| 737014 | 6370 Shannon Pkwy Apt 406 | Union City | GA | 30291 | Fulton | | | |
| 737015 | 6370 Shannon Pkwy Apt 501 | Union City | GA | 30291 | Fulton | | | |
| 737016 | 6370 Shannon Pkwy Apt 502 | Union City | GA | 30291 | Fulton | | | |
| 737017 | 6370 Shannon Pkwy Apt 503 | Union City | GA | 30291 | Fulton | | | |
| 737018 | 6370 Shannon Pkwy Apt 504 | Union City | GA | 30291 | Fulton | | | |
| 736902 | 6370 Shannon Pkwy Apt 505 | Union City | GA | 30291 | Fulton | | | |
| 737019 | 6370 Shannon Pkwy Apt 506 | Union City | GA | 30291 | Fulton | | | |
| 737020 | 6370 Shannon Pkwy Apt 507 | Union City | GA | 30291 | Fulton | | | |
| 737021 | 6370 Shannon Pkwy Apt 508 | Union City | GA | 30291 | Fulton | | | |
| 737022 | 6370 Shannon Pkwy Apt 601 | Union City | GA | 30291 | Fulton | | | |
| 737023 | 6370 Shannon Pkwy Apt 602 | Union City | GA | 30291 | Fulton | | | |
| 737024 | 6370 Shannon Pkwy Apt 603 | Union City | GA | 30291 | Fulton | | | |
| 737025 | 6370 Shannon Pkwy Apt 604 | Union City | GA | 30291 | Fulton | | | |
| 736903 | 6370 Shannon Pkwy Apt 605 | Union City | GA | 30291 | Fulton | | | |
| 736904 | 6370 Shannon Pkwy Apt 606 | Union City | GA | 30291 | Fulton | | | |
| 736905 | 6370 Shannon Pkwy Apt 607 | Union City | GA | 30291 | Fulton | | | |
| 736906 | 6370 Shannon Pkwy Apt 608 | Union City | GA | 30291 | Fulton | | | |
| 736907 | 6370 Shannon Pkwy Apt 701 | Union City | GA | 30291 | Fulton | | | |
| 736908 | 6370 Shannon Pkwy Apt 702 | Union City | GA | 30291 | Fulton | | | |
| 736891 | 6370 Shannon Pkwy Apt 703 | Union City | GA | 30291 | Fulton | | | |
| 736909 | 6370 Shannon Pkwy Apt 704 | Union City | GA | 30291 | Fulton | | | |
| 736910 | 6370 Shannon Pkwy Apt 705 | Union City | GA | 30291 | Fulton | | | |
| 736911 | 6370 Shannon Pkwy Apt 706 | Union City | GA | 30291 | Fulton | | | |
| 736912 | 6370 Shannon Pkwy Apt 801 | Union City | GA | 30291 | Fulton | | | |
| 736913 | 6370 Shannon Pkwy Apt 802 | Union City | GA | 30291 | Fulton | | | |
| 736914 | 6370 Shannon Pkwy Apt 803 | Union City | GA | 30291 | Fulton | | | |
| 736915 | 6370 Shannon Pkwy Apt 804 | Union City | GA | 30291 | Fulton | | | |
| 736916 | 6370 Shannon Pkwy Apt 805 | Union City | GA | 30291 | Fulton | | | |
| 736917 | 6370 Shannon Pkwy Apt 806 | Union City | GA | 30291 | Fulton | | | |
| 736918 | 6370 Shannon Pkwy Apt 807 | Union City | GA | 30291 | Fulton | | | |
| 736892 | 6370 Shannon Pkwy Apt 808 | Union City | GA | 30291 | Fulton | | | |
| 736919 | 6370 Shannon Pkwy Apt 809 | Union City | GA | 30291 | Fulton | | | |
| 736920 | 6370 Shannon Pkwy Apt 901 | Union City | GA | 30291 | Fulton | | | |

Schedule C – Capital Expenditure Reserve Amounts
#49332641_v1

| 736921 | 6370 Shannon Pkwy Apt 902 | Union City | GA | 30291 | Fulton | | | |
|---|---|---|---|---|---|---|---|---|
| 736922 | 6370 Shannon Pkwy Apt 903 | Union City | GA | 30291 | Fulton | | | |
| 736923 | 6370 Shannon Pkwy Apt 904 | Union City | GA | 30291 | Fulton | | | |
| 736924 | 6370 Shannon Pkwy Apt 905 | Union City | GA | 30291 | Fulton | | | |
| 736925 | 6370 Shannon Pkwy Apt 906 | Union City | GA | 30291 | Fulton | | | |
| 736926 | 6370 Shannon Pkwy Apt 907 | Union City | GA | 30291 | Fulton | | | |
| 736927 | 6370 Shannon Pkwy Apt 908 | Union City | GA | 30291 | Fulton | | | |
| 736928 | 6370 Shannon Pkwy Apt 909 | Union City | GA | 30291 | Fulton | | | |
| 736893 | 6370 Shannon Pkwy Apt 910 | Union City | GA | 30291 | Fulton | | | |
| 736990 | 6370 Shannon Pkwy Leasing Office 1 | Union City | GA | 30291 | Fulton | | | |
| 736991 | 6370 Shannon Pkwy Leasing Office 2 | Union City | GA | 30291 | Fulton | | | |
| 736988 | 6370 Shannon Pkwy Unit 99 (Laundry) | Union City | GA | 30291 | Fulton | | | |
| | | | | | | 3,650.00 | 43,800.00 | 7,300.00 |

Schedule C – Capital Expenditure Reserve Amounts
#49332641_v1

**SCHEDULE D**

Definition of Special Purpose Entity

"**Special Purpose Entity**" means a limited liability company that, since the date of its formation and at all times on and after the date thereof, has complied with and shall at all times comply with the following requirements unless it has received either prior consent to do otherwise from Lender, or, while the Loan is securitized, a Rating Agency Confirmation from each of the Rating Agencies:

(a)     Borrower (i) has been, is, and will be organized solely for the purpose of acquiring, renovating, rehabilitating, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Properties, entering into and performing its obligations under the Loan Documents to which it is a party, refinancing the Properties in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, and (ii) has not owned, does not own, and will not own any asset or property other than (A) the Properties, and (B) incidental personal property necessary for the ownership or operation of the Properties.

(b)     Pledgor (i) has been, is, and will be organized solely for the purpose of acting as the sole member of Borrower, executing the Loan Documents to which it is a party and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, and (ii) has not owned, does not own, and will not own any asset or property other than its membership interest in Borrower.

(c)     Borrower has not engaged and will not engage in any business other than the acquisition, renovation, rehabilitation, ownership, management and operation of the Properties and Borrower will conduct and operate its business as presently conducted and operated.

(d)     Pledgor has not engaged and will not engage in any business other than acting as the member of Borrower and Pledgor will conduct and operate its business as presently conducted and operated.

(e)     Each Loan Party has not and will not enter into any contract or agreement with any Affiliate of such Loan Party except upon commercially reasonable terms and conditions that are comparable to those of an arms-length basis with third parties who are not Affiliates.

(f)     Each Loan Party has not incurred and will not incur any Debt other than, with respect to Borrower, Permitted Debt, and with respect to Pledgor, Pledgor Permitted Debt. No Debt other than the Indebtedness may be secured (senior, subordinate or *pari passu*) by the Collateral.

(g)     Each Loan Party has not made and will not make any loans or advances to any third party (including any Affiliate or constituent party), and has not and shall not acquire obligations or securities of its Affiliates.

(h)     Each Loan Party has been, is, and intends to remain Solvent and each Loan Party has paid and intends to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of any Loan Party to make any additional capital contributions to such Loan Party.

(i)      Each Loan Party has done or caused to be done, and will do, all things necessary to observe organizational formalities and preserve its existence, and no Loan Party will, nor will such Loan Party permit any Person to, (i) terminate or fail to comply with the provisions of its organizational documents, or (ii) unless (A) Lender has consented and (B) following a Secondary Market Transaction, the applicable Rating Agencies have issued a Rating Agency Confirmation in connection therewith, amend, modify or otherwise change its partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents.

(j)      Each Loan Party has maintained and will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any other Person. No Loan Party's assets will be listed as assets on the financial statement of any other Person, provided, however, that a Loan Party's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of such Loan Party and such Affiliates and to indicate that such Loan Party's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person, and (ii) such assets shall be listed on such Loan Party's own separate balance sheet.  Except to the extent that such Loan Party is treated as a "disregarded entity" for tax purposes and is not required to file tax returns under applicable law, each Loan Party will file its own tax returns (to the extent such Loan Party is required to file any such tax returns) and will not file a consolidated, combined or unitary income tax return (as provided for in IRC Sec. 1501 or any applicable state or local law) with any other Person.  Each Loan Party has maintained and shall maintain its books, records, resolutions and agreements in accordance with this Agreement.

(k)      Each Loan Party has been, will be, and at all times has held and will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of such Loan Party or any constituent party of such Loan Party), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its Affiliates as a division or department or part of the other and shall maintain and utilize separate stationery, invoices and checks bearing its own name.

(l)      Each Loan Party has maintained and intends to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of any Loan Party to make any additional capital contributions to such Loan Party.

(m)      No Loan Party or any constituent party of such Loan Party has sought or will seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of such Loan Party.

(n)      No Loan Party has or will commingle the funds and other assets of such Loan Party with those of any Affiliate or constituent party or any other Person, and has held and will hold all of its assets in its own name.

(o)      Each Loan Party has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person.

(p)    No Loan Party has or will assume or guarantee or become obligated for the debts of any other Person (other than other Loan Parties) and no Loan Party has or will hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person (other than other Loan Parties), except, in each case, as contemplated by this Agreement or the other Loan Documents.

(q)    The organizational documents of each Loan Party shall also provide an express acknowledgment that Lender is an intended third-party beneficiary of the "special purpose" provisions of such organizational documents.

(r)    Notwithstanding anything herein to the contrary, each Loan Party shall be a Delaware single-member limited liability company satisfying the requirements below:

(i)    the organizational documents shall provide that, as long as any portion of the Obligations remains outstanding, upon the occurrence of any event that causes the sole member ("**Sole Member**") of such limited liability company to cease to be a member of such limited liability company (other than (i) upon an assignment by Sole Member of all of its limited liability company interest in the limited liability company and the admission of the transferee, if permitted pursuant to the organizational documents and the Loan Documents or (ii) the resignation of Sole Member and the admission of an additional member to the limited liability company, if permitted pursuant to the organizational documents and the Loan Documents), a Person shall, without any action of any Person and simultaneously with Sole Member ceasing to be a member of such limited liability company, automatically be admitted as the member of the limited liability company (a "**Special Member**") and shall preserve and continue the existence of the limited liability company without dissolution.  The organizational documents of the limited liability company shall further provide that for so long as any portion of the Obligations is outstanding, no Special Member may resign or transfer its rights as a Special Member unless a successor Special Member has been admitted to the limited liability company as a Special Member.

(ii)    The organizational documents of the limited liability company shall provide that, as long as any portion of the Obligations remains outstanding, except as expressly permitted pursuant to the terms of this Agreement, (x) Sole Member may not resign, and (y) no additional member shall be admitted to the limited liability company; and

(iii)    the organizational documents of the limited liability company shall provide that, as long as any portion of the Obligations remains outstanding: (A) the limited liability company shall be dissolved, and its affairs shall be wound up, only upon the first to occur of the following: (1) the termination of the legal existence of the last remaining member of the limited liability company or the occurrence of any other event which terminates the continued membership of the last remaining member of the limited liability company unless the business of the limited liability company is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the "**Act**"), or (2) the entry of a decree of judicial dissolution under Section 18-802 of the Act; (B) upon the occurrence of any event that causes the last remaining member of the limited liability company to cease to be a member of the limited liability company or that causes Sole Member to cease to be a member of the limited liability company (other than (1) upon an assignment by Sole Member of all of its limited liability company interest in the limited liability company and the admission of the transferee, if permitted pursuant to the

organizational documents and the Loan Documents, or (2) the resignation of Sole Member and the admission of an additional member of the limited liability company, if permitted pursuant to the organizational documents and the Loan Documents), to the fullest extent permitted by law, the personal representative of such last remaining member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in the limited liability company, agree in writing (a) to continue the existence of the limited liability company, and (b) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the limited liability company, effective as of the occurrence of the event that terminated the continued membership of such member in the limited liability company; (C) the bankruptcy of Sole Member or a Special Member shall not cause such Sole Member or Special Member, respectively, to cease to be a member of the limited liability company and upon the occurrence of such an event, the business of the limited liability company shall continue without dissolution; (D) that in the event of the dissolution of the limited liability company, the limited liability company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the limited liability company in an orderly manner), and the assets of the limited liability company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; and (E) that to the fullest extent permitted by law, each of Sole Member and the Special Member shall irrevocably waive any right or power that they might have to cause the limited liability company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the limited liability company, to compel any sale of all or any portion of the assets of the limited liability company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the limited liability company.

(s)    No Loan Party has permitted or will permit any Affiliate (except an Approved Manager pursuant to a Management Agreement entered into in accordance with this Agreement) or constituent party independent access to its bank accounts.

(t)    Each Loan Party has paid and intends to pay its own liabilities and expenses, including the salaries of its own employees (if any) from its own funds, and has maintained and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of any Loan Party to make any additional capital contributions to such Loan Party.

(u)    Each Loan Party has compensated and shall compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of any Loan Party to make any additional capital contributions to such Loan Party.

(v)    Each Loan Party has allocated and will allocate fairly and reasonably any overhead expenses that are shared with any Affiliate, including shared office space.

(w)    Except in connection with the Loan, no Loan Party has pledged and no Loan Party will pledge its assets for the benefit of any other Person.

(x)    No Loan Party has and no Loan Party will have any obligation to indemnify its officers, directors, members or partners, as the case may be, unless such an obligation is fully

subordinated to the Indebtedness and will not constitute a claim against it if cash flow in excess of the amount required to pay the Indebtedness is insufficient to pay such obligation.

(y)     If such Loan Party is (i) a limited liability company, has articles of organization, a certificate of formation and/or an operating agreement, as applicable, (ii) a limited partnership, has a limited partnership agreement, or (iii) a corporation, has a certificate of incorporation or articles that, in each case, provide that such entity will not:  (A) dissolve, merge, liquidate, consolidate; (B) sell, transfer, dispose, or encumber (except with respect to the Loan Documents) all or substantially all of its assets or acquire all or substantially all of the assets of any Person; or (C) engage in any other business activity, or amend its organizational documents with respect to the matters set forth on this **Schedule D** without the consent of Lender.

(z)     No Loan Party has, does or will have any of its obligations guaranteed by an Affiliate (other than by the Pledgor Guaranty and the Sponsor Guaranty with respect to the Loan).